**MIDN MORGAN MITCHELL**
**300 Steamboat Road**
**Kings Point, New York 11024**

October 29, 2025

**Via Email (flynnc@usmma.edu)**
Acting Superintendent Captain Anthony J. Ceraolo
United States Merchant Marine Academy
300 Steamboat Road
Kings Point, New York 11024

Re: <u>Consideration Statement After Honor Board Determination</u>

Dear Superintendent Ceraolo:

## INTRODUCTION

This letter will serve as my statement pursuant to Superintendent Instruction 2024-07 for the Honor Manual ("Honor Code") Section 4.8.1., which provides me with the right to submit a statement to the Superintendent for reconsideration of the determination that I should be setback to the Class of 2027. As set forth in the Honor Code reconsideration is warranted if: "There were procedural errors in the case or in the interpretation of the Honor Code serious enough to deny the Midshipman a fair investigation and/or hearing" **or** "The severity of the sanction is disproportionate to the violation(s) committed in accordance with the Honor Code."

A review of the totality of the circumstances demonstrates that both grounds exist in this matter. As set forth in more detail below, there were multiple procedural errors relating to my case. First, prior to the September 25, 2025 Honor Board Hearing (the "Honor Board") I was advised that I was prohibited from using any "new evidence" at the Honor Board unless I agreed that the honor staff could reopen the investigation against me. Critically, however, this "Hobson's Choice" is in direct violation of Honor Code Section 4.6.4, which specifically affords me with the right to present new evidence at the Honor Board:

> <u>Objections to Evidence</u>. At the time the evidence is presented to the voting members during the hearing, the accused will be given an opportunity to object to anything contained therein. The rules of evidence for judicial proceedings do not apply to Honor Board proceedings. The presiding officer will consult with the Honor Staff Advisor and rule on objections to evidence. **Additionally, the presiding officer <u>will allow</u> the accused to present *any new evidence* to be considered at the hearing** (emphasis added).

Critically, because of this improper restriction placed on me, I withheld at the Honor Board presenting evidence that would have been beneficial to my defense, such as the testimony of Midshipmen who would corroborate my position.

Second, in violation of Honor Code Section 4.5.12., it is evident that my right to confidentiality was breached.

Third, in violation of Code Section 4.5.14., the documents that I received prior to the Honor Board confirm that I have not been provided with all interviews that were taken. In fact, I was only provided with six interviews, even though it is evident that many more interviews were conducted. Moreover, surprisingly, the only interviews ever provided have information that is against me even though I am certain that there were other interviews taken where the individual interviewed provided information that was supportive of my position. Simply put, it is obvious that the investigation intentionally withheld information that could have been used by me in my defense in blatant violation of Code Section 4.3.3.

Fourth, the Honor Board relied upon what were described as incriminating "statements" made about me by certain Midshipmen. Significantly, however, in actuality, there were no statements made by such Midshipmen. Rather, the "evidence" used against me consists of what purport to be MIDN Solmos' notes from interviewing these Midshipman. MIDN Solmos' notes are not signed as accurate by any Midshipman and are nothing more than blatant hearsay. And, one of the issues pertaining to my prior board hearing was the perception that MIDN Solmos had an improper bias against me, which completely taints the accuracy of his notes.

Fifth, the exact charges against me were not clearly explained. More specifically, it was my understanding that I was accused of lying about being aware of the presence of alcohol during a soccer team movement ("TM"). I later learned, however, that the Honor Board also determined whether I lied about drinking and providing alcohol and found me guilty of lying about these issues, even though I was not even aware that this was part of the Honor Board. This is a direct violation of Honor Code Section 4.3.3.e.

In addition, the penalty imposed on me, which is a setback, is clearly disproportionate to the offense. Notably, after the prior Honor Board, Superintendent Nunan imposed a much lighter penalty, which was 45 days of remediation. The penalty imposed upon me is also far harsher than the penalty imposed on Midshipmen who were actually drinking at the TM. In fact, other than Midshipman Ronzoni (who also sought and obtained a second Honor Board) no Midshipman has received a penalty anywhere near what was imposed on me, making it clear that I have been penalized for seeking a second Honor Board. I should not be punished excessively for exercising my rights.

I also submit multiple character statements supporting my request for reconsideration.

And, I submit statements by MIDN Muehlbauer who was the individual who submitted the HB-1 against me. Tellingly, MIDN Muehlbauer affirms that I am "innocent" and that I never lied to him.

Accordingly, I request that you reconsider the decision of a setback.

## **RELEVANT FACTS**

On August 17th, 2024, I went out on liberty to the beach where the KP Futbol Club TM was taking place. Although at the beach, I was not a part of the official TM and was there in my own personal capacity and stayed near my friends, having minimal interaction with members of the Men's and Women's Soccer Team, as I originally intended. The following day (18AUG2024), I was interviewed by MIDN Muehlbauer, along with MIDN Jablonowski, MIDN Colpoys, and MIDN Schineller about my involvement regarding the situation. I stated to seeing red solo cups; however, at no point did I ever see any open containers or alcohol being poured into those. Furthermore, I did not believe the red solo cups to be indicative of drinking taking place, seeing as they can be used for any sort of beverage. At the end of my interview, MIDN Muehlbauer told me that he did not see a reason for me to get in any sort of trouble seeing as I was not on the official TM list, was in a public place, and of legal age. On August 28th, I received an email stating that an HB-1 had been submitted by MIDN Muehlbauer, who stated in no uncertain terms that he believed me "to be innocent and to be telling the truth." See Exhibit A.

At no point throughout the TM did any Plebe or Midshipman notify myself that alcohol was being purchased and/or consumed while at the beach, which includes all witnesses that were called to my hearing. Furthermore, in their interviews with last year's investigating officer, MIDN Solmos, none of the witnesses provided or verified a specific instance which would support their claim that I was "100% aware of the situation", as well that they were "100% confident" that I was aware of what was partaking at the beach. There has been no clarification of the "situation" that MIDN Solmos referred to with the witnesses or in their statements that were provided. In my hearing, each witness was explicitly asked if they could provide further elaboration on how they were 100% confident of my knowledge that drinking was taking place, yet none of the witnesses called could provide details to support their testimony that I was aware alcohol was being consumed.

Notably, prior to my recent Honor Board, MIDN Muehlbauer provided another statement where he makes clear that MIDN Solmos essentially misled him to file an HB-1. MIDN Muehlbauer noted his concern "that parties outside of the Honor Board at the time may have impacted the Board's ability to hold an impartial and fair hearing." He reiterates that his believes that I am innocent. See Exhibit B.

Also, on August 25th, 2024, I was informed about a meeting held by MIDN Samantha Bumann with the plebes on the women's soccer team. MIDN Bumann was the

acting Honor Board Investigations Officer PO, at the time, under MIDN Solmos. MIDN Bumann was present at the TM. MIDN Bumann was also present at the 7/11 at the time the alcohol was purchased by MIDN Jade Winters and MIDN Alexx Foreman. MIDN Bumann was maintained as the Honor Board Investigating PO, even with her conflicts of interest as a member of the women's soccer team, attendee of the TM and trip to 7/11, and as a former roommate of MIDN Ronzoni. MIDN Bumann made a group-chat with the plebe members of the women's soccer team, stating that she needed to meet with them in regards to the questioning that took place on August 24th after a women's soccer practice by MIDN Heck, MIDN Alvarado, and MIDN Solmos, who were all acting members on the Honor Board Staff. The plebes met with MIDN Bumann on August 24th, at 2100 at Land Hall. No other upperclassmen, including team captains were invited, present, or consulted on MIDN Bumann's meeting.

After hearing of this meeting, MIDN Ronzoni and I asked to meet with one of our Team Captains, MIDN Jasper Schineller. We both met with MIDN Schineller, as well as MIDN Colploys, our other team captain. Myself and MIDN Ronzoni both expressed our concerns with this meeting taking place, seeing as we both felt MIDN Bumann had gone above the scope of her responsibilities as a Petty Officer, and the conflict of interest as a team member and someone who was in attendance of the TM, herself. Our team captains, upon finding out, met with MIDN Solmos about the meeting MIDN Bumann held. They asked him multiple times who was allowed to interview the plebes for information regarding the TM, and each time a list of names was stated, none of them included MIDN Bumann. After this meeting, it was concluded that he did not plan nor was aware of any meetings regarding the TM. They later went on to meet with MIDN Bumann, who explained that she felt the need to hold this meeting to ask the plebes for any information they felt uncomfortable sharing in front of the Honor Board staff on the morning of August 24th. She also explained that she felt entitled to do this seeing as she was the petty officer of the Honor Board Investigating Chair (MIDN Solmos). She also said that MIDN Solmos gave her permission to hold this meeting. She did not mention that the questioning of the plebes regarding upperclassman (myself and MIDN Ronzoni), which was conflicting with the plebe's statements. After confronting MIDN Bumann, MIDN Schineller and MIDN Colploys met again with MIDN Solmos, as well as MIDN Alvarado. They shared what they had been told by MIDN Bumann, to which MIDN Solmos stated that he was aware that she planned to muster the plebes. This statement contradicted his previous statement, as well as his statement earlier that no other person besides the ones that he previously listed, which did not include MIDN Bumann. He explained that he told MIDN Bumann she could only meet with them as a concerned teammate; however, this is not how she carried out the meeting, clearly shown in the text message threat about the meeting. See Exhibit C.

On October 2nd, 2024, MIDN Zachary Alvarado emailed me my case packet and stated in his email that "this email contains all the evidence and summaries collected during the Honor Investigation" and that "the names of all parties involved have been redacted".

The case packet contained **only six witnesses**, which I knew did not align with the amount of people who had been either interviewed or questioned regarding my case. I emailed MIDN Alvarado back on October 8th, requesting for a copy of any/all evidence or notes that was acquired through the interviews and questioning between the men's and women's soccer teams regarding myself and my case. MIDN Alvarado replied that all evidence which was collected was sent on October 2nd. I then emailed MIDN Alvarado back, stating that, "I believe that not all the notes/evidence that has been acquired throughout all of the interviews and questionings regarding this incident are being included. In the evidence you sent me, there are only 3 plebe interviews; however, I am aware that my involvement was brought up in the questioning that took place on Saturday, August 24th, after a women's soccer practice with the plebe girls. Furthermore, I am also aware of the fact that multiple plebe boys on the men's soccer team were questioned by the Honor Board Staff in regards to my involvement, yet none of this is included in the evidence." In fact, my brother, Walker Mitchell, who was a plebe, as well as others, were questioned regarding this incident, as well as my involvement, by MIDN Solmos.

Likewise, MIDN Doshan has affirmed that he was interviewed by MIDN Solmos. Tellingly, it is also important to note that MIDN Doshan said nothing incriminating regarding myself and my involvement. <u>See</u> Exhibit D. Yet, I was never provided with his interview.

Therefore, I knew that not everything was being included in the case packet. MIDN Alvarado replied that "In regards to the August 24th situation, no evidence was gathered that will be used in the hearing and that anyone who had evidence to share stemming from that meeting was interviewed and their interviews are included in the case packet, as well as interviews from three members of the boy's team." MIDN Alvarado ended the email with, "Any other information that is not an official interview or submitted for your review will not be used against you in the hearing or shared in any way with the voting members." **<u>At no time was I provided with any evidence, from these interviews, that may have supported my statements.</u>**

- Under section 4.3.3(e) of the Honor Manual, it states that the role of Investigating Members is to "gather any and all available supporting evidence, documentation, information, etc. that proves **or _disproves_** the allegations made against the accused midshipman" (emphasis added)

After a delay for "Administrative Issues", on October 11th, 2024, I had my hearing where I was found in-violation of breaking the Honor Code. At this time, the specifics of the Honor Code Violation of Lying were still not clarified to specifics of what the "Lying" referred to. My advisor, CAPT Buck McDermott had to ask. On November 18th, 2024, I received an email stating that former Superintendent, VADM Nunan, affirmed the finding of the Honor Board. VADM Nunan imposed a restriction of 45 days and 50 hours of extra duty. <u>See</u> Exhibit E.

I requested a reconsideration of the Superintendent's Decision on November 20th, 2024. On December 12th, 2024, the former Superintendent acknowledged that my request met the requirement of Section 4.9(b)(ii), which states "there were procedural errors in the case or in the interpretation of the Honor Code serious enough to deny the Midshipman a fair investigation and/or hearing". Furthermore, VADM Nunan wrote, "as a result of these serious procedural errors, I am remanding your case back to the Honor Board for a new hearing, to take place after you return from Sea Year Training". See Exhibit F.

On July 30th, 2025, MIDN Debus sent myself an email which states, "Your case has been reopened as per the notice of extension (attached), and your return from second sailing. MIDN Rupli, the investigating officer, will review the case packet and the honor staff will begin to schedule your honor hearing rehearing." The extension which was attached was from the prior year, when all Honor Board hearings were postponed due to "Administrative Issues". The Notice of Extension had the names of the previous Honor Board Members and my previous advisor, CAPT Buck McDermott, who is no longer at Kings Point, along with the graduating members.

On August 1st, 2025, I received my case packet via email with the statements/evidence from 2024, which were now unredacted from MIDN Cahalan (Honor Board Vice Chair), as well as the Receipt of Evidence form.

On August 5th, 2025, I emailed MIDN Cahalan and explicitly asked if there was going to be a new investigation or if the previous case packet is the only evidence. I also asked if I was afforded the right to submit new letters and witness statements. MIDN Cahalan replied to this email by stating, "There will not be a new investigation conducted, but you may submit new letters and witness statements. There have been no recent changes that would impact the procedural matters of your case, but I have attached the most recent Honor Manual". See Exhibit G.

On August 17th, 2025, I was told by MIDN Nicole Nagengast and MIDN Karianna Eagle that MIDN Rupli, the Investigating Officer, was discussing matters of the case over the weekend, as well as explicitly said, "they are so fucked" (referring to myself and MIDN Ronzoni) to MIDN Caden Pierce and MIDN Carson Eudy. See Exhibit H.

On August 19th, 2025, MIDN Victoria Crofford, who worked as the Second Company Honor Board Chair Petty Officer during the fall of 2024 when the initial honor-board was taking place, stated that she resigned from the Honor Board Staff due to the fact of the unfair process she had seen taking place at meetings regarding my case. She stated that MIDN Solmos and MIDN Bumann used explicit language, such as "we are going to get them", in reference to myself, MIDN Ronzoni, and MIDN Ramsden. See Exhibit I.

On August 21st, 2025, I received an email from MIDN Cahalan with the names of the witnesses that the Honor Board would be calling, which included: MIDN Jade Winters, MIDN Savannah Koback, MIDN Colin Robertson, and MIDN Angelee Crooks. He also stated in the email, "Please submit any additional evidence as soon as possible".

On August 25th, 2025, myself and MIDN Ronzoni met with 5th company Honor Board Chair, MIDN Zach Ohlmeier, and MIDN Jaren Sin, 1st Battalion Honor Board Chair. We expressed our concerns about the breach of confidentiality of MIDN Jason Rupli, the investigating officer for both of our cases, and discussing matters of our case with people who are in no way involved (regarding the incident which took place over the weekend of August 17th). Both of which advised neither of us to bring up this incident until after our hearing.

On August 26th, 2025, I emailed MIDN Cahalan asking if I could re-schedule my Honor Board due to my advisor, CDR Bonvento being sick throughout the weekend and week. I stated that I would like for him to be present at my hearing, as well as time to prepare by speaking with him and to please let me know if we could move the hearing to next week. MIDN Christopher Debus, the Regimental Honor Board Chair, replied to this saying that we would look to reschedule for another time. He also stated in his email, "Furthermore, it is my understanding you may have additional witness statements/evidence you would like to present at your hearing. If this is the case, there are two options available:

1. If you have substantive evidence that you wish to present in your defense, the honor staff will reopen the investigation as per the honor manual and investigate all new evidence, whether evidence submitted by you or new evidence uncovered by the investigations officer to include previous statements made since 27 August 2024 which relates to this case.
2. As per the Superintendent's Reconsideration Decision of last year, we will proceed with a rehearing, using the unredacted case packet which you have in your possession (with no new evidence). See Exhibit I.

- It should be noted that the Superintendent's Reconsideration Decision of last year stated a new hearing, not a rehearing.

- It should be of note that these "options" are not outlined anywhere in the Honor Manual or the Superintendent's Reconsideration Decision.

- It should be of note that these "options" were not mentioned until August 26th, 2025, almost a month after my first email received from MIDN Debus regarding my Honor Board.

- It should be of note that these "options" are a direct contradiction to MIDN Cahalan's email which was received on August 5th, 2025 that stated

explicitly, "There will not be a new investigation conducted, but you may submit new letters and witness statements."

- It should be of note that these "options" are again contradictory to MIDN Cahalan's email on August 14th, 2025, where he stated "If you would like to call any witnesses for your defense please send me their name, academy affiliation, and reason for calling them." There was no mention of these "options".

- It should also be of note that these "options" are also contradictory to another email sent from MIDN Cahalan sent on August 21st, 2025, which stated to "Please submit any additional evidence as soon as possible.", where again there was no mention of these "options" in his email as well.

- As per Section 4.6.4. of the Honor Manual, it states, "At the time the evidence is present to the voting members during the hearing, the accused will be given an opportunity to object to anything contained therein. The rules of evidence for judicial proceedings to not apply to Honor Board proceedings. The presiding officer will consult with the Honor Staff Advisor and rule on objections to evidence. <u>Additionally, the presiding officer will allow the accused to present any new evidence to be considered at the hearing.</u>"

On September 2nd, 2025, I responded to MIDN Debus' email by stating, "I am a little confused by these two options seeing as neither of them are outlined in the Honor Manual or the Superintendent's decision of a re-hearing. Furthermore, MIDN Cahalan has stated previously that we may submit new letters and witness statements and mentioned nothing about this leading to a re-investigation. I would appreciate if you could provide in full detail of my two options, so I can have a clear understanding and can make a decision from there."

MIDN Debus replied to this email, stating "If Option 1 is chosen, your case will be reopened, investigating any new evidence you wish to present. Additionally, the investigating officer may interview all participants who were potentially involved in the incident and present new evidence, to include using statements made to the honor board and staff since the date of 27 August 2024. As mentioned, your case would be reopened for investigation following the timeline which is outlined in the Honor Manual. If option 2 is selected, we would proceed with a rehearing, meaning a new hearing is conducted using the redacted case packet you have in your possession as stated in the Superintendent's Reconsideration decision. Any new substantive evidence, such as witness statements explaining your alleged involvement would constitute the re-opening of your case allowing the investigating officer to investigate all new evidence as outlined in Option 1."

I replied to this email by forwarding MIDN Debus the email I received from MIDN Cahalan on August 5th, which stated there would be no re-investigation, but that new letters and witness statements could be submitted. I also asked him to clarify the change in practice regarding that now there was going to be a re-investigation if I was to submit new letters and witness statements.

MIDN Debus replied by stating, "MIDN Cahalan was correct that no new investigation was being conducted at the time and your hearing, originally scheduled for 27 August 2025, was based off the unredacted case packet from last year. Additionally, as per MIDN Cahalan's email, you MAY submit new letters and witness statements, however as stated in my previous emails, would prompt the case to be reopened for investigation of new evidence. If there is any additional confusion regarding your two options, I advise you speak with CAPT Keane." To reiterate, it was not until August 26th, after the hearing had been rescheduled twice, that any mention of "options" were presented.

I replied to MIDN Debus by stating, "I spoke with LCDR Miller about speaking to CAPT Keane regarding this email about my options for my upcoming hearing and how to proceed. However, CAPT Keane was absent today and was unable to meet. Due to this and my advisor also not being able to be present today because of his illness, I would like to ask you to extend this deadline till I can clearly understand the 'options' as they are not outlined in the Superintendent's decision or the Honor Manual."

On September 3rd, 2025, MIDN Debus replied by informing me that my decision needed to be submitted by Thursday, 4 September, at 1630, as well as if I had any further questions to speak to CAPT Keane and that failure to adhere to the deadlines as outlined may result in being entered into the conduct system for failure to comply with general orders. He also emailed me, "the attached document, statements you provided to the voting members at last year's hearing, have been added digitally to your CURRENT case packet for reference. As this evidence was introduced last year, it is not considered new and therefore does not prompt a new investigation."

- It is important to note that the evidence I brought in my defense to my first Honor Board hearing was not made available to myself, or the voting members until 5 business days prior to my hearing date. It was not included in the initial case packet sent on August 1st, 2025.

Furthermore, on September 3rd, myself and MIDN Ronzoni made a complaint about the confidentiality of Honor Board Investigator, MIDN Rupli. We were told that since he is not a voting member that it does not matter. The Honor Board manual explicitly states that I am entitled to confidentiality regarding matters of my case under Section 4.5.12.

On September 4th, 2025, I emailed MIDN Debus and stated, "In reference to the two choices that were put forth on August 26th by the Honor Board, I am confirming Option 2

(Superintendent's Reconsideration Decision) so that we may move forward with the hearing. Please confirm that the Honor Board is now in receipt of the evidence that I submitted for my defense from the previous Honor Board Hearing that was not enclosed in my evidence packet sent to me on August 1st, 2025. Additionally, please also confirm that I can also bring in all of my character statements that I submitted in the previous hearing that were not attached in your previous email" (regarding statements I had brought as evidence for the first Honor Board hearing).

MIDN Debus emailed me to confirm the receipt of my decision to proceed with a re-hearing as per the Superintendent's Reconsideration decision, as well that the honor board has receipt of my previous witness statements introduced at last year's hearing and only that voting members would be made aware. He also stated that statements made as part of an appeal will not be introduced as they were not available at the previous hearing (although statements and evidence made in my appeal were found substantial enough for it to get reprimanded back to the Honor Board staff). He also stated that the honor board does not entertain character statements, but this contradicts what was accepted at the 2024 hearing.

Four witnesses were brought into my hearing, which included: MIDN Jade Winters, MIDN Angelee Crooks, MIDN Savannah Koback, and MIDN Colin Robertson. See Transcript (attached as Exhibit K).

MIDN Jade Winters was interviewed by former MIDN Jasper Schineller and MIDN Muehlbauer the following day after the TM and was also interviewed with MIDN Alexx Foreman. MIDN Jasper Schineller sat in on several of the interviews with women's soccer players regarding the TM. She maintains that all stories told throughout these interviews regarding myself, as well as what I told MIDN Schineller and MIDN Muehlbauer, aligned except for the story MIDN Winters' told them. See Exhibit L. I note that MIDN Winters has provided a statement confirming that I never offered or provided alcohol to anyone. See Exhibit M.

Former RTOA, MIDN Lauren Jablonowski interviewed MIDN Crooks and MIDN Audrey Burrell the following day of the TM. She claims that when asking questions regarding my involvement, neither MIDN Crooks nor MIDN Burrell were aware of who I was. It was not until she showed them an image of me when they both recognized me, and said that they only saw me at the beach completely unassociated with anyone else on the Men's and Women's Soccer Team besides MIDN Ronzoni. This is contradictory to what she supposedly told MIDN Solmos in her interview, a month after the TM took place. In my hearing, she also stated explicitly that she just assumed I was aware of the situation. See Exhibit N. I note that MIDN Crooks has provided a statement confirming that I never offered or provided alcohol to anyone. See Exhibit O.

MIDN Koback stated that I was 100% aware of the situation, yet at the hearing, admitted to having no interaction with me, as well as being set up around 30-40 feet away from where I was set up on the beach.

MIDN Robertson stated in his investigation that I was 100% aware of the situation, yet admitted at the hearing to have never met me prior to the TM or at the TM, as well that we had no interaction at any point throughout the TM.

In all of the witnesses' interviews, they all stated that they could say with 100% confidence I was aware of the situation occurring at the beach; however, when explicitly asked at the hearing, not one could provide a situation or instance that would attest to this statement. Some even admittingly stated that they just assumed I was aware. This highlights that there are serious questions as to the accuracy of the interviews as written by MIDN Solmos.

Furthermore, when it came time for my questioning, the voting members asked several questions regarding MIDN Ramsden, such as what she brought to the beach, what she was doing, etc., even though MIDN Ramsden was found not in violation by last year's Honor Board staff for providing alcohol and knowledge that drinking was taking place.

After my hearing, I met with my Battalion Honor Board Chair, MIDN Jaren Sin, on September 12th, 2025. When I met with him, he told me verbatim that the voting members of my hearing found me guilty due to the fact that I "character assassinated the witnesses". I expressed to MIDN Sin that the fact they did not like how I questioned the witnesses did not constitute an honor violation, as well as explicitly asked him if they considered the fact that none of the witnesses could provide statements to support their claim I was "100% aware of the situation". MIDN Sin could not answer the question and replied that "he was not in the hearing and was just stating what he was told by the other members of the staff in the debrief after my hearing concluded". Lastly, he told me that I was found guilty of lying about drinking, lying about providing, and lying about being aware of the situation. I asked him how I could be found guilty of all three when I was only on hearing for being aware of the situation, and that CAPT Keane, the Honor Advisor who oversees the staff, as well as each case, told LCDR Miller explicitly that I was only on hearing for awareness. At no point was I notified that I was on hearing for drinking, providing, and awareness. This essentially eliminated my right to a fair hearing, as well as did not allow me to be able to prepare for these underlying charges.

I received the Superintendent's Decision on October 20, 2025 (the "Decision") (attached hereto as Exhibit P). The Decision indicates that the Honor Board unanimously found that I lied to Midshipman Muehlbauer about members of the soccer team consuming alcohol. Pursuant to the Decision, you directed that I be setback to Class of 2027. Pursuant to Honor Code Section 4.8.1.d., I hereby submit this request for reconsideration.

For purposes of this submission, I request that you also consider the numerous statements all attesting to my character from Captain Gramer, Captain De Jean, Captain Tortora, Director O'Boyle, Professor Wei, MIDN Juhola and MIDN Teria. These statements consistently confirm that a setback is not a proper penalty. <u>See</u> Exhibit Q.

## <u>RECONSIDERATION OF THE DECISION IS WARRANTED</u>

The Honor Code provides that reconsideration is warranted if there were procedural errors or the severity of the punishment is disproportionate to the violation. As detailed above, both of these grounds apply here.

With regard to the procedural errors, most significantly, even though the Honor Code is clear that I was permitted to present "new evidence" at the Honor Board -- without any restrictions on doing so -- and even though the Nunan December 2024 Decision never indicates that my presentation of "new evidence" would result in the Honor Board having the opportunity to reopen the new investigation against me, the Honor Board took the position that I could not present any new evidence *unless* I agreed to the reopening of the investigation. Doing so is in direct violation of Honor Code Section 4.6.4. Since I had no idea exactly what the consequences of a reopened investigation would be, I had no choice and was forced to agree to not present new evidence at the Honor Board.

Second, in violation of Honor Code Section 4.5.12., it is evident that my right to confidentiality was breached. In fact, I detailed above how numerous Midshipmen were aware of the proceedings against me and how I was harassed, mocked and jeered by other Midshipmen in violation of the Honor Code.

Third, in violation of Code Section 4.5.14. and 4.3.3, it is beyond evident that I did **<u>not</u>** receive copies of all interviews that were conducted. Indeed, my brother was interviewed, yet there is no statement from him. And, MIDN Doshan has affirmed that he was interviewed by MIDN Solmos, yet I never received a statement from MIDN Doshan. Tellingly, the **only** interviews provided were of six individuals, each of whom supposedly supported the claim that I was not honest. It is crystal clear that MIDN Solmos in his "investigation" either intentionally withheld memorializing interviews with individuals who provided information helpful to my position or that these interviews were created and withheld from me. Either scenario is an obvious violation of Code Section 4.3.3., which requires that the investigation memorialize information that "disproves the allegations made against the accused midshipman."

Fourth, the Honor Board relied upon what were described as incriminating "statements" made about me by certain Midshipmen. Significantly, however, in actuality, there were no statements made by such Midshipmen. Rather, the "evidence" used against me consists of what purport to be MIDN Solmos' notes from interviewing these Midshipman. MIDN Solmos' notes are not signed as accurate by any Midshipman and are nothing more

than blatant hearsay. Moreover, when I questioned these witnesses at the hearing there were clear doubts shown as to the accuracy of what MIDN Solmos wrote.

In addition to the numerous procedural errors, I submit that it is evident that the punishment is disproportionate to the violation. As noted, after being found in violation at the 2024 hearing and prior to my initial appeal, the former Superintendent directed that I complete a program of honor remediation, subject to Remediation restrictions for a period of 45 days, 50 hours of extra duty hours (with 20 being community service), make presentations to my peers, maintain an honor remediation journal, weekly meetings with my Senior Remediator, and monthly meetings with the Director of Leadership. This is disproportionate to the recommendation of a setback after being found in violation after the 2025 hearing, under the same evidence packet which was used in the 2024 hearing. And, Midshipmen who readily admitted to drinking and who readily admitted to lying about what occurred at the beach received far less punishment than me. In fact, to my knowledge, the only Midshipman who received such a harsh penalty were me and MIDN Ronzoni, who also requested and obtained a second Honor Board, supporting the conclusion that the severe punishment imposed is retribution for merely exercising our rights.

In conclusion, throughout my time at Kings Point, I have had no prior Honor or Regimental offenses and only one failed class my plebe year, which was remediated in summer school and fell under the "Forgiveness Clause". I am active in the Regiment as the Regimental Midshipman Activities Officer, Second Company Evaluations Officer, co-editor of the yearbook, and assist the student council of the Class of 2026. Had I known that any drinking was taking place throughout the TM, I would have taken the appropriate action and upheld the standards that I am bound to and which are set forth by the Academy. Throughout this entire process, there have been numerous procedural errors on behalf of the Honor Board Staff, biasness, and breach of confidentiality. I am respectfully asking that these matters be considered when reading this appeal, and you will see fit to reconsider the Decision to have me setback.

Respectfully submitted,


MIDN Morgan Mitchell

# EXHIBIT A



United States Merchant Marine Academy
300 Steamboat Road
Kings Point, NY, 11024

21 Oct 2024

MEMORANDUM FOR HONOR BOARD

FROM: MIDN Thorsten Muehlbauer 1/C, United States Merchant Marine Academy

SUBJECT: MIDN Morgan Mitchell 2/C Statement

This letter is to recall my investigation and opinion on MIDN Morgan Mitchell's involvement in an alcohol incident that occurred August 17th, 2024.

I interviewed MIDN Mitchell on August 18th, 2024 in order to build stronger evidence and figure out which parties were involved in the alcohol incident and to what extent. During MIDN Mitchell's questioning, she denied supplying any alcohol and had no knowledge of the Futbol Club drinking at the beach. During my initial investigation, <u>I believed MIDN Mitchell to be innocent and to be telling the truth.</u>

Following my investigation, the Honor Board Investigations Officer, MIDN Keegan Solmos 1/C, informed me that there were reports that MIDN Mitchell may have been lying. Due to this, I felt it was my obligation to allow MIDN Mitchell to HB-0 herself, to which she declined. Although, I continued to believe MIDN Mitchell to be innocent, I opened an HB-1 in order to let the Honor Board handle the investigation in the proper manner.

However, I believe that parties outside of the Honor Board have impacted the Board's ability to hold an impartial and fair trial. Additionally, I have learned specifics of the case and verdicts through parties uninvolved – signifying a breach of the nondisclosure policy the members of the Honor Board must uphold.

Let this letter remind the Honor Board that I continue to believe MIDN Mitchell to be innocent. Additionally, I grant the board permission to use my name and call me as a witness in any case I have opened. I respectfully request the board to take this statement into consideration.

Thorsten Muehlbauer, Midshipman 1st Class,
Regimental Training Officer
United States Merchant Marine Academy

# EXHIBIT B

FROM: Thorsten Muehlbauer, 1st Rotation Regimental Training Officer AY 2024-2025, United States Merchant Marine Academy

SUBJECT: MIDN Marina Ronzoni 1/C and MIDN Morgan Mitchell 1/C Statement

This letter is to recall my investigation and opinion on both MIDN Ronzoni and MIDN Mitchell's involvement in an alcohol incident that occurred August 17th, 2024.

I interviewed MIDN Ronzoni and MIDN Mitchell separately on August 18th, 2024 in order to gather evidence and determine which parties were involved in the alcohol incident and to what extent. During both MIDN Ronzoni and MIDN Mitchell's questioning, they both denied drinking any alcohol on the Team Movement, and denied knowing that the other members of the women's soccer team intended to purchase and consume alcohol. During my initial investigation, I believed both MIDN Ronzoni and MIDN Mitchell to be innocent and to be telling the truth.

Following my investigation, the Honor Board Investigations Officer at the time, MIDN Keegan Solmos interviewed me in relation to the incident concerning other parties involved. During this official interview, MIDN Solmos informed me that there were reports that MIDN Ronzoni and MIDN Mitchell may have been lying. Due to this, I felt it was my obligation to allow them to HB-0 themselves, to which they both declined. Although I continued to believe they were innocent, as the Regimental Training Officer the honor system did not directly operate under my purview. Therefore, I opened an HB-1 in order to let the Honor Board handle the investigation in the proper manner.

Shortly after opening the HB-1s for MIDN Ronzoni and MIDN Mitchell, I questioned exactly where the "reports" that MIDN Ronzoni and MIDN Mitchell had been lying came from. <u>MIDN Solmos had brought these reports directly to my attention, but I was not informed on who exactly made these reports. MIDN Solmos explained to me that he couldn't open an HB-1 against them as the Honor Board Investigations Officer, and that I would have to, so I deferred to his judgement.</u>

I believe that parties outside the Honor Board at the time may have impacted the Board's ability to hold an impartial and fair trial. I questioned why I had to HB-1 MIDN Ronzoni and MIDN Mitchell if I had never talked to the source of the "reports" MIDN Solmos described. In hindsight, I would not have opened the HB-1 myself, and would have let the source of the reports do so.

Let this letter illustrate to the Honor Board that I continue to believe MIDN Ronzoni and MIDN Mitchell to be innocent. I believe in the honor system and trust the board to make the right decision. I respectfully request the board to take this statement into consideration.

Respectfully,

Thorsten Muehlbauer, USMMA 2025

# EXHIBIT C

To whom it may concern,

The morning of Sunday August 25th 2024, MIDN Jasper Schineller and I were informed of a meeting held by MIDN Sammy Bumann the night of August 24th to discuss the Beach TM with the women's soccer plebes. MIDN Bumann did this without informing any of the team captains or upperclassman. Some upperclassman were informed by the plebes that this meeting was held, and these upperclassman then told us. MIDN Schineller and I were frustrated because the plebes have already been interrogated by MIDN leadership and other upperclassman about the situation and do not need to muster in their free time to discuss with those who don't have the right to know. Teammates involved informed us that MIDN Bumann called the meeting as an Honor Board PO. She asked the plebes about people drinking on the TM and for more information if available.

After hearing about the muster with the plebes, MIDN Jasper Schineller and I met with MIDN Solmos at 1530 on August 25th. This meeting was to discuss who had the right to ask the plebes for information about the Beach TM. In four different ways, we asked MIDN Solmos who could talk to the plebes. MIDN Solmos stated each time a list of names and none of these lists included MIDN Bumann. At the conclusion of the meeting, MIDN Solmos also said he did not plan or was aware of any meetings about the beach TM since the most recent meeting with the plebes after soccer practice the morning of August 24th.

 After meeting with MIDN Solmos, we decided to meet with MIDN Bumann to explain our frustration with her mustering the plebes. We stated that we heard she held a meeting with the plebes without prior knowledge of any upperclassman. She explained that as an Honor Board PO she felt the need to hold the meeting to ask any plebes for information they were uncomfortable sharing at the morning meeting in front of the honor board staff and everyone involved in the beach TM. She said that MIDN Solmos gave her permission to meet with the plebes. She did not mention questioning the plebes about upperclassman drinking which conflicted with plebe statements.

After meeting with MIDN Bumann, MIDN Schineller and I met again with MIDN Solmos who this time was accompanied by MIDN Alvarado. We told MIDN Solmos the

information MIDN Bumann explained to us and he stated he was aware MIDN Bumann planned to muster the plebes. This was a switch up from when he claimed he had no knowledge of any meetings planned or held since the morning meeting on August 24th. This also conflicted with the statement that no one was allowed to question the plebes besides the people he listed, which did not include MIDN Bumann. He explained hat he did not mention the meeting with MIDN Bumann because he told her she could meet with the plebes only as a concerned teammate. However, this was not her intention and called the meeting as an Honor Board PO. It is clear there are many discrepancies between the stories of MIDN Bumann and MIDN Solmos with what actually happened based on plebe statements.

Very Respectfully,

MIDN Natalie Colpoys

Women's Soccer Team Co-Captain

To whom it may concern,

While liberty on the evening of Saturday, August 17th, 2024 I, MIDN Jasper Schineller 1/C, was notified to come back to campus as soon as possible. The only initial information I had was that it had to do with the beach TM that took place earlier in the day. I was informed that when some of the women's team got back from the TM they were interviewed and confessed to drinking. Throughout the rest of the evening I met with several of my teammates involved in the TM. I wanted to speak with the plebes especially because it was so early in the trimester and their KP career that they do not know what was going on or what was going to happen. Several of these interactions with the plebes MIDN Throsten was also present. The plebes stories about the TM all matched up. The plebes did not speak of the MIDN Mitchell drinking. Those that knew the upperclassmen were there said that they sat far away from the majority of the group.

The following day, Sunday, August 18th, 2024, MIDN Throsten and I separately met with MIDN Marina Ronzoni and MIDN Morgan Mitchell. MIDN Mitchell said that she was not drinking on the beach but did have drinks before. MIDN Throsten suggested this was not an issue because the drinking was not a part of or during the TM. Stories of both MIDN Ronzoni and MIDN Mitchell aligned.

On the evening of Saturday, August 24th, 2024 MIDN Sammy Bumann 2/C mustered the women's soccer plebes without my knowledge. After being informed by other upperclassmen on the team about this meeting, I was confused and frustrated. My confusion was from the unclear intent and purpose of the meeting. I had several frustrations with this meeting. One, being was that no one but field and academic captains should be mustering the team especially on the weekend during free time. Another being that my plebes that we involved in the beach TM had an abundant number of meetings and interviews with MIDN leadership, upperclassmen and Honor Board staff. The week following the TM, they were being questioned about the situation often by people who had no business in asking about it. I had concerns that the plebes would not know any better to answer questions from anyone who was asking. With this concern, I asked to meet with MIDN Keegan Solmos 1/C.

After discussions with teammates that were involved in the meeting the following conclusions were made about how the meeting was conducted. MIDN Bumann was acting as an Investigating Honor Board PO. She questioned the plebes about other teammates on the TM

regarding drinking involvement. She told plebes to come forward with any more information if they have it.

MIDN Natalie Colpoys 1/C, the other field captain of the women's team, met with MIDN Solmos at 1530 the following day, Sunday, August 25th, 2024. The importance of this meeting was to ask who was allowed to discuss the TM with the plebes. Several times, in a number of ways, MIDN Colpoys and I asked who was allowed to talk to them. MIDN Solmos has the same answer each time. None of the persons listed included MIDN Bumann, his Petty Officer. We also asked if the most recent meeting that was conducted, at the Saturday soccer practice with the Honor Board staff, was the last planned meeting to happen. MIDN Solmos confirmed this.

After the meeting we assumed MIDN Solmos had no knowledge of the meeting MIDN Bumann held or that he knew about the meeting and was lying. Immediately following the meeting, MIDN Colpoys and I met with MIDN Bumann. We explained we knew that she held a meeting and expressed our discomfort with her mustering them regardless of the meeting topic. We asked for explanation of the intent of the meeting. She explained that as an Honor Board PO she mustered the plebes for any outlying information that was not already presented. We asked what was the purpose if they had already been interviewed several times including the day before when the actual Honor Board staff questioned them. She told us that she was asked MIDN Solmos if she could meet with them about the situation and he allowed her to. She said she was encouraging them to come forward so that they would not get in trouble with the Honor Board. She failed to mention that she was asking specific questions about upperclassmen drinking. This conflicted with plebe statements.

Considering both MIDN Solmos and MIDN Bumann meetings, there was clear discrepancies. With these different stories, MIDN Colpoys and I asked to meet with MIDN Solmos again. During the second meeting MIDN Zachary Alvarado was also present. MIDN Colpoys and I presented the information MIDN Bumann told us to the gentlemen. MIDN Solmos confirmed his aware of the meeting she held. This conflicted with his previous statement that there was no more planned meetings after the Saturday morning meeting. This also conflicted with several statements of who was allowed to question the plebes about the TM. We expressed that these statements we contradicting. We asked why he did not mention MIDN Bumann's meeting the first time we spoke with him. He suggested that MIDN Bumann was allowed to

meet with the plebes as a concerned teammate but not as an Honor Board PO. MIDN Colpoys and I expressed our discomfort with MIDN Bumann's actions as a PO. We thought it was extremely unprofessional to have someone that was involved with the TM be a part of the investigating team.

During the following week, MIDN Colpoys and I met with MIDN Bumann shortly before one of our practices. We confronted her and said we know she lied about multiple things regarding when she mustered the plebes. She tried to explain herself and developed watery eyes. We kept this interaction short. No further actions were taken regarding MIDN Solmos and MIDN Bumann's contradicting stories.

Very Respectfully,

MIDN Jasper Schineller 1/C

Women's Soccer Team Captain

# EXHIBIT D

To Whom it May Concern,

On the day of August 17th, 2024 I attended the KP Futbol Beach TM. In the following month, I was interviewed by M/N Solmos for an Honor Board pertaining to two soccer players, M/N Ronzoni and M:N Mitchell, on the women's team. During this interview, I did not say anything incriminating about either one of the players,  as I never witnessed them drinking. It came to my attention that my statement was never given to the players as part of their packets, from the Honor Board.

*Michael Doshan*

# EXHIBIT E



18 November 2024

From:   Joanna M. Nunan
        Vice Admiral, USMS

To:     MIDN Morgan Mitchell, Class of 2026

Subj:   Superintendent's Final Decision, Honor Board of 9 October 2024

Upon review of your case, I have decided to affirm the finding of the Honor Board that you are guilty of lying to the Commandant's Investigation Officer about your participation in an unauthorized alcohol event with underaged Midshipmen and Plebes. You are cleared to depart for Sea Year Training. Upon your return, I direct the following actions:

1.  You will complete a program of honor remediation in accordance with Section 5.4 of the Honor Manual (Superintendent Instruction 2022-06, *Regimental Honor Program)*.  If the Commandant determines your remediation was unsuccessful you will be referred to an Executive Board or Superintendent's disciplinary hearing and may be disenrolled from the Academy.

2.  Pursuant to Section 4.7 of the Honor Manual (Superintendent Instruction 2022-06, *Regimental Honor Program)*, you are subject to the following Remediation restrictions for a period of 45 days (which may be waived by the Commandant, in part or in whole, upon good cause shown):

    a.  Restricted to campus – no team movements, trips, leave, or liberty
    b.  Prohibited from representing USMMA through participation in athletic competitions, extracurricular activities, performances, or other intercollegiate clubs or activities

3.  You will complete 50 hours of Extra Duty, at least 20 of which will be community service.

4.  You will make presentations to your classmates, teammates and platoon about your honor case, to be pre-approved by the Office of the Commandant and scheduled by the Director of Leadership and Ethics.

5.  You will maintain an honor remediation journal during your remediation period, which shall be reviewed by your Senior Remediator.

6.  During your remediation period, you will have weekly meetings with your Senior Remediator and monthly meetings with the Director of Leadership.

By copy of this memorandum, the Commandant of Midshipmen is directed to implement this decision immediately.

Sincerely,

Joanna M. Nunan
Vice Admiral, USMS

Encl:    Acknowledgement of Decision

cc:      Office of the Dean
         Commandant of Midshipmen
         Director of Leadership and Ethics
         Registrar
         Director of Athletics
         Director of Naval Science

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:      MIDN Morgan Mitchell, Class of 2026

To:        Joanna M. Nunan
           Vice Admiral, USMS

Subj:      Superintendent's Final Decision re: Honor Board of 9 October 2024


I am in receipt of the Superintendent's Final Decision of 18 November 2024 concerning the Honor Board which was convened to inquire into my conduct.

____    I accept the decision of the Superintendent, and waive my right to reconsideration. I acknowledge the terms set forth in that decision, my responsibilities to abide by them, and the consequences should I fail to do so.

____    I will request a reconsideration of the Superintendent's Decision.


I acknowledge that I have until the close of the business day after receipt of this notice to provide the Superintendent written notice of my intent to request a reconsideration of this decision.  I acknowledge that I must submit my request for reconsideration in writing no later than seven business days after receipt of this decision.


_____                    _____
MIDN Morgan Mitchell                                Date

This acknowledgement must be emailed to Ms. Cynthia Flynn at flynnc@usmma.edu in the Office of the Superintendent within 24 hours of receipt.

# EXHIBIT F



12 December 2024

From:   Joanna M. Nunan
        Vice Admiral, USMS

To:     MIDN Morgan Mitchell, Class of 2026

Subj:   Superintendent's Final Decision on Request for Reconsideration

On 20 November 2024, you submitted a request for reconsideration on my 18 November 2024 decision affirming the finding of the Honor Board that you were guilty of lying to the Commandant's Investigation Officer about your participation in an unauthorized alcohol event with underaged Midshipmen and Plebes.

Pursuant to Section 4.9(b) of the Honor Manual (SI 2022-06), the only grounds for reconsideration are as follows:

> i. There is new evidence of a substantive nature not previously available at the time of the hearing, which would have materially affected the decision;
> ii. There were procedural errors in the case or in the interpretation of the Honor Code serious enough to deny the Midshipman a fair investigation and/or hearing; or
> iii. The severity of the sanction is disproportionate to the violation(s) committed in accordance with the Honor Code.

Your request met the requirement of Section 4.9(b)(ii) as you raised concerns about procedural errors.

Prior to making my decision as to whether to grant your request for reconsideration, I fully reviewed and considered the letter, including attachments, that you submitted with your request for reconsideration. After careful deliberation, I have decided that there were procedural errors serious enough to deny you a fair hearing. Specifically, the investigation report provided to you should not have been redacted and MIDN Cooke should have recused himself from the hearing board (although I note that you could have challenged his participation and did not appear to do so). Further, if there are witness statements that were not provided to you, they should have been provided. However, the Investigation Officer is not obligated to interview every potential witness, and you have a right under the Honor Process to call witnesses in your defense at the hearing.

As a result of these serious procedural errors, I am remanding your case back to the Honor Board for a new hearing, to take place after you return from Sea Year training.

By copy of this memorandum, the Commandant of Midshipmen is directed to implement this decision.

Sincerely,

Joanna M. Nunan
Vice Admiral, USMS

cc:      Commandant of Midshipmen
          Director of Leadership and Ethics
          Director of Athletics

# EXHIBIT G

**From:** 2026Debus, Christopher <Christopher.Debus.2026@midshipman.usmma.edu>
**Sent:** Tuesday, September 2, 2025 1:09 PM
**To:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Cc:** Bonvento, Matthew <BonventoM@USMMA.EDU>; 2026Cahalan, Charles
<Charles.Cahalan.2026@midshipman.usmma.edu>
**Subject:** Re: Investigation Notes, Collected Evidence, and Case Summary

MIDN Mitchell,

MIDN Cahalan was correct that no new investigation was being conducted at the time and your hearing, originally scheduled for 27 August 2025, was based off the unredacted case packet from last year.

Additionally, as per MIDN Cahalan's email, you <u>MAY</u> submit new letters and witness statements, however as stated in my previous emails, would prompt the case to be reopened for investigation of new evidence.

If there is any additional confusion regarding your two options, I advise you speak with CAPT Keane.

Very Respectfully,

**MIDN CDR Christopher Debus 1/C**

Regimental Honor Board Chairman

Maritime Logistics and Security | Class of 2026B

Fourth Company | Flight Deck #5424

United States Merchant Marine Academy

Cell: (904) 903-0408



---

**From:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Sent:** Tuesday, September 2, 2025 12:30 PM
**To:** 2026Debus, Christopher <Christopher.Debus.2026@midshipman.usmma.edu>
**Cc:** Bonvento, Matthew <BonventoM@USMMA.EDU>
**Subject:** FW: Investigation Notes, Collected Evidence, and Case Summary

Good afternoon,

Here is an email from MIDN Cahalan on August 5th, which states there would be no re-investigation, but that new letters and witness statements could be submitted. From my understanding, now, if we are to submit new letters and witness statements, there is going to be a re-investigation. Could you please clarify the change in practice? Thank you.

Very Respectfully,

MIDN LT Morgan Mitchell 1/C

Regimental Midshipman Activities Officer

2nd Company Evaluations Officer

Maritime Logistics and Security

C: 662-319-1107



**From:** 2026Cahalan, Charles <Charles.Cahalan.2026@midshipman.usmma.edu>
**Sent:** Tuesday, August 5, 2025 7:47 PM
**To:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Cc:** Bonvento, Matthew <BonventoM@USMMA.EDU>
**Subject:** Re: Investigation Notes, Collected Evidence, and Case Summary

Good evening MIDN Mitchell,

There will not be a new investigation conducted, but you may submit new letters and witness statements. There have been no recent changes that would impact the procedural matters of your case, but I have attached the most recent Honor Manual. Please let me know if you have any additional questions.

Very Respectfully,

MIDN LCDR Charles Cahalan 1/C

Regimental Honor Board Vice Chairman

Baseball Team Captain

Maritime Logistics and Security

Class of 2026 - 1st Company

---

**From:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Sent:** Tuesday, August 5, 2025 4:46 PM
**To:** 2026Cahalan, Charles <Charles.Cahalan.2026@midshipman.usmma.edu>
**Cc:** Bonvento, Matthew <BonventoM@USMMA.EDU>
**Subject:** RE: Investigation Notes, Collected Evidence, and Case Summary

Good afternoon,

I have a few questions regarding the Honor Investigation. Is there going to be a new investigation or is the previous packet the only thing available? Am I afforded the right to submit new letters and witness statements? Am I being tried under the previous honor-board manual that was in place when my investigation started (2022), or the current manual? Please provide a copy of what is being used. Furthermore, CDR Bonvento will now be my advisor due to CAPT McDermott resigning. Thank you!

Very Respectfully,

MIDN LT Morgan Mitchell 1/C

Regimental Midshipman Activities Officer

2nd Company Evaluations Officer

2026A- Logistics and Security

---

**From:** 2026Cahalan, Charles <Charles.Cahalan.2026@midshipman.usmma.edu>
**Sent:** Tuesday, August 5, 2025 9:28 AM
**To:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Cc:** 2026Debus, Christopher <Christopher.Debus.2026@midshipman.usmma.edu>
**Subject:** Re: Investigation Notes, Collected Evidence, and Case Summary

Good morning MIDN Mitchell,

Attached is your updated case summary. Your 5 business days to review the evidence will start will this email.

Very Respectfully,

MIDN LCDR Charles Cahalan 1/C

Regimental Honor Board Vice Chairman

Baseball Team Captain

Maritime Logistics and Security

Class of 2026 - 1st Company

**From:** 2026Cahalan, Charles
**Sent:** Friday, August 1, 2025 12:31 PM
**To:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Cc:** Keane, CAPT Patrick <KeaneP@USMMA.EDU>; 2026Debus, Christopher
<Christopher.Debus.2026@midshipman.usmma.edu>
**Subject:** Investigation Notes, Collected Evidence, and Case Summary

MIDN Mitchell,

I, M/N LCDR Charles Cahalan 1/C (RHBVC), will be the Presiding Officer of your Honor Hearing.

This email contains all the evidence and summaries collected during the Honor Investigation, namely, the Investigation Notes and Case Summary. Attached is the unredacted case packet, per the retrial instructions. After reviewing these documents, please electronically sign the Receipt of Evidence form, which is also included in this email, and send it to me by or before **COB Friday the 8th of August, 2025**. If you have any questions, or need more time, feel free to email me or talk with your Company Honor Chair.

Standby for further hearing scheduling information.

Very Respectfully,

MIDN LCDR Charles Cahalan 1/C

Regimental Honor Board Vice Chairman

Baseball Team Captain
Maritime Logistics and Security

Class of 2026 - 1st Company

Charles.Cahalan.2026@midshipman.usmma.edu

# EXHIBIT H

To whom it may concern,

While speaking with other 1/C Midshipman on Saturday August 16th, 2025, the topic of MIDN Mitchell's and MIDN Ronzoni's Honor Board hearing was brought up. Some friends stated that "we heard that they are screwed". I then asked what they meant by that and they then stated that MIDN Rupli, the investigating officer of the case, has been talking about it and said quote "They are fucked". Although I did not explicitly hear MIDN Rupli say that statement, many of his close friends confirmed that he was talking about the case and said the above statement.

I was surprised by the statement made by MIDN Rupli because this goes against the fact that the Honor Board system is supposed to be fair for all midshipmen. This breaches the NDA signed by all members of the Honor Board staff and also instills distrust within the Regiment of Midshipman.

Very Respectfully,

MIDN Nicole Nagengast 1/C

Nicole.Nagengast.2026@midshipman.usmma.edu

# EXHIBIT I

MIDN Victoria Crofford 2/C

United States Merchant Marine Academy

August 19, 2025

To Whom It May Concern,

I am writing in regard to MIDN Mitchell's current Honor Board Trial.

Last year, I served as a Petty Officer for the 2nd Company Honor Board Chair under MIDN
Michael Monkevich. During that time, I witnessed and participated in multiple trials and their
procedural aspects. Prior to each trial, the Honor Board members and Petty Officers attended
preliminary meetings to review the upcoming case. The majority of these meetings were
conducted appropriately and focused on the facts of the case.

In my experience, it was uncommon for midshipmen to plead not guilty, so the cases that
involved appeals were particularly significant. Toward the end of my first trimester as Petty
Officer, the cases related to the soccer team drinking incident began to come to trial. While I did
not have voting authority, I attended the pre-meeting prior to MIDN Ramsden's case, which
involved circumstances similar to MIDN Mitchell's.

That trial, in my observation, was extremely unfair and biased. Fundamental rights, such as the
right to a fair proceeding, should always be preserved, particularly when the outcome can affect
a midshipman's career and future. The Honor Manual is based on its very name: honor. Its
purpose is to guide trials toward truth, not to trap midshipmen into stumbling over words during
an unfair process.

The meetings led by MIDN Solomos and MIDN Bumman did not reflect this standard. Their
stated purpose was clearly to find the accused guilty, with explicit language such as, "we are
going to get them." They also redacted the names of those making accusations, not solely to
prevent retaliation but, as was admitted in those confidential meetings, to avoid confronting the
fact that some accusers had either already been found guilty of misconduct themselves or had
inconsistencies in their stories. In short, the evidence was selectively framed to fit a
predetermined outcome.

According to the Honor Manual, any individual with involvement in a case must recuse
themselves. Out of respect for this principle, and despite not having a vote, I refrained from
attending any further trials after what I witnessed during that pre-meeting.

It is also deeply concerning that MIDN Solomos and MIDN Bumman approached this situation
with clear bias and unprofessionalism. They employed leading questions, withheld exculpatory
evidence, and portrayed MIDN Mitchell unfairly. Notably absent from the investigation was
mention that MIDN Solomos' car was seen at the 7-Eleven where alcohol was purchased, with
MIDN Bumman present as well. Further, MIDN Bumman's decision to personally investigate and

interview participants, despite only holding the role of Petty Officer, was inappropriate and outside her authority. This conduct reflects poorly on the integrity of the process.

The Honor Board's role is to collect facts and uncover truth, not to prosecute or vilify classmates out of spite. Yet the lack of procedural integrity, the suppression of relevant evidence, and the dismissive attitude toward the concerns of other board members suggest otherwise.

For the record, I did not attend the hearings of MIDN Ramsden, Ronzoni, or Mitchell after witnessing the pre-meeting for MIDN Ramsden's case. I informed MIDN Monkevich at the time that I found the process to be unfair and therefore refused to participate further. These unresolved issues, both at the staff and Honor Board levels, are precisely why I have chosen not to be, and will never again be, involved in the Honor Board.

I have no hesitation in expressing these views openly. Honor must be the foundation of the Honor Board, and in this case, it was not. If MIDN Mitchell is found guilty, then by principle, all midshipmen involved in the team activity should likewise be held accountable, as they also failed to uphold the standards of their positions. The truth and all viable evidence must be considered, and unfortunately, I witnessed firsthand that this was not done in MIDN Mitchell's case.

Very Respectfully,

Midshipman Victoria Crofford 2/C

# EXHIBIT J

**From:** 2026Debus, Christopher <Christopher.Debus.2026@midshipman.usmma.edu>
**Sent:** Tuesday, August 26, 2025 3:18:01 PM
**To:** 2026Mitchell, Morgan <Morgan.Mitchell.2026@midshipman.usmma.edu>
**Cc:** Bonvento, Matthew <BonventoM@USMMA.EDU>; 2026Cahalan, Charles <Charles.Cahalan.2026@midshipman.usmma.edu>; 2026Bickford, Landon <Landon.Bickford.2026@midshipman.usmma.edu>
**Subject:** Re: Honor Trial

Good afternoon MIDN Mitchell,

Understood, we will look to reschedule for another time.

Furthermore, it is my understanding you may have additional witness statements/evidence you would like to present at your hearing. If this is the case, there are two options available:

1. If you have substantive evidence that you wish to present in your defense, the honor staff will reopen the investigation as per the honor manual and investigate all new evidence, whether evidence submitted by you or new evidence uncovered by the investigations officer to include previous statements made since 27 August 2024 which relates to this case.

2. As per the Superintendent's Reconsideration Decision of last year, we will proceed with a retrial, using the unredacted case packet which you have in your possession (with no new evidence).

Please let me know your decision as soon as possible so the honor staff may proceed accordingly.


Very Respectfully,

**MIDN CDR Christopher Debus 1/C**
Regimental Honor Board Chairman
Maritime Logistics and Security | Class of 2026B
Fourth Company | Flight Deck #5424
United States Merchant Marine Academy
Cell: (904) 903-0408

# EXHIBIT K

MIDSHIPMAN MITCHELL:  (Indiscernible.)

This is Midshipman Mitchell reporting for

honor board.

MR. CAHALAN:  Please be seated.

May I have your attention?  This honor

hearing will now commence.  The accused is

Midshipmen Mitchell, who is charged with

lying.  If any voting member feels that he

or she is unable to cast an unbiassed vote,

it is your moral responsibility to excuse

yourself.

Midshipman Mitchell, this honor

hearing has been convened to hear new

evidence and clarify any old evidence

concerning your alleged honor violation.

You have been accused of lying.  The honor

staff present will vote as to whether

you're in violation or not in violation of

the honor code and concept.

Midshipmen Mitchell, you're entitled

to be present during the presentation of

all evidence except during closed

deliberations and balloting.  You may

testify on your behalf.

Remember, you've accepted the duty to

1      abide by the honor concept by becoming a

2      midshipman.  Therefore, you're encouraged

3      to disclose any relevant information you

4      might have.  You may opt to not testify,

5      and your silence will not be used against

6      you.  However, if you do testify, any and

7      all statements over the course of this

8      proceeding may be used against you in

9      further proceedings.

13:13:37  10      You're reminded of your rights at this

11     time.  You have the right to remain silent;

12     the right not to be subjected to

13     self-incrimination; the right to an

14     advisor; the right to submit a statement to

15     the investigating officer for consideration

16     during the course of the investigation; the

17     right to protest any honor hearing

18     representatives selected for the hearing.

19     The right to submit a statement to the

13:14:50  20     commandant for consideration in their

21     decision; the right to submit a statement

22     to the superintendent for reconsideration

23     of their decision.

24      In cases where the commandant's

25     decision is less than disenrollment or

setback, the right to request the

commandant reconsider that decision. In

cases referred to the superintendent for

disenrollment, the right to request the

superintendent reconsider the decision that

it poses discipline less than

disenrollment.

Without a violation, the right to

submit a statement as part of an appeal to

the commandant or superintendent concerning

procedural matters. The right to repeal to

the assistant secretary of administration

if disenrollment section is imposed.

Do you understand and acknowledge your

rights?

MIDSHIPMAN MITCHELL: Yes.

MR. CAHALAN: You also have the right

to introduce any new evidence or to help

clarify or further your defense. You may

question any of the procedures which occur

during the hearing. Your advisor or I will

answer any of your questions regarding your

rights or honor hearing procedures on your

behalf.

Do you understand?

1        MIDSHIPMAN MITCHELL:  I have the right

2    to submit new evidence?

3        MR. CAHALAN:  That was provided from

4    the Department of Transportation lawyer

5    that this was going to be a direct retrial

6    with all the same evidence.

7        CAPTAIN KEANE:  Do you have new

8    evidence you need to present?  That's

9    (indiscernible) standard.

13:20:02  10    MR. BONVIENTO:  There was -- not the

11    opportunity to provide.  It was either

12    option A or option B.  So if option B was

13    chosen, which was a retrial, there was a

14    direct statement that ^ CK  no new evidence

15    could be presented.  It was only going to

16    be --

17        CAPTAIN KEANE:  But the other option

18    allowed evidence to be introduced?

19        SPEAKER:  Yes, sir.  That was the

13:22:46  20    option (indiscernible).

21        CAPTAIN KEANE:  Yes.

22        SPEAKER:  And the option was option B

23    which (indiscernible) --

24        SPEAKER:  Yes.

25        SPEAKER:  -- conducted a retrial with

1    no new evidence.

2         CAPTAIN KEANE:  Okay.  So then an

3    option for new evidence at this time and

4    place is not available.

5         It's a real simple question and it's a

6    real simple answer.

7         And it's for you:  Do you have

8    evidence that's substantial and significant

9    that you would want to present at this

13:25:54   10    hearing?

11         MIDSHIPMAN MITCHELL:  Yes, but I don't

12    have an opening.

13         CAPTAIN KEANE:  Okay.

14         MIDSHIPMAN MITCHELL:  Because I was of

15    the impression that I can bring new

16    evidence to this case.

17         CAPTAIN KEANE:  Well, you have the

18    option per the Department of Transportation

19    lawyer to have a case where you are able to

13:27:47   20    present new evidence as opposed to the

21    original decision, which was one whereby

22    you be -- the only difference between your

23    last hearing and this hearing will be that

24    the names would not be redacted.

25         So if you have new evidence that is

1    significant and that the board should

2    consider, okay, if that's the case, then

3    tell me that right now and we'll go ahead

4    and suspend the hearing and we'll set it up

5    today.

6        MIDSHIPMAN MITCHELL:  No, we can

7    proceed.

8        CAPTAIN KEANE:  I'm giving you the

9    opportunity to present new evidence.  Not

13:29:27  10    character statements, but evidence that's

11    relevant to this.

12        MIDSHIPMAN MITCHELL:  No, sir, we can

13    just proceed with the trial today.

14        CAPTAIN KEANE:  Okay.  You had the

15    opportunity.  I'm just making sure that

16    you're aware that the opportunity was to

17    add new evidence.

18        MIDSHIPMAN MITCHELL:  Yes, sir.

19        CAPTAIN KEANE:  Okay?

13:30:29  20        MR. CAHALAN:  Have you seen all the

21    evidence related to your case?

22        MIDSHIPMAN MITCHELL:  Yes.

23        MR. CAHALAN:  We're about to hear

24    evidence presented concerning an alleged

25    violation of the honor concept from a

member of regimen.  This midshipmen is
charged with lying.  The purpose of this
hearing is to uncover all the facts of the
case and make a valid determination as to
whether Midshipman Mitchell is in violation
or not in violation of the honor code and
concept.

The investigating officer may now
present the case summary and open
statements.

INVESTIGATING OFFICER:   Midshipman
Mitchell stands accused of lying in
reference to a soccer club team movement by
Former Midshipman Muehlbauer, First Class.
The lying accusation occurred on August
18th, 2024.  Midshipman Mitchell stands
accused of lying by former Midshipman
Muehlbauer in respect to a soccer club Team
Movement.

In the accuser interview, Midshipman
Muehlbauer stated that he and former
Midshipman Jablonowski, Midshipman
Schinellar, Midshipman Colpoys met with
Midshipman Mitchell on Sunday, August 18th,
at 1430 to question her involvement.

1    Midshipman Mitchell stated that her

2    Midshipman Ramsden and Midshipman Rozoni

3    set up away from everyone, and that she had

4    a drink on the way to the beach.

5    After Midshipman Muehlbauer received a

6    report that Midshipman Mitchell was

7    involved in this situation at the beach, he

8    met with Midshipman Mitchell on Sunday

9    August 25th at 1800, where Midshipman

13:36:21  10   Muehlbauer gave Midshipman Mitchell the

11   opportunity to submit an HB-0.

12   Midshipman Mitchell fully denies --

13   denied the defense [sic], and Midshipman

14   Muehlbauer submitted an HB-1 so the case

15   could be investigated.

16   Midshipman Mitchell fully denies the

17   violation.  In the accused interview,

18   Midshipman Mitchell stated that Midshipman

19   Rozoni was not drinking.  Midshipman

13:38:28  20   Mitchell stated that her, Midshipman

21   Rozoni, and Midshipman Ramsden did not

22   bring any alcohol to drink or to pass out

23   to the plebe members of the women's soccer

24   team.

25   Midshipman Mitchell stated that she

had no interaction with either the men's or
women's soccer teams besides two brief
conversations with her brother, Plebe
Mitchell, and Midshipman ^ CK Wes ferry.

Midshipman Mitchell stated that she
was set up around 35 feet from the men's
soccer team setup. In the witness
interviews with six different eyewitnesses,
witness accounts from the girls' and boys'
soccer teams at the beach, Midshipman
Mitchell's involvement was established.

Midshipman Vanasse stated that her --
stated he heard Midshipman Mitchell state
that they have White Claws that the plebe
soccer girls can drink. Midshipman Koback,
Midshipman Crooks, Midshipman Robertson,
Midshipman Tallini, and Midshipman Vanasse
stated that Midshipman Mitchell was
interacting with the men's and women's
soccer teams the whole time at the beach.

Midshipman Robertson and Midshipman
Tallini stated that they witnessed
Midshipman Rozoni drinking at the beach.
Midshipman Robertson, Midshipman Tallini
and Midshipman Vanasse say that they

witnessed Midshipman Mitchell drinking at
the beach.

Midshipman Koback, Midshipman Crooks,
Midshipman Robertson, Midshipman Winters,
Midshipman Tallini, and Midshipman Vanasse
all stated that they can confidently say
that Midshipman Mitchell was fully aware of
the situation at the beach.

Midshipman Koback, Midshipman Crooks,
Midshipman Winters, Midshipman Tallini, and
Midshipman Vanasse stated that Midshipman
Mitchell's setup was located around 30 to
40 feet away from the women's soccer team
setup and about 10 feet away from the men's
soccer team setup.

MR. CAHALAN:  The board will now call
the first witness, Midshipman Robertson.

MIDSHIPMAN ROBERTSON:  Good afternoon,
ladies and gentlemen.  Midshipman Robertson
reporting before the honor board's order.

MR. CAHALAN:  Please be seated.  And
the seat is behind.

Midshipman Robertson, you may present
your opening statement if you have one.

MIDSHIPMAN ROBERTSON:  I don't.

1    MR. CAHALAN:  Thank you.  The voting

2    members may now question the witness.

3       VOTING MEMBER 1:  In your witness

4    statement you stated that you witnessed

5    Midshipman Mitchell and Midshipman ^ CK

6    Rontoni drinking at the beach, but

7    Midshipman Mitchell stated that did not

8    happen.  Could you recount what you saw?

9       MIDSHIPMEN ROBERTSON:  Quite frankly,

17:04:56  10    this is 13 months ago, and, I mean, I

11    vaguely recall, I mean, the events.  So my

12    best recollection, I believe ^ CK

13    (indiscernible), yes.  Yeah, I believe so.

14       VOTING MEMBER 2:  You stated that you

15    could confidently say that Midshipman

16    Mitchell was fully aware of the situation

17    at the beach.  Could you explain why you

18    are sure of that?

19       MIDSHIPMAN ROBERTSON:  I mean, there's

17:07:44  20    -- it's a Team Movement, obviously, so I

21    think having drinks out, you know, in

22    certain circumstances are not -- in fact,

23    can happen.  That's all I can really say

24    honestly.  It's just so long ago, it's kind

25    of hard to recall everything.

1       VOTING MEMBER 3:  So did you see

2   Midshipman Mitchell often?  Like, did you

3   talk to her personally at all?

4       MIDSHIPMAN ROBERTSON:  No.  No.

5       VOTING MEMBER 3:   But did you see her

6   around other people or near you at all?

7       MIDSHIPMAN ROBERTSON:   Oh.  To my

8   recollection, I don't know who she was

9   with.  She was -- (indiscernible).  She

17:12:48  10  wasn't really with the soccer team.  So

11  there's (indiscernible) with some

12  upperclassmen though.

13      VOTING MEMBER 3:  But she was with

14  another group besides Midshipman Ronzoni

15  and Midshipman Ramsden?

16      MIDSHIPMAN ROBERTSON:  Yes, I believe

17  so.  Yeah.

18      VOTING MEMBER 4:  Do you think there's

19  any way Midshipman Mitchell could have been

17:16:17  20  unaware of the situation that was happening

21  at the beach?

22      MIDSHIPMAN ROBERTSON:  I don't think

23  so.  I mean, she definite -- definitely

24  aware of what was going on, I believe.

25      MR. CAHALAN:  If the voting members

1    have no further questions, Midshipman

2    Mitchell may now question the witness.

3        MIDSHIPMAN MITCHELL:  The incident you

4    described occurred about a month prior to

5    you giving your statement, correct?

6        MIDSHIPMAN ROBERTSON:  I'm sorry.

7    Repeat that?

8        MIDSHIPMAN MITCHELL:  The TM happened

9    about a month before you made your

10   statement to the honor board staff,

11   correct?

12       MIDSHIPMAN ROBERTSON:  They questioned

13   me pretty soon after that, at the -- what

14   happened at the TM.

15       MIDSHIPMAN MITCHELL:  But on your

16   honor board statement, it was dated

17   September 20 something?

18       MIDSHIPMAN ROBERTSON:  Yeah.  It does

19   say that, yes.

17:24:59  20       MIDSHIPMAN MITCHELL:  From this TM you

21   received a class 1 alcohol offense and an

22   honor board (indiscernible), correct?

23       MIDSHIPMAN ROBERTSON:  I didn't have

24   any class 1s (indiscernible) because I

25   didn't drink at all.

1          MIDSHIPMAN MITCHELL:  Can you say what

2     you were honor boarded for, as well as what

3     -- or can you say what you were honor

4     boarded for?

5          MIDSHIPMAN ROBERTSON:  Yeah.  I lied

6     for the team.  Or I lied with the team and

7     said that there was no (indiscernible) at

8     the beach.  And prior to that

9     (indiscernible).

17:28:39  10          MIDSHIPMAN MITCHELL:  At the PKT the

11     Sunday after the TM, former Midshipmen

12     Jablonowski asked all the players on the

13     men's soccer team to stay after, correct?

14          MIDSHIPMAN ROBERTSON:  Yes.  Yeah.

15          MIDSHIPMAN MITCHELL:  She gave you the

16     opportunity to report to her room or former

17     Midshipman Muehlbauer's room until 2130 and

18     give a report on your story, correct?

19          MIDSHIPMAN ROBERTSON:  Yep.

20          MIDSHIPMAN MITCHELL:  Did you report

21     to any of their rooms?

22          MIDSHIPMAN ROBERTSON:  Yeah, I talked

23     with them after.

24          MIDSHIPMAN MITCHELL:  What was your

25     explanation of the events throughout the

1    day when reporting to Midshipmen

2    Jablonowski or former Midshipman

3    Muehlbauer?

4         MIDSHIPMAN ROBERTSON:  I said that

5    there were midshipmen drinking at the

6    beach, and they were in fact directing it

7    to the soccer team.

8         MIDSHIPMAN MITCHELL:  After the PKT

9    did you meet with your team captains

17:36:30  10    Midshipmen T_____, and Midshipman

11    _____?

12         MIDSHIPMAN ROBERTSON:  I didn't handle

13    it with them at all.  I believe there were

14    some text messages back and forth, but I

15    didn't meet with them at all.  No.

16         MIDSHIPMAN MITCHELL:  But you were on

17    board with maintaining the lie that all the

18    plebe boys were telling about the beach,

19    correct?

17:39:21  20         MIDSHIPMAN ROBERTSON:  Yeah, there's a

21    whole -- there's a whole series of stories

22    about it the captains had us say.

23         MIDSHIPMAN MITCHELL:  So this meeting

24    and those text messages were help -- were

25    continuing to fabricate your story,

1          correct?

2                    MIDSHIPMAN ROBERTSON:  Yes.  Yeah, to

3          the stories that (indiscernible).

4                    MIDSHIPMAN MITCHELL:   So to verify,

5          you lied multiple times regarding this

6          incident, as well as complying with others

7          who told a lie?

8                    MIDSHIPMAN ROBERTSON:  Yeah.  Even the

9          captains told me to do it for -- well, they

10         talked to Jablonowski.

11                   MIDSHIPMAN MITCHELL:  Had you met me

12         prior to the beach TM?

13                   MIDSHIPMAN ROBERTSON:  No.

14                   MIDSHIPMAN MITCHELL:  If you had never

15         met me prior to this incident, how can you

16         be a hundred percent confident that I was

17         aware of the situation?

18                   MIDSHIPMAN ROBERTSON:  Because you

19         were drinking at the beach with drinks.

17:57:55  20         Alcohol.

21                   MIDSHIPMAN MITCHELL:  How do you know

22         I was drinking?

23                   UNIDENTIFIED SPEAKER: (Indiscernible.)

24                   MIDSHIPMAN MITCHELL:  You had --

25                   SPEAKER:  Yes.

1    SPEAKER:  Please maintain

2    professionalism (indiscernible).

3    MIDSHIPMAN ROBERTSON:  Okay.  Sorry.

4    MIDSHIPMAN MITCHELL:  How did you know

5    I was drinking at the beach if you hadn't

6    even met me at that point?

7    MIDSHIPMAN ROBERTSON:  Hadn't met you

8    personally, but I did know you were Walker

9    Mitchell's sister.  I know that much,

10   Midshipmen Mitchell.

11   MIDSHIPMAN MITCHELL:  At any point

12   throughout the TM did you notify me that

13   drinking was taking place?

14   MIDSHIPMAN ROBERTSON:  No.  I stayed

15   out of that.  I didn't drink at all.

16   MIDSHIPMAN MITCHELL:  You did not go

17   into a specific instance verifying that I

18   was aware of what was taking place

19   throughout the TM, correct, on your -- in

20   your interview to Midshipman ^ CK  Salvez

21   last year, correct?

22   MIDSHIPMAN ROBERTSON:  Sorry, can you

23   repeat that?

24   MIDSHIPMAN MITCHELL:  You did not give

25   a specific instance verifying that I was

1    aware of what was taking place throughout

2    the TM to Midshipmen Salvez last year,

3    correct?

4         MIDSHIPMAN ROBERTSON:  You would have

5    to be pretty aware that you were drinking

6    on the beach.  I mean, I didn't give a

7    specific instance.

8         MIDSHIPMAN MITCHELL:  I'm not asking

9    about me drinking; I'm asking about me

10   being aware.

11        MIDSHIPMAN ROBERTSON:  I'm not --

12        MIDSHIPMAN MITCHELL:  You couldn't --

13   you didn't give a specific instance to

14   Midshipman Salvez verifying that I was

15   aware, correct?

16        MIDSHIPMAN ROBERTSON:  It's hard not

17   to be aware of that.

18        MIDSHIPMAN MITCHELL:  And what would

19   make me aware of that?

20        MIDSHIPMAN ROBERTSON:  The fact that

21   (indiscernbile) to the beach, ^ CK  the

22   soccer team drinking, and the fact that

23   you're a second classman, which is part of

24   (indiscernible) drinking.

25        MIDSHIPMAN MITCHELL:  But you said

1      yourself that I wasn't with the soccer

2      teams, correct?

3          MIDSHIPMAN ROBERTSON:  It's the soccer

4      team.  I mean, you're still drinking.

5          MIDSHIPMAN MITCHELL:  Well, how could

6      you not give a specific instance a year ago

7      verifying this claim?

8          MIDSHIPMAN ROBERTSON:  Because I

9      really wasn't in it at all.  I just -- I

10     didn't drink at all.  I was there,

11     obviously, but I didn't partake in the

12     drinking.  I was (indiscernible) of

13     everything.

14         MIDSHIPMAN MITCHELL:  How many other

15     men's soccer players were on the TM?

16         MIDSHIPMAN ROBERTSON:  The plebes and

17     a couple of upperclassmen, I believe, so it

18     would be 10, 11.  Maybe (indiscernible).

19     I'm not quite sure of full numbers, but all

20     the plebes and a few upperclassmen.

21         MIDSHIPMAN MITCHELL:  How many of

22     these players were plebes at the time of

23     the TM?

24         MIDSHIPMAN ROBERTSON:  10 about.  Like

25     I said, I don't know.  It's most all of the

1    plebes actually and then a couple of

2    upperclassmen.

3        MIDSHIPMAN MITCHELL:  And all the

4    plebes on the men's soccer team were

5    interviewed by Midshipmen Salvez, correct?

6        MIDSHIPMAN ROBERTSON:  I don't know if

7    they were, but I believe some may.

8        MIDSHIPMAN MITCHELL:  You were all

9    going to be together (indiscernible)?

10       MIDSHIPMAN ROBERTSON:  I didn't drink.

11    I was (indiscernible) drink. ^ CK.

12    (Indiscernible).

13       MIDSHIPMEN MITCHELL:  But you're the

14    only one maintaining that we were aware,

15    correct?

16       MIDSHIPMEN ROBERTSON:  I suppose.

17       MIDSHIPMEN MITCHELL:  At any point

18    throughout your interview with Midshipmen

19    Salvez, did he show you an image of myself

20    when asking questions regarding my

21    involvement?

22       MIDSHIPMEN ROBERTSON:  No.

23    (Indiscernible).

24       MIDSHIPMEN MITCHELL:  All right.  No

25    further questions.

1    MR. CAHALAN:  If the accused

2    midshipmen has no further questions, the

3    witness is now dismissed.

4        The board will now call the second

5    witness, Midshipman Koback.

6        MIDSHIPMAN KOBACK:  Midshipman Koback

7    reporting to the board as ordered.

8        MR. CAHALAN:  Please be seated in the

9    chair behind.

18:44:17  10        Midshipman Koback, you may present

11    your opening statement if you have one.

12        MIDSHIPMAN KOBACK:  (Indiscernible)

13    no.

14        MR. CAHALAN:  Thank you.  The voting

15    members may now question the witness.

16        VOTING MEMBER A:   Do you know if

17    Midshipman Mitchell personally?

18        MIDSHIPMAN KOBACK:  Yes, ma'am.  We

19    play soccer together.

18:45:35  20        VOTING MEMBER A:  And you say without

21    a doubt that you saw her at the TM?

22        MIDSHIPMAN KOBACK:  Yes, ma'am.

23        VOTING MEMBER A:  Did you see her

24    drinking?

25        MIDSHIPMAN KOBACK:  No, I -- I don't

1    recall that.

2         VOTING MEMBER A:  Did --

3         MIDSHIPMAN KOBACK:  I don't remember.

4    It was too far back.

5         VOTING MEMBER A:   Okay.  Were you

6    with her some of the time, part of the

7    time?  Can you remember?

8         MIDSHIPMAN KOBACK:  I wasn't with her

9    at all.  She was off, like, with other

18:47:24  10    members of the team.

11         VOTING MEMBER A:  Were those members

12    of the team drinking?

13         MIDSHIPMAN KOBACK:  I wasn't looking

14    at her and that group, so I can't really

15    say if they were or not.  I was more with

16    the plebe side.  So I'm not sure if they

17    were or not.

18         VOTING MEMBER B:  But you can confirm

19    she did interact with other midshipmen

18:48:46  20    besides Midshipman Ramsden and Ronzoni?

21         MIDSHIPMAN KOBACK:  From what I

22    remember, yes.

23         VOTING MEMBER B:  How often did she

24    interact with other midshipmen?

25         MIDSHIPMAN KOBACK:  I'm not sure.

1          VOTING MEMBER B:  Was it often or

2     sparse from what you recollect?

3          MIDSHIPMAN KOBACK:  I only saw her

4     interacting with other people, like, once.

5     I really didn't see her the rest of the

6     time.

7          VOTING MEMBER C:  You stated that you

8     could confidently say that Midshipmen

9     Mitchell was fully aware of the situation

18:50:19  10     at the beach.  Could you explain why you're

11     so sure of that?

12          MIDSHIPMAN KOBACK:  Because it was

13     pretty obvious what was going on at the

14     beach.  There were red Solo cups

15     everywhere, and it was pretty obvious that

16     there was drinking.

17          VOTING MEMBER C:  Was there a red Solo

18     cup anywhere near where the setup that

19     Midshipmen Mitchell had?

18:51:28  20          MIDSHIPMAN KOBACK:  I don't remember

21     that.

22          VOTING MEMBER D:  Was Midshipman

23     Mitchell and Midshipman Ronzoni set up

24     together?

25          MIDSHIPMAN KOBACK:  I'm sorry, could

1          you repeat your question?

2               VOTING MEMBER D:  Midshipman Mitchell

3          and Midshipman Ronzoni, were they set up

4          together?

5               MIDSHIPMAN KOBACK:  Were they set up,

6          as were they around each other?

7               VOTING MEMBER D:  Yeah.

8               MIDSHIPMAN KOBACK:  Yeah.  From what I

9          remember, yes.

18:52:40  10               VOTING MEMBER D:  And you said that

11          they said -- Midshipman Ronzoni said you

12          can't have your phones because you are

13          drinking.  Is that correct?

14               MIDSHIPMAN KOBACK:  That's what I put

15          in my statement, yes.

16               VOTING MEMBER D:  Okay.  So you were

17          next to them at some point to be able to

18          hear that, correct?

19               MIDSHIPMAN KOBACK:  Midshipman Ronzoni

18:53:53  20          came over to take our phones away.  I don't

21          remember exactly what she said to me.  But

22          that was what I was in any interview, so.

23               MR. CAHALAN:  If the voting members

24          have no further questions, Midshipman

25          Mitchell may now question the witness.

1    MIDSHIPMEN MITCHELL:  The events that

2    you described occurred about a month prior

3    to you giving your statement, correct?

4        MIDSHIPMAN KOBACK:  The month prior.

5        MIDSHIPMEN MITCHELL:  You gave your

6    honor board interview a month after the TM,

7    correct?

8        MIDSHIPMAN KOBACK:  Yes, that's

9    correct.

18:55:53 10    MIDSHIPMEN MITCHELL:  You were asked

11    in the same context of placing charges,

12    correct?

13        MIDSHIPMAN KOBACK:  I'm sorry, could

14    you repeat that?

15        MIDSHIPMEN MITCHELL:  You were asked

16    to give that statement, meaning being

17    interviewed, in the context of placing

18    charges, correct?

19        MIDSHIPMAN KOBACK:  I believe so, yes.

18:57:12 20    MIDSHIPMEN MITCHELL:  Did you receive

21    an alcohol offense in this incident?

22        MIDSHIPMAN KOBACK:  Yes, I did.

23        MIDSHIPMEN MITCHELL:  So you were

24    drinking at the beach, consuming alcohol?

25        MIDSHIPMAN KOBACK:  Yes, I was.

1          MIDSHIPMAN MITCHELL:  You were

2     interviewed by Midshipman Salvez, correct?

3          MIDSHIPMAN KOBACK:  Yes, that is

4     correct.

5          MIDSHIPMEN MITCHELL:  Did Midshipman

6     Salvez (indiscernible) to read back over

7     your statement once your interview

8     concluded?

9          MIDSHIPMAN KOBACK:  He read me back my

18:58:19  10     statement, and I signed off on it.

11          MIDSHIPMEN MITCHELL:  But you didn't

12     read it yourself.

13          MIDSHIPMAN KOBACK:  I do not remember

14     reading my statement, no.

15          MIDSHIPMEN MITCHELL:  In your

16     statement Midshipman Salvez wrote that you

17     said, in quotes, You can't have your phones

18     because you were drinking.  Is this a

19     direct and exact quote from you?

18:59:14  20          MIDSHIPMAN KOBACK:  I'm not sure.

21          MIDSHIPMEN MITCHELL:  How many other

22     plebe girls were at the beach TM?

23          MIDSHIPMAN KOBACK:  How many other

24     girls?

25          MIDSHIPMAN MITCHELL:  Uh-huh.

1          MIDSHIPMAN KOBACK:  I'm pretty sure it

2     was almost all the plebes except for three

3     of them.

4          MIDSHIPMEN MITCHELL:  Why would their

5     statement be different than yours if you

6     were all at the beach together?

7          MIDSHIPMAN KOBACK:  I'm not sure.

8     That was so long ago.

9          MIDSHIPMEN MITCHELL:  You read in your

19:00:19 10     statement that myself and others were set

11     up around 40 feet away from the women's

12     soccer team, correct?

13          MIDSHIPMAN KOBACK:  Yes, that is

14     correct.

15          MIDSHIPMEN MITCHELL:  And that me and

16     you did not interact at all, correct?

17          MIDSHIPMAN KOBACK:  No, I did not

18     interact with you at all.

19          MIDSHIPMEN MITCHELL:  So if I was far

19:00:54 20     away, how can I [sic] be sure of the

21     drinking?

22          MIDSHIPMAN KOBACK:  Because it was

23     pretty evident what was going on at the

24     beach.

25          MIDSHIPMEN MITCHELL:  If the red Solo

1    cup is indicative of drinking, do you think

2    Commander ^ CK  Romanto is drinking now?

3         MIDSHIPMAN KOBACK:  No, because this

4    is a different context and situation.

5         MIDSHIPMEN MITCHELL:  Well, a red Solo

6    cup can be used for anything, correct?

7         MIDSHIPMAN KOBACK:  Correct.

8         MIDSHIPMEN MITCHELL:  Not just

9    alcohol?

10        MIDSHIPMAN KOBACK:  Correct.

11        MIDSHIPMEN MITCHELL:  And

12   (indiscernible) --

13        MR. CAHALAN:  Please keep this

14   professional and respectful.

15        MIDSHIPMEN MITCHELL:  You can't say

16   any specific instance where I

17   (indiscernible) alcohol being poured into a

18   red Solo cup, correct?

19        MIDSHIPMAN KOBACK:  No.

20        MIDSHIPMEN MITCHELL:  At any point

21   throughout the TM did you notify me that

22   drinking was taking place?

23        MIDSHIPMAN KOBACK:  I did not.

24        MIDSHIPMEN MITCHELL:  Why could you

25   not give a specific instance a year ago

1          when you were interviewed by the honor

2          board staff?

3               MIDSHIPMAN KOBACK:  I'm sorry, could

4          you repeat that question?

5               MIDSHIPMEN MITCHELL:   Why could you

6          not give a specific instance a year ago

7          when you were interviewed by the honor

8          board staff.

9               MIDSHIPMAN KOBACK:  Specific instance

19:04:49  10          a year ago?

11               MIDSHIPMEN MITCHELL:  Verifying that I

12          was a hundred percent aware of the

13          situation.

14               MIDSHIPMAN KOBACK:  From what I

15          understood, there was really no way to not

16          be sure of the situation.

17               MIDSHIPMEN MITCHELL:  But to confirm,

18          you stated we had no interaction and I was

19          40 feet away from you.  So it would be hard

19:05:30  20          to prove on your oath that I was completely

21          aware of what was going on at the beach,

22          correct?

23               MIDSHIPMAN KOBACK:  Correct.

24               MIDSHIPMEN MITCHELL:  No further

25          questions.

1          MR. CAHALAN:  If the accused

2     midshipman has no further questions, the

3     witness is now dismissed.

4          The board will now call a third

5     witness, Midshipman Crooks.

6          MIDSHIPMAN CROOKS:  Midshipman Crooks

7     reporting for honor board (indiscernible).

8          MR. CAHALAN:  Please be seated.

9     Midshipman Crooks, you may now present your

19:09:30  10     opening statement if you have one.

11          MIDSHIPMAN CROOKS:  I don't have one.

12          MR. CAHALAN:  Thank you.  The voting

13     members may now question the witness.

14          VOTING MEMBER 1(a):  Do you know

15     Midshipman Mitchell personally?

16          MIDSHIPMAN CROOKS:  Just personally?

17          VOTING MEMBER 1(a):  Yes.

18          MIDSHIPMAN CROOKS:  We're on the

19     soccer team together.  That's about it.

19:10:47  20          VOTING MEMBER 1(a):  So you could

21     point her out in a crowd just like you saw

22     her?

23          MIDSHIPMAN CROOKS:  Yes.

24          VOTING MEMBER 2(a):  And in your

25     interview or your statement you said

1    Midshipman Mitchell was interacting with

2    the team the whole time.  Could you confirm

3    that?

4         MIDSHIPMAN CROOKS:  I don't know about

5    the whole time.  I just had one

6    conversation with her that was pretty

7    short.  But other than that, I kind of kept

8    to myself and my friends, so I can't really

9    speak to what she was doing.

19:12:18  10    VOTING MEMBER 2(a):  But did you see

11    her throughout your time at the beach?

12    Like, did you, like, see her interacting

13    with other team members?

14         MIDSHIPMAN CROOKS:  I would say so

15    from what I saw.

16         VOTING MEMBER 2(a):  So was it often

17    or, like, sparse?

18         MIDSHIPMAN CROOKS:  I can't say that I

19    remember exactly.

19:13:13  20    VOTING MEMBER 2(a):   Okay.

21         VOTING MEMBER 3(a):  You stated that

22    you could confidently say that Midshipman

23    Mitchell was aware of what was going on at

24    the beach.  Could you explain why you were

25    so sure that she was aware?

1          MIDSHIPMAN CROOKS:  I said that I

2    believe that she was probably aware to what

3    happened just because, from my perspective,

4    what was happening was pretty evident from

5    everyone just from people, like, having

6    drinks in the open and stuff like that.

7          So for everyone that was there, I find

8    it hard to believe that there were people

9    that (indiscernible) what was happening.

19:15:20  10          VOTING MEMBER 4(a):  You said

11    Midshipman Ronzoni, Mitchell, and Ramsden

12    were set up around 30 feet away from the

13    team together, correct?

14          MIDSHIPMAN CROOKS:  Correct.

15          VOTING MEMBER 4(a):   Okay.  And then

16    you said that Midshipman Ramsden said, If

17    you want any drinks, just let me know.

18    Correct?

19          MIDSHIPMAN CROOKS:  Correct.

19:16:37  20          VOTING MEMBER 4(a):   So then

21    Midshipman Mitchell would have been with

22    Midshipman Ramsden where the drinks would

23    have been, correct?

24          MIDSHIPMAN CROOKS:  I'm not sure.  She

25    wasn't with her when she said that to us,

1         so I can't (indiscernible).

2              VOTING MEMBER 5(a):  Did you see her

3         distribute any alcoholic drinks to any of

4         the midshipmen or plebes?

5              MIDSHIPMAN CROOKS:  Midshipman

6         Mitchell or --

7              VOTING MEMBER 5(a):   Yes, Midshipman

8         Mitchell.

9              MIDSHIPMAN CROOKS:  (Indiscernible.)

19:18:19  10    VOTING MEMBER 5(a):  Okay.

11             VOTING MEMBER 6(a):  Can you confirm

12        there was alcohol at the event?

13             MIDSHIPMAN CROOKS:  Yes.

14             VOTING MEMBER 6(a):   Did you see it

15        being poured at any point, like, from a can

16        or bottle, anything?

17             MIDSHIPMAN CROOKS:  I mean, I can

18        confirm there was alcohol there.  I did

19        get, like, an alcohol offense for consuming

19:19:58  20    it myself.

21             VOTING MEMBER 6(a):  Where did you get

22        it from?

23             MIDSHIPMAN CROOKS:  I got it from the

24        third classmen that gave it to us.

25             VOTING MEMBER 7(a):  What did you

1    drink the alcohol from?

2         MIDSHIPMAN CROOKS:  A cup.

3         VOTING MEMBER 7(a):  What kind?

4         MIDSHIPMAN CROOKS:  A Solo cup.

5         VOTING MEMBER 8(a):  Do you know this

6    third classman?  Were they on the soccer

7    team?

8         MIDSHIPMAN CROOKS:  Yes.

9         VOTING MEMBER 8(a):  Do you remember

19:41:39  10    who they came there with?

11         MIDSHIPMAN CROOKS:  Who they what?

12         VOTING MEMBER 8(a):  Who they came

13    there with?

14         MIDSHIPMAN CROOKS: The van that we all

15    came in.

16         VOTING MEMBER 8(a):  So you were in a

17    van with this third classman?

18         MIDSHIPMAN CROOKS:  Yes.

19         VOTING MEMBER 8(a):  Who else was in

19:43:10  20    this van?

21         MIDSHIPMAN CROOKS:  A lot of people,

22    like plebes and third classmen.  I can't

23    name exactly everyone.  I don't remember.

24         VOTING MEMBER 8(a):  Midshipman

25    Mitchell was not in the van with you?

1          MIDSHIPMAN CROOKS:  No.

2          VOTING MEMBER 8(a):  Did you guys stop

3     at any point to get alcohol?

4          MIDSHIPMAN CROOKS:  Yes.

5          VOTING MEMBER 8(a):  Okay.  And

6     Midshipman Mitchell was not with you guys?

7          MIDSHIPMAN CROOKS:  No.

8          VOTING MEMBER 9(a):   Was this stop

9     for alcohol mentioned in any of your group

19:45:30  10     chats or anything like that?

11          MIDSHIPMAN CROOKS:  No.

12          MR. CAHALAN:  If the voting members

13     have no further questions, Midshipman

14     Mitchell may now question the witness.

15          MIDSHIPMEN MITCHELL:  The incident you

16     described at the beach occurred a month

17     prior to you giving your statement to the

18     honor board staff, correct?

19          MIDSHIPMAN CROOKS:  (Indiscernible.)

19:49:30  20          MIDSHIPMEN MITCHELL:  All right.  You

21     were drinking at the beach, consuming

22     alcohol, correct?

23          MIDSHIPMAN CROOKS:  Yes.

24          MIDSHIPMEN MITCHELL:  You were

25     interviewed by Midshipman Muehlbauer,

1       former RTO, and Midshipman Jablonowski,

2       former RTO, correct?

3            MIDSHIPMAN CROOKS:  (Indiscernible.)

4            MIDSHIPMEN MITCHELL:  You weren't

5       questioned the Sunday after the TM?

6            MIDSHIPMAN CROOKS:  No.

7            MIDSHIPMEN MITCHELL:  Midshipman

8       Jablonowski maintained she interviewed

9       yourself and Midshipman ^ CK  Aubrey

19:51:16  10    Burrell the Sunday following the TM.

11           MIDSHIPMAN CROOKS:  I -- she had

12      mentioned -- like, she had talked to us,

13      but it wasn't, like, long.

14           MIDSHIPMEN MITCHELL:  But she talked

15      to regarding the TM?

16           MIDSHIPMAN CROOKS:  Correct.

17           MIDSHIPMEN MITCHELL:  So Midshipman

18      Aubrey Burrell was in the interview with

19      you, correct?

19:56:00  20           MIDSHIPMAN CROOKS:  Correct.

21           MIDSHIPMAN MITCHELL:  Did you and

22      Midshipman Burrell have the same story as

23      far as the events that happened throughout

24      the day?

25           MIDSHIPMAN CROOKS:  Yes.

1          MIDSHIPMAN MITCHELL:  In your talk

2     with Midshipman Jablonowski, were you asked

3     about my involvement regarding the TM?

4          MIDSHIPMAN CROOKS:  Not that I can

5     remember, but that was a long time ago.

6          MIDSHIPMEN MITCHELL:  Midshipman

7     Jablonowski maintains that both you and

8     Midshipman Burrell were unaware of who I

9     was when she explicitly asked you about me.

19:58:10  10     Is it true that you did not recognize me

11     until Midshipman Jablonowski showed you an

12     image of myself?

13          MIDSHIPMAN CROOKS:  That can be true.

14     I honestly do not remember.  But it was at

15     the very beginning of the year, so I don't

16     doubt that I didn't know midshipmen's

17     names.

18          MIDSHIPMEN MITCHELL:  Is it also true

19     that after being shown the image of me, you

19:58:59  20     then told Midshipman Jablonowski that you

21     did recognize me, but only saw me at the

22     beach with a different group completely

23     unassociated with anyone on the women's and

24     men's soccer team besides Midshipman

25     Ronzoni.

1          MIDSHIPMAN CROOKS:  I don't know about

2     -- could you say that one more time?  I'm

3     sorry.

4          MIDSHIPMEN MITCHELL:  Is it also true

5     that after being shown the image of me, you

6     then told former Midshipman Jablonowski

7     that you did recognize me but only saw me

8     at the beach with a different group

9     completely unassociated with anyone on the

20:00:04  10     women's and men's soccer team besides

11     Midshipman Ronzoni?

12          MIDSHIPMAN CROOKS:  For the most part,

13     yeah (indiscernible).

14          MIDSHIPMEN MITCHELL:  Why did

15     Midshipman Jablonowski's story at your

16     initial interview, which took place the

17     Sunday after the TM, differ so much from

18     what you said during your interview with

19     Midshipman Salvez, which occurred a month

20:01:02  20     later?

21          MIDSHIPMAN CROOKS:  I don't think it

22     differs much.

23          MIDSHIPMEN MITCHELL:  But in your

24     statement to the honor board, you had said

25     that I was interacting with the men's and

1    women's soccer team.  And to Midshipman

2    Jablonowski, you claimed that I was at the

3    beach with a different group completely

4    unassociated with anyone on the men's and

5    women's soccer team besides Midshipman

6    Ronzoni.  Correct?

7         MIDSHIPMAN CROOKS:  You interacted

8    with me, and I know that for a fact because

9    I remember it.  And I remember you talking

20:02:07  10    to people that were there, but I don't know

11    what group you came with.  And I don't know

12    where you were sitting because I wasn't --

13    like, I knew you were sitting -- if it was

14    like the women's soccer team and then the

15    men's soccer team, I know you were further

16    away.  But I don't know what group you

17    were, like, with.

18         MIDSHIPMEN MITCHELL:  Did anyone else

19    on the honor board staff, including

20:02:48  20    (indiscernible) Midshipman Salvez?

21         MIDSHIPMAN CROOKS:  No, not that I can

22    remember.

23         MIDSHIPMEN MITCHELL:  There wasn't a

24    meeting held at the end of August last year

25    with you and all the players on that hall?

MIDSHIPMAN CROOKS:  Yes, there was.

MIDSHIPMEN MITCHELL:  What did they
meet with you about?

MIDSHIPMAN CROOKS:  We were told --
that was a long time ago.  From what I
remember, the main thing that we were told
was just emphasizing telling the truth, but
I can't say that I remember any details.

MIDSHIPMEN MITCHELL:  Who held this
meeting?

MIDSHIPMAN CROOKS:  Midshipman ^ CK
Goodman.

MIDSHIPMEN MITCHELL:  Did she ask
about my involvement regarding the
incidents that happened on the TM?

MIDSHIPMAN CROOKS:  I do not remember.

MIDSHIPMEN MITCHELL:  When I asked you
what was discussed at this meeting, did you
not tell me that Midshipman Goodman was
asking questions about myself and
Midshipman Ronzoni?

MIDSHIPMAN CROOKS:  I don't remember.

MIDSHIPMEN MITCHELL:  Did you not also
tell me in this same conversation that
nothing else was said from yourself and

1          others who attended this meeting other than

2          you all did not know a hundred percent so

3          you did not answer?

4              MIDSHIPMAN CROOKS:  Say that again.

5              MIDSHIPMEN MITCHELL:  Did you not tell

6          me as well regarding this meeting that

7          nothing else was said from yourself and

8          others who attended the meeting other than

9          you all did not know a hundred percent so

10         you did not answer?

11             MIDSHIPMAN CROOKS:  I'm sorry.

12             MIDSHIPMEN MITCHELL:  You stated in

13         your interview to Midshipman Salvez that

14         myself and Midshipman Ronzoni were set up

15         around 30 feet away from the girls' soccer

16         team, correct?

17             MIDSHIPMAN CROOKS:  Yeah, that's

18         correct.

19             MIDSHIPMEN MITCHELL:  At no point

20         throughout the TM did you notify that me

21         that drinking was taking place or that

22         alcohol was bought, correct?

23             MIDSHIPMAN CROOKS:  I did not notify

24         you, correct.

25             MIDSHIPMEN MITCHELL:  You said in your

1     answers to the honor board there were

2     drinks in the open.  Do you mean open

3     containers or red Solo cups?

4         MIDSHIPMAN CROOKS:  I had drinks in a

5     Solo cup.  I did see open containers.

6         MIDSHIPMEN MITCHELL:  Okay.  And who

7     provided you with alcohol for the TM?

8         MIDSHIPMAN CROOKS:  Provided me with

9     the alcohol for the TM?  The -- do I need

10    to say names?

11        MIDSHIPMAN MITCHELL:  Yeah.

12        MIDSHIPMAN CROOKS:  Midshipman ____

13    and Midshipman _____.

14        MIDSHIPMEN MITCHELL:  Thank you.

15    (Indiscernible) has a red Solo cup

16    (indiscernible)?

17        MIDSHIPMAN CROOKS:  No.

18        MIDSHIPMAN MITCHELL:  You did not give

19    a specific instance with the honor board

20    staff verifying that I was aware of what

21    was taking place throughout the TM,

22    correct?

23        MIDSHIPMAN CROOKS:  Say that one more

24    time.

25        MIDSHIPMAN MITCHELL:  You could not --

1      did not give a specific instance to

2      Midshipman S_____ verifying that I was

3      aware of what was taking place throughout

4      the TM, correct?

5          MIDSHIPMAN CROOKS:  (No audible

6      response.)

7          MIDSHIPMAN MITCHELL:  Why did you not

8      give a specific instance a year ago?

9          MIDSHIPMAN CROOKS:  I didn't give a

10:02:06  10     specific instance because I couldn't say

11     for a fact.  I know you saw me, but I was

12     drinking out of a cup, so there's

13     (indiscernible) I didn't say anything to

14     you.

15         MIDSHIPMAN MITCHELL:  So me being

16     aware was an assumption you made?

17         MIDSHIPMAN CROOKS:  Yeah.  It would be

18     an assumption, just based off of what I had

19     seen with my eyes (indiscernible).  It was

10:04:45  20     an assumption, yes.

21         MIDSHIPMAN MITCHELL:  All right.  No

22     further questions.

23         MR. CAHALAN:  If the accused

24     midshipman has no further questions, the

25     witness is now dismissed.

1       The board will now call the fourth

2   witness, Midshipman Winters.

3       MIDSHIPMAN WINTERS:  Good afternoon,

4   ladies and gentlemen.  Midshipman _____ for

5   honor hearing as ordered.

6       MR. CAHALAN:  Please be seated.

7   Midshipman Winters, you may present your

8   opening statement if you have one.

9       MIDSHIPMAN WINTERS:  I don't have one.

10:08:29   10       MR. CAHALAN:  Thank you.  The voting

11   members may now question the witness.

12       VOTING MEMBER A(1):  The previous

13   midshipman that was in here, Midshipman

14   Crooks, said that you supplied her --

15       MIDSHIPMAN WINTERS:  I'm sorry

16   (indiscernible).

17       VOTING MEMBER A(1):  Sorry.  The

18   previous midshipman that was in here,

19   Midshipman Crooks I believe, stated that

10:10:13   20   you provided her with alcohol along with

21   Midshipman ^ CK  foreman.  Where did you

22   get the alcohol from?

23       MIDSHIPMAN WINTERS:  We got it from

24   ^ CK  S_____.

25       VOTING MEMBER A(1):  Were you with

1    anyone else?

2         MIDSHIPMAN WINTERS:  What is it?

3         VOTING MEMBER A(1):  Were you with

4    anyone else?

5         MIDSHIPMAN WINTERS:  Yes.  It was --

6    there was multiple people.  I can't --

7         VOTING MEMBER A(1):   Was midshipman

8    Mitchells [sic] with you?

9         MIDSHIPMAN WINTERS:  Who?

10:12:43  10         VOTING MEMBER A(1):   Midshipman

11    Mitchells.

12         MIDSHIPMAN WINTERS:  No.

13         VOTING MEMBER B(1):  Do you know if

14    Midshipman Mitchell was aware of the

15    purchasing of such alcohol?

16         MIDSHIPMAN WINTERS:  The purchase of

17    it?

18         VOTING MEMBER B(1):  Yeah.

19         MIDSHIPMAN WINTERS:  I am not certain,

10:14:34  20    no.

21         VOTING MEMBER B(1):  Okay.

22         VOTING MEMBER C(1):  Did you see any

23    open alcohol containers at the event?

24         MIDSHIPMAN WINTERS:  From what I

25    remember, no.  I can't say.  I mean, I

can't fully remember, so I can't speak on
that.

VOTING MEMBER D(1): Did you pour any
alcohol at the event?

MIDSHIPMAN WINTERS: Yes. We had --
if I can elaborate, we had -- we had
containers so we poured that into our -- I
had a Yeti Cup. But, yes, most people
brought one too. (Indiscernible) were
there.

VOTING MEMBER E(1): What kind of
containers were they?

MIDSHIPMAN WINTERS: Like a Yeti cup
or just -- just any cup. A water bottle
maybe. The containers with the alcohol,
just....

VOTING MEMBER F(1): Did you interact
with Midshipman Mitchell any time during
this event?

MIDSHIPMAN WINTERS: Prior, yes.
Before we got in the vans. Not directly
but in a group because we had to get the
^ CK dance tuition together. And at the
beach, no2t directly, no, but with group,
yes.

1          VOTING MEMBER G(1):  Did you -- was

2     she only with Midshipman Ramsden Midshipman

3     Rozoni, or did you see her interact with

4     the men's and women's soccer team at all?

5          MIDSHIPMAN WINTERS:  Yes, I believe it

6     was her brother that she was interacting

7     with.  I'm not for sure who else, but they

8     were all in a group together.

9          VOTING MEMBER H(1):  In this meeting

10:39:24 10     beforehand when you were getting the van

11     situated, was there any talk about picking

12     up alcohol?

13          MIDSHIPMAN WINTERS:  With Midshipman

14     Rozoni, yes.

15          VOTING MEMBER H(1):  And Midshipman

16     Mitchell was standing with you then?

17          MIDSHIPMAN WINTERS:  I'm for sure how

18     close she was in proximity, so I can't say

19     for certain how much she heard or anything.

10:40:28 20          VOTING MEMBER I(1):  You said that you

21     saw Midshipman Ramsden at the beach

22     drinking and passing out alcohol to the

23     women's soccer team and plebes, correct?

24          MIDSHIPMAN WINTERS:  Correct.  Yes.

25          VOTING MEMBER I(1):  Okay.  And where

1          was she passing that out from?

2              MIDSHIPMAN WINTERS:  So they were over

3          this end from us, and she came to our group

4          to pass them out to the ^ CK , yes.

5              VOTING MEMBER I(1):  And she came

6          directly from her setup?

7              MIDSHIPMAN WINTERS:  Yes.

8              VOTING MEMBER I(1):  So then the

9          alcohol would have been next to all of the

10:43:20  10          midshipmen there?

11              MIDSHIPMAN WINTERS:  Yes.

12              VOTING MEMBER J(1):  You stated that

13          you can confidently say that Midshipman

14          Mitchell was fully aware of the situation

15          at the beach.  Could you please explain why

16          you are sure of this?

17              MIDSHIPMAN WINTERS:  For -- I guess

18          for me would be the fact that Midshipman

19          Ramsden did have alcohol and she offered it

10:44:03  20          to our plebes.  And then also the guys were

21          there, and some of them looked intoxicated.

22          And I was aware people were drinking.  The

23          fact that I noticed that other people were,

24          so it was pretty obvious.

25              VOTING MEMBER K(1):  Is there any way

1          that you think Midshipman Mitchell would

2          have been unaware of the situation?

3                   MIDSHIPMAN WINTERS:  No.

4                   VOTING MEMBER L(1):  When she spoke to

5          her brother, was it later in the event

6          where people were more intoxicated, or was

7          it towards the beginning?

8                   MIDSHIPMAN WINTERS:  I do not

9          remember.

10:49:27  10                   VOTING MEMBER L(1):  Okay.

11                   VOTING MEMBER M(1):  Was Midshipman

12         Mitchell away from everybody else the

13         entire time, or was she intermittently

14         passing through?

15                   MIDSHIPMAN WINTERS:  As in do you mean

16         was she, like, off with --

17                   VOTING MEMBER M(1):  Like was she away

18         from the men's and women's soccer team the

19         entire time --

10:50:19  20                   MIDSHIPMAN WINTERS:  No.

21                   VOTING MEMBER M(1):  -- or was she

22         intermingling?

23                   MIDSHIPMAN WINTERS:  Yes, it was --

24         she was with the male side more.  She was

25         -- yes, in this group.  Yeah, she wasn't

1      off elsewhere.

2           VOTING MEMBER M(1):  And this was the

3      entire time throughout the event?

4           MIDSHIPMAN WINTERS:  There was

5      probably a few times because there was

6      (indiscernible) off in the distance.  There

7      were a few times people would go in and

8      out, but I can't say for sure if she went

9      over there or not.

10          VOTING MEMBER N(1):  And you knew who

11     Midshipman Mitchell was prior to going to

12     the beach?

13          MIDSHIPMAN WINTERS:  Yes.  We were on

14     a team together, yes.

15          MR. CAHALAN:  If the voting members

16     have no further questions, Midshipman

17     Mitchell may now question the witness.

18          MIDSHIPMAN MITCHELL:  The incident you

19     described (indiscernible) occur around --

20     or sorry.  Did the incident at the beach

21     occur a month prior to you giving your

22     statement to the honor board staff?

23          MIDSHIPMAN WINTERS:  I can't remember

24     exactly.  Sorry.  Yeah, I can't remember

25     exactly when I (indiscernible).

1        MIDSHIPMAN MITCHELL:  Were you asked

2  to give this statement in the context of me

3  facing charges?

4        MIDSHIPMAN WINTERS:  As in I gave

5  statement so that you would

6  (indiscernible).  Wait, can you restate

7  that?

8        MIDSHIPMAN MITCHELL:  You were facing

9  -- were you facing charges when you gave

10:59:02  10  this statement?

11        MIDSHIPMAN WINTERS:  I can't remember.

12  I'm sorry.  It's just too far.  I want to

13  say that I was already in the process of

14  it.

15        MIDSHIPMAN MITCHELL:  You just stated

16  that we did interact prior to going to the

17  beach.  However, I had a statement from you

18  saying that I did not provide alcohol and

19  we did not interact prior to going to

10:59:58  20  beach.

21        MIDSHIPMAN WINTERS:  I didn't say that

22  you weren't -- wait, I'm sorry.  The

23  alcohol and that you didn't --

24        MIDSHIPMAN MITCHELL:  In the statement

25  that you wrote last year for me, you stated

1          that I did not provide alcohol and did not

2          interact with you prior to the beach.

3               MIDSHIPMAN WINTERS:  Correct.

4               MIDSHIPMAN MITCHELL:  You just stated

5          that we interacted prior to going to the

6          beach.

7               MIDSHIPMAN WINTERS:  As in you were by

8          the van our by Midshipman Rozoni's car.

9          When she approached us, you were off in the

11:01:21  10          distance.  Yes, I did say that.

11               MIDSHIPMAN MITCHELL:  You rode with

12          the plebes as well as two other midshipmen

13          to the beach in the ^ CK van, correct?

14               MIDSHIPMAN WINTERS:  As -- two -- yes,

15          Midshipman ___ and ___ , yes.

16               MIDSHIPMAN MITCHELL:  And ^ CK

17          (indiscernible) go directly to the beach.

18          Who else was at S____ when the alcohol was

19          purchased?

11:03:30  20               MIDSHIPMAN WINTERS:  Besides ___

21          people that were all there?  So it was me,

22          Midshipman ^ CK foreman, Midshipman ^ CK

23          Howell.  I want to say nine plebes, and

24          then Midshipman S___ and Midshipman ^ CK

25          Goodman.  But they were -- they weren't

1    with us when they were purchased.  They

2    were just at S____.

3         MIDSHIPMAN MITCHELL:  You as well as

4    Midshipman Foreman purchased the alcohol

5    for the plebes, correct?

6         MIDSHIPMAN WINTERS:  Correct.

7         MIDSHIPMAN MITCHELL:  You're not 21

8    years old and, therefore, not of legal age

9    to buy alcohol, correct?

11:05:05  10    MIDSHIPMAN WINTERS:  Correct.

11         MIDSHIPMAN MITCHELL:  How did you

12    purchase the alcohol?

13         MIDSHIPMAN WINTERS:  We put it up on

14    the counter, and they rung it for us.

15         MIDSHIPMAN MITCHELL:  After first

16    seeing the alcohol, you distributed several

17    ^ CK, as well as have it in a government

18    vehicle, correct?

19         MIDSHIPMAN WINTERS:  Correct.

11:06:00  20    MIDSHIPMAN MITCHELL:  Did you have the

21    plebes pour the alcohol you bought them and

22    distribute it to them into the water

23    bottles?

24         MIDSHIPMAN WINTERS:  They

25    (indiscernible) bottles.

1          MIDSHIPMAN MITCHELL:  Did you have to

2     plebes pour the alcohol that you bought and

3     distributed to them into water bottles?

4          MIDSHIPMAN WINTERS:  No.  We all

5     distributed it ourselves, and we were --

6     yes.  And (indiscernible)  we poured our

7     drinks.

8          CAPTAIN KEANE:  I just want to remind

9     the accused that this is not a ^ CK  check

11:09:16  10    check.  This is not a time to level charges

11     against another ^ CK.  This is about an

12     honor hearing.  So if there's a point to

13     this, please get there.

14          MIDSHIPMAN MITCHELL:  At any point

15     throughout the TM, you never once notified

16     me that you bought alcohol for the plebes

17     and the plebes were consuming alcohol,

18     correct?

19          MIDSHIPMAN WINTERS:  Correct.

11:09:56  20          MIDSHIPMAN MITCHELL:  In your

21     statement you stated that I was

22     approximately 40 feet away from the women's

23     soccer team, correct?

24          MIDSHIPMAN WINTERS:  Correct.

25          MIDSHIPMAN MITCHELL:  Also in your

1 statement you stated that you can

2 confidently say that I was aware of the

3 situation, yet gave no specific instance to

4 validate this claim, correct?

5   MIDSHIPMAN WINTERS:  As in currently

6 now, I would say that Midshipman Ramsden

7 had the alcohol coming from where you guys

8 were to us.

9   MIDSHIPMAN MITCHELL:  But last year

10 you didn't a specific instance, correct?

11   MIDSHIPMAN WINTERS:  Right.  I wasn't

12 asks for a specific incident.

13   MIDSHIPMAN MITCHELL:  After the beach

14 TM you were interviewed by Midshipman

15 Muehlbauer and Midshipman Schineller,

16 correct?

17   MIDSHIPMAN WINTERS:  Correct.

18   MIDSHIPMAN MITCHELL: In this

19 interview, was Midshipman Foreman

20 interviewed along with you?

21   MIDSHIPMAN WINTERS:  I can't remember

22 if we were together or not.

23   MIDSHIPMAN MITCHELL:  Midshipman

24 Schineller maintains that you and

25 Midshipman Foreman were interviewed

11:10:42 (line 10)

11:11:37 (line 20)

together.  She also maintains that your

story throughout your interview did not

align with any other women's soccer players

that she interviewed.

Are you also aware that Midshipman

Schineller maintains the fact during your

interview Midshipman Foreman acted confused

and even interrupted your story when

speaking of myself and the other second

class midshipman at the time?

MIDSHIPMAN WINTERS:  As in she -- no.

Are you asking if I was aware that that

happened or....

MIDSHIPMAN MITCHELL:  Why would

Midshipman Foreman's statement be different

if you were at the beach together?

MIDSHIPMAN WINTERS:  I'm not sure.

MIDSHIPMAN MITCHELL:  In your opinion,

why would Midshipman Schineller maintain

this idea when she faces no arrest or

punishment as well as not being associated

with the TM (indiscernible)?  You and

Midshipman Foreman's stories don't align.

MIDSHIPMAN WINTERS:  I'm not sure.

MIDSHIPMAN MITCHELL:  No further

1    questions.

2         MR. CAHALAN:  If the accused

3    midshipman has no further questions, the

4    witness is now excused.

5         Midshipman Mitchell, you are now

6    allowed to present your opening statement.

7         MIDSHIPMAN MITCHELL:  On August 17,

8    2024, ^ CK  to the beach where the ^ CK  KP

9    football club TM was taking place.

11:15:50  10    Although at the beach, I was not a part of

11    the official TM and was there on my own

12    personal capacity and stuck with my

13    friends, having minimal interaction with

14    members of the men's and women's soccer

15    team as I originally intended.

16         The following day, I was interviewed

17    by Midshipman Muehlbauer, along with

18    Midshipman Jablonowski, Midshipman Colpoys,

19    and Midshipman Schineller about my

11:16:41  20    involvement regarding the situation.  I.

21         Admitted to seeing red Solo cups.

22    However, at no point did I ever see any

23    open containers or alcohol being poured

24    into the red Solo cups.  Furthermore, I did

25    not believe the red Solo cups to be

1     indicative of drinking takes place, seeing

2     as it can be used for any sort of beverage.

3          At the end of my interview, Midshipman

4     Muehlbauer told me that he did not see a

5     reason for me to get into any sort of

6     trouble, seeing as I was not on the

7     official TM list, was in a public place and

8     of legal age.

9          On August 28th, I received an email

11:17:37   10     stating that an HB-1 had been submitted by

11     Midshipman Muehlbauer, who stated that he

12     believed me to be innocent.  Midshipman

13     Muehlbauer maintains the belief that I was

14     truthful in my initial interview and has

15     stated that in hindsight he would not have

16     opened the HB-1 himself.

17          At no point throughout the TM did any

18     plebe or midshipman notify myself or the

19     ^ CK  MIC that alcohol was being consumed

11:18:20   20     while at the beach, which includes each

21     witness here today.

22          Furthermore, in their interviews, none

23     of these witnesses can provide and verify a

24     specific instance which will validate their

25     claims that I was 100 percent aware of the

1    situation.  There are witnesses being

2    called here today who were interviewed by

3    Midshipman Muehlbauer, Midshipman

4    Jablonowski, Midshipman Colpoys and

5    Midshipman Schineller who have a

6    contradicting story regarding what was said

7    in their initial interview compared to what

8    was being said in the interview conducted

9    by the investigating officer.

11:19:18  10    There are also witnesses who were

11    interviewed with a counterpart, and their

12    counterpart was not interviewed by the

13    investigating officer.  Or if they were --

14    excuse me.  Out of everyone who was at the

15    beach throughout this incident, which was

16    roughly 60 to 65 people, only six people

17    maintain that I was aware of the situation

18    with no credible evidence supporting this

19    claim.

11:19:58  20    Had I known and been made aware any

21    drinking was taking place on the TM, I

22    would have put an immediate stop to it.

23    MR. CAHALAN:  Thank you.  The voting

24    members may now ask questions as needed to

25    clarify the evidence.

1      VOTING MEMBER AA(1):  With the

2  severity of consequences at the school of

3  an alcohol offense, why would eight

4  different midshipmen and former midshipmen

5  risk their time in AA, deferred graduate

6  status, class 1 ^ CK  sticks and take their

7  time to lie and say that you would not have

8  been aware if they face such a consequence

9  for admitting to the drinking?

12:56:56  10      MIDSHIPMAN MITCHELL:  I'm not sure if

11  they just assumed I was aware because I was

12  there.  So I can't really attest to what --

13  what they thought when they doing the

14  interview.

15      VOTING MEMBER BB(1):   Midshipman

16  Winters said she saw you going in and out

17  of the area with the men's and women's

18  soccer team who were visibly drunk.  Can

19  you on firm this?

12:57:46  20      MIDSHIPMAN MITCHELL:  No, I can't

21  confirm that.

22      VOTING MEMBER BB(1):  Can you confirm

23  that you saw anybody that looked or acted

24  drunk?

25      MIDSHIPMAN MITCHELL:  Nobody I saw was

1    seemingly drunk.  At least  I didn't see

2    anybody where I immediately saw them and

3    thought that they had been drinking or they

4    were ^ CK

5       VOTING MEMBER BB(1):  Midshipman

6    Winters also said that Midshipman Ramsden

7    came from wherever you were to bring them

8    alcohol.  Was Midshipman Ramsden with you

9    before she brought the alcohol over?

12:59:24  10       MIDSHIPMAN MITCHELL:  I don't recall,

11    if I'm being honest.  But Midshipman Crooks

12    stated that I -- or I wasn't around

13    Midshipman Ramsden whenever she offered the

14    alcohol to the plebes.

15       VOTING MEMBER BB(1):  Midshipman

16    Winters said that it was a straight shot

17    from wherever you were to them.  Where

18    would Midshipman Ramsden have stopped to

19    get the alcohol, if not from wherever you

13:00:15  20    were?

21       MIDSHIPMAN MITCHELL:  I'm not sure.

22       START at 49:12

23       VOTING MEMBER CC(1):  Did you ride

24    with Midshipman Rozoni to the beach?

25       MIDSHIPMAN MITCHELL Yes.

1   VOTING MEMBER CC(1):  Were you aware

2   that she had a conversation with Midshipman

3   Winters before everyone left?

4       MIDSHIPMAN MITCHELL:  I was not aware

5   of that.  The only thing I was aware of was

6   that they were trying to find the keys to

7   the vans.

8       VOTING MEMBER DD(1):  When you

9   interacted with your brother and Midshipman

10  ^ CK  Ferry, was it later in the night or

11  earlier in the evening?

12      MIDSHIPMAN MITCHELL:  I believe I

13  spoke to Ferry when he got there.  And then

14  I just ^ CK , and that was it.

15      VOTING MEMBER DD(1):  Were they

16  showing any signs of intoxication when you

17  talked to them?

18      MIDSHIPMAN MITCHELL:  I didn't notice

19  any signs of intoxication ^ CK .  Was

20  driving the van for the boys' team.

21      VOTING MEMBER EE(1):  Even though you

22  were set up 35 to 40 feet away from the

23  men's and women's soccer team, did you not

24  hear any commotion, any loud noises

25  associated with intoxication or....

1              MIDSHIPMAN MITCHELL:  I didn't.  I

2       mean, I remember there was music playing.

3       And the music was pretty loud from the

4       speaker, but that's all I can remember as

5       far as ^ CK go.

6          VOTING MEMBER EE(1):  Did you interact

7       with the women's soccer team, like, at all?

8          MIDSHIPMAN MITCHELL:  I don't remember

9       interacting with the women's soccer team.

10         VOTING MEMBER EE(1):  Why did you go

11      to the TM if not to interact with your

12      team?

13         MIDSHIPMAN MITCHELL:  Just to go to

14      the beach.  And me and Midshipman Rozoni

15      and Midshipman Ramsden were just going to

16      go to the beach, and then we were leaving

17      early.  Leaving the beach early to go out

18      for my birthday, which was the week before.

19         VOTING MEMBER FF(1):  Where did

20      Midshipman Ramsden get the alcohol?

21         MIDSHIPMAN MITCHELL:  I believe she

22      stated she got it from S____.  I'm not sure

23      where she got it from.  It's been a year.

24         VOTING MEMEBER FF(1):  And you got

25      stopped at 7-Eleven, or she went prior, or

1          where did --

2               MIDSHIPMAN MITCHELL:  We didn't stop

3          at 7-Eleven on the way to the beach.

4               VOTING MEMBER FF(1):  Did she have a

5          bag when she got in your car?

6               MIDSHIPMAN MITCHELL:  I didn't see her

7          with a bag, no.

8               VOTING MEMBER GG(1):  So she brought

9          enough to distribute, but she didn't get in

10         your car with a bag?

11              MIDSHIPMAN MITCHELL:  I didn't see her

12         get in the car with a bag.  And I'm not

13         sure how much she had at the beach.

14              VOTING MEMBER GG(1):  But she had some

15         at the beach?

16              MIDSHIPMAN MITCHELL:  I know she drank

17         on the way to the beach, but I can't really

18         attest to what she brought.  I'm not sure

19         of that what specifically she brought to

20         the beach.

21              VOTING MEMBER HH(1):  You were aware

22         that she had alcohol in the car, correct?

23              MIDSHIPMAN MITCHELL:  Yes.

24              VOTING MEMBER HH(1):  Were you aware

25         that she walked over to the plebes to ask

1        if they wanted any alcohol?

2            MIDSHIPMAN MITCHELL:  No.

3            VOTING MEMBER II(1):  Were you not

4        with her or near your setup when she went

5        over to the plebes to ask for the alcohol,

6        or were you somewhere else at the time?

7            MIDSHIPMAN MITCHELL:  I was somewhere

8        else at the time she asked the plebes if

9        she wanted -- they wanted the alcohol.

10            VOTING MEMBER II(1):  Where were you?

11        Was this at the beginning or towards the

12        end of the evening ^ CK time?

13            MIDSHIPMAN MITCHELL:  I'm not sure if

14        she asked at the beginning or the end.

15            VOTING MEMBER JJ(1):  What did

16        Midshipman Ramsden bring with her into your

17        car?

18            MIDSHIPMAN MITCHELL:  I just remember

19        -- I don't remember -- just remember her

20        having herself.  It was a year ago, so --

21            VOTING MEMBER JJ(1):  Where did the

22        alcohol --

23            MIDSHIPMAN MITCHELL:  -- I honestly

24        can't say confidently.  What she brought to

25        the car.

^ START AT 52:30

VOTING MEMBER JJ(1):  You said she was
drinking on the way to the beach.  How --
where did she get the alcohol from?

MIDSHIPMAN MITCHELL:  At 7-Eleven.
Well --

VOTING MEMBER JJ(1):  Where's --

MIDSHIPMAN MITCHELL:  -- to my
personal knowledge, she got the alcohol
prior to (indiscernible) going to the
beach.  But we did not stop at 7-Eleven, so
I'm -- I can't say confidently if she got
it Friday night or when she got the
alcohol.

VOTING MEMBER KK(1):  What was with
Midshipman Ramsden when she got into the
car?

MIDSHIPMAN MITCHELL:  I'm not sure.

VOTING MEMBER KK(1):  You said she
just brought herself.

MIDHIPMAN MITCHELL:  That's -- from
what I can remember, I just remember her
bringing herself.

VOTING MEMBER KK(1):  She was drinking
in the car.

1    MIDSHIPMAN MITCHELL:  Yes.  I don't

2    remember if she had a bag or not.  That was

3    over a year ago.  I'm --

4        VOTING MEMBER KK(1):  So there was

5    alcohol in your car or with Midshipman

6    Ramsden?

7        MIDSHIPMAN MITCHELL:  Can you ask that

8    one more --

9        VOTING MEMBER KK(1):  Was there

10   alcohol in your care, or was it with

11   Midshipman Ramsden when she got into your

12   car?

13       MIDSHIPMAN MITCHELL:  The -- I think

14   it was in the car to my best personal

15   knowledge.

16       VOTING MEMBER KK(1):  Then where's --

17   can you clarify what you meant by stopping

18   at 7-Eleven.

19       MIDSHIPMAN MITCHELL:  Yeah.  I think

20   she went to 7-Eleven prior -- like, the day

21   before the beach, left it in the car, and

22   then drank it on the way to the beach.

23       VOTING MEMBER LL(1):  Did she tell you

24   she was leaving alcohol in your car?

25       MIDSHIPMAN MITCHELL:  Well, it wasn't

1        my car.

2            VOTING MEMBER LL(1):  Well, in "the"

3        car.

4            MIDSHIPMAN MITCHELL:  No.

5            VOTING MEMBER MM(1):  When you guys

6        left the car, was Midshipman Ramsden

7        carrying anything?

8            MIDSHIPMAN MITCHELL:  I don't remember

9        if she was carrying anything.

10            MR. CAHALAN:  Please keep this with

11        Midshipman Mitchell's involvement in the

12        honor hearing.

13            VOTING MEMBER NN(1):  Do you have the

14        statement from Midshipman Muehlbauer saying

15        that he would never have HB-1'd you?

16            MIDSHIPMAN MITCHELL:  I don't have it

17        with me, no.  I do have the statement

18        supporting that on (indiscernible).

19            VOTING MEMBER NN(1):  And when was

20        that claim made?

21            MIDSHIPMAN MITCHELL:  When we did our

22        appeal last year, he stated that he was

23        going to HB-1 me, so I have a statement

24        from that time last year, as well as an

25        updated statement within the last month,

1  month and a half.

2       VOTING MEMBER NN(1):  Before you left

3  the beach, where was the car parked?

4       MIDSHIPMAN MITCHELL:  I guess ^ CK. It

5  was ^ CK .  It wasn't my car.  It wasn't

6  my car, so ^ CK.

7       VOTING MEMBER NN(1):  So you knew that

8  there was alcohol in your car at the senior

9  ^ CK lot.

10      MIDSHIPMAN MITCHELL:  I'm -- I wasn't

11 the one who left alcohol in the car?

12      VOTING MEMBER NN(1):  Did you know

13 about it?

14      MIDSHIPMAN MITCHELL:  ^ CK.

15      VOTING MEMBER NN(1):  Before -- before

16 Midshipman Rozoni took a drink of it in the

17 car, did you know that there was alcohol in

18 the car?

19      MIDSHIPMAN MITCHELL:  Are you talking

20 about Midshipman Rozoni or Midshipman

21 Ramsden?

22      VOTING MEMBER NN(1):  I'm sorry,

23 Midshipman Ramsden.

24      MIDSHIPMAN MITCHELL:  And you're

25 asking what again?  I'm sorry.

1      VOTING MEMBER NN(1):  Where was --

2      were you aware that there was alcohol in

3      the car while it was parked in the senior

4      parking lot?

5      MIDSHIPMAN MITCHELL:  Honestly I'm not

6      sure.  I don't remember.

7      MR. CAHALAN:  Do the voting members

8      have any further questions?

9      VOTING MEMBER OO(1):  Yeah.

10     Midshipman Rams -- Midshipman Ramsden and

11     Rozoni were with you on the beach, right?

12     MIDSHIPMAN MITCHELL:  Right.

13     VOTING MEMBER OO(1):  And did either

14     of them have open containers at any point?

15     MIDSHIPMAN MITCHELL:  Not that I can

16     recall now.

17     VOTING MEMBER OO(1):  So Midshipman

18     Ramsden brought a bag of alcohol or

19     something of that sort and distributed it

20     to the plebes, but she didn't drink on the

21     beach?

22     MIDSHIPMAN MITCHELL:  I'm not sure.

23     I'm not Midshipman Ramsden.

24     VOTING MEMBER OO(1):  And did she come

25     back with --

1          MR. CAHALAN:  Please keep this to

2     Midshipman Mitchell's involvement.  Please

3     keep this to Midshipman Mitchell's

4     involvement.

5          Do the voting members have any further

6     questions?

7          If there are no further questions, the

8     investigating officer and Midshipman

9     Mitchell will be given time to make closing

10    statements.

11         INVESTIGATING OFFICER:  I have no

12    closing statements.

13         UNIDENTIFIED SPEAKER:  I'm sorry, can

14    you repeat that?

15         MR. CAHALAN:  If you have a closing

16    statement, please state one now.

17         MIDSHIPMAN MITCHELL:  I'm okay.

18         MR. CAHALAN:  Thank you.  Please be

19    seated.

20         MIDSHIPMAN MITCHELL:  Sorry.

21         MR. CAHALAN:  With all the evidence

22    concerning this possible honor violation,

23    Midshipman Mitchell, you're excused to

24    allow the voting members to deliberate.

25

# EXHIBIT L

To whom it may concern,

While liberty on the evening of Saturday, August 17th, 2024 I, MIDN Jasper Schineller 1/C, was notified to come back to campus as soon as possible. The only initial information I had was that it had to do with the beach TM that took place earlier in the day. I was informed that when some of the women's team got back from the TM they were interviewed and confessed to drinking. Throughout the rest of the evening I met with several of my teammates involved in the TM. I wanted to speak with the plebes especially because that was the majority of the women's team on the TM. Several of these interactions with the plebes MIDN Throsten was also present. The plebes stories about the TM all matched up. The plebes did not speak of the MIDN Mitchell or MIDN Ronzoni drinking. Those that knew the upperclassmen were on the TM said that they sat far away from most of the group. The only person that spoke of MIDN Mitchell and MIDN Ronzoni drinking was MIDN Winters.

MIDN Throsten and I completed the interview with MIDN Winters and MIDN Forman at the same time. Both underclassmen were in the room. From conducting other interviews, we knew that MIDN Winters and MIDN Forman were the suppliers of alcoholic beverages on the TM. We also had reports of MIDN Winters planning on buying the alcohol ahead of time and speaking with plebes about supplying it. During the interview MIDN Forman and Winters had discrepancies. We would ask them the same questions, but answers were slightly different even though they they we listening to each other's answers. None of them stood out until we asked about the upperclassmen drinking on the TM. We asked if they saw or knew if any other women on the TM were drinking or supplying alcohol. MIDN Winters had a full story of the 2/C female midshipman offering a drinks from a case to underclassmen. She said she knew that they were drinking before the TM and had brought drinks to the beach with them. MIDN Forman did not say that she saw them or knew of them drinking. She confessed that she knew the boys team was drinking and supplied alcohol as well, but did not know of upperclass women doing so. I distinctly remember MIDN Forman acting confused and even interrupting part of MIDN Winters story when speaking about the 2/C MIDN.

I was not a part of the formal investigation committee, nor did I participate in any of the TM itself. I was simply helping conduct interviews with MIDN Throsten and separately to inform my team about what was going to happen following the incident. We thought my

presence in some of the interviews may have made the women more comfortable to talk about what had happened because I was a familiar face.

The following day, Sunday, August 18th, 2024, MIDN Throsten and I separately met with MIDN Marina Ronzoni and MIDN Morgan Mitchell. MIDN Mitchell said that she was not drinking on the beach but did have drinks before. MIDN Throsten suggested this was not an issue because the drinking was not a part of or during the TM. Stories of both MIDN Ronzoni and MIDN Mitchell aligned along with everyone but MIDN Winters.

 Very Respectfully,

ENS Jasper Schineller

# EXHIBIT M

I, MIDN Jade Winters, did not see or hear of MIDN Morgan Mitchell providing anyone alcohol on the KP Futbol TM. I also did not have any interaction with MIDN Mitchell prior to leaving for the beach.

MIDN Jade Winters

*[signature: Jade Winters]*

# EXHIBIT N

To whom this may concern,

 On the day of August 17th, 2024 I was made aware on an incident involving the Women's and Men's Soccer Team which involved the consumption of alcohol by members of the Women's and Men's Soccer Team by Plebes, at this time members of the class of 2028 which is prohibited, consumption of alcohol on a Team Movement by those involved on the KP Futbol Club TM, which was primarily Women's and Men's soccer players and also a prohibited action, and finally the unauthorized use of TM vans, Women's soccer used them to travel to a 7/11 to purchase alcohol. During this time I was serving as the Regimental Training Officer Assistant and was made aware by this violation by a Battalion Training Officer who was just at the beach that day for their own pleasure and witnessed the event. He did not approach the groups, yet reported the behavior to myself and the current RTO at this time, Thorsten Muehlbauer. I was not made aware of these actions until approximately between 1800-2000 that night. I immediately called the RTO and asked what should our initial actions be. He began speaking to members of the Women's and Men's soccer team immediately. I did not partake in these initial interviews as because I was not present on campus during that time. The following day I was given a recap by the RTO of the information he gathered when speaking of members of the Women's and Men's soccer team members at that time. The basic consensus at this time was that the Women's soccer team used TM Vans to travel to the 7/11 to purchase alcohol, they then consumed the alcohol at the beach, and returned to campus later that night. The Men's soccer team at this time was claiming that none of them had consumed alcohol at the beach. On Sunday, August 19th 2024, the RTO and myself conducted five more interviews with members of the Women's Soccer Team at this time. At the time it was Plebe Audrey Burrell (2nd company), Plebe Angelee Crooks (2nd company), MIDN Morgan Mitchell (2nd company), MIDN Marianna Ronzoni (5th company), and the last individual was a Plebe in 4th company, but I cannot recall the name at this time. The main objective of these interviews was to get the the the plebes to identify any upperclassmen we were unsure of their actions at the beach. Particularly asking about MIDN Ronzoni and MIDN Mitchell since they both were at the beach that day, but not in the TM Vans. The RTO and I were curious to as if they had purchased or were promoting drinking to the members of the TM. The RTO and I conducted this first interview with Plebe Burrell and Plebe Crooks in their room. We asked them to take us through the events of the day which they did. However, when I explicitly asked about MIDN Mitchell they were unaware who she was. I then began to describe MIDN Mitchell to them it was not until I should them an image of MIDN Mitchell that they said they recognized her, but only saw her at the beach with a different group completely unassociated with anyone on the Women's and Men's soccer team besides MIDN Ronzoni. I also asked them about MIDN Ronzoni. They stated she did not travel with them in the TM vans and was also unassociated with the group as she was hanging with MIDN Mitchell and others. The female plebe on the soccer team in 4th company also said the same thing, at this time I cannot remember the name of the Plebe. After speaking with those three plebes. Myself, the RTO, and the two captains of the women's soccer team at this time Natalie Colpoys and Jasper Schineller spoke with MIDN Mitchell and MIDN Ronzoni in MIDN Schineller's room. MIDN Mitchell stated that she was at the beach that day, but claimed to not have known anything about what the Men's and Women's soccer team was doing. She traveled there with MIDN Ronzoni, in MIDN Ronzoni's car. She told all of us that she saw members of the Men's and Women's soccer team, but was not aware of what they were doing, due to being at a different area of the beach while there. She also was not listed as a member on the TM, which means she did not have to adhere to the rules regarding a TM since she was engaging in normal class rates liberty procedures. After speaking with MIDN Mitchell the same four people, spoke with MIDN Ronzoni. A similar story was shared that MIDN Ronzoni was

spending time at the beach with MIDN Mitchell and others not associated with the TM. However, we explained to MIDN Ronzoni her failure to observe the TM she was in charge of and how the consumption and purchase of alcohol is partially her fault due to the fact she should have been in that TM van. She accepted the fact that she did use poor judgment in that case and should have been in the TM van as well as observing the actions of those involved on her clubs TM. Following those interviews during the day I conducted the weekly Plebe Knowledge Test (PKT) at 1900 that night. After the PKT, around 2000 I had all the Men's Soccer Team players in the Class of 2028 stay after. I asked them this was their final opportunity to come forward and tell the truth before myself, the RTO, RX (Konor Bye), and RC (Geoffrey Gumport) at this time were going to speak with Deputy Commandant, Commander McCarthy, the following morning regarding the issue. I stressed that if they were honest their punishment could be less severe and starting off their plebe year with honor offenses would be worse than just a Class 1 stick. I gave all those members of the Men's Soccer Team till 2130 to report to my room or the RTOs to make a report on their story. All of them reported to myself or the RTO by this time. However, they all maintained the lie they were keeping at this time which was that they did not partake in drinking at the beach. We came to know this was a lie as they fabricated their story even more after the PKT after 3rd Company CX, Grady Ward reported all of those individuals going to speak with their Captains Giovanni Tallini and Derek Vanasse. Before coming to speak with myself or the RTO. I personally can account two members of the men's soccer team coming to speak with me which was Walker Mitchell and Cal Lutz. I asked them if there was any upperclassmen they wanted to report as again at this time we were looking for people who may have been involved and were lying or weren't on the TM, but engaged with supplying alcohol to the TM. Both of these men claimed they didn't see anyone consuming alcohol. This above statement is my recollection of the events from last August of 2024 if there are any questions regarding my statement I can be reached from the contact information in my signature. Please be advised I may not be readily available beginning September 8th of 2025 as I will be starting The Basic School in Quantico, VA for the USMC.

Very Respectfully,

2LT Lauren C. Jablonowski,

USMC Cell: (516)732-8713

Email: laurenjabs03@gmail.com

# EXHIBIT O

13 October 2024

To Whom It May Concern,

I, Plebe Angelee Crooks, would like to make a witness statement on behalf of MIDN Morgan Mitchell. As someone who attended the KP Futbol Club TM to the beach I can confirm that MIDN Mitchell did not provide any of the plebes with alcohol. The only way that the plebes were provided alcohol was from the 3rd Class Midshipmen who have already came forward, MIDN Winters and MIDN Forman. MIDN Mitchell never offered or provided alcohol to the plebes for the duration of the TM.

Very Respectfully,

Plebe Angelee Crooks

# EXHIBIT P



Date:     20 October 2025

From:    CAPT Anthony J. Ceraolo, Superintendent *(Acting)*

To:       MIDN Morgan Mitchell, Class of 2026

Subj:    Superintendent's Decision, Honor Board Hearings of 10 September 2025

On 10 September 2025, an Honor Board hearing was convened to consider the allegation that you lied to former Midshipman Muehlbauer (the Regimental Training Officer (RTO)) regarding members of the U.S. Merchant Marine Academy's (USMMA) women's soccer team consuming alcohol during a Kings Point (KP) Futbol Club team movement (TM) to Point Lookout Beach, New York on 17 August 2024. The Honor Board unanimously found that you had lied, and, thus, violated the Honor Code.

This Honor Board proceeding was your second such hearing for the same honor violation. The first honor hearing occurred on 09 October 2024. At that hearing, the then voting members (comprised of entirely different midshipmen who made up the Academic Year 2024-2025 Honor Board) determined unanimously that you had violated the Honor Code. At that time the honor staff and Commandant of Midshipmen recommended setback; however then Superintendent Nunan determined you should be granted honor probation with remediation. You requested VADM Nunan reconsider her decision based on a lack of your ability to confront witnesses due to names being redacted in the case packet prepared. She agreed with you and directed a new hearing take place upon your return from sea. Your subsequent hearing again resulted in the Honor Board (again, comprised of entirely different midshipmen) unanimously finding that you had violated the Honor Code.

Prior to deciding whether you should remain enrolled at the Academy, I fully reviewed the Honor Board files, including but not limited to, the entire recorded hearing that took place on 10 September 2025, as well as the recommendations of the Chair and Vice Chair of the Regimental Honor Board, and the Acting Commandant, all of whom recommended that you be setback to the Class of 2027. The Honor Board Advisor did not concur with them and recommended you be disenrolled. Pursuant to Section 4.7.2 of the November 2024 Honor Manual (Superintendent Instruction 2024-07, *Regimental Honor Program)*, I also reviewed your entire Academy record. During your time at the Academy, your conduct record has been characterized as good. However, your Honor Code violation has failed to meet the standards, integrity, and commitment expected of our midshipmen.

Based on this review, I direct that you be setback. Accordingly, I direct the following:

1. You are setback to the Class of 2027. You will enter setback status upon successful completion of Term 1 AY 2025-2026. You will return to the Academy on a date to be determined by the Commandant in order to join the Class of 2027. At that point, you will resume your academic studies in Term 2 (T2) of Academic Year 2026-2027, with a schedule as determined by the Academic Dean.

2. While you are on setback, you must execute the following:

   a. Take two 3-credit college courses at another institution of higher education. These courses must be honor and ethics related and will not be eligible for exemption credit. The two courses must be pre-approved by the Director of Leadership and Ethics Development;

      i. You must earn a grade of at least a 'C' in each course, and you must arrange to have an official transcript sent from the Registrar at the institution you complete this coursework to the Academy Registrar. That transcript must be received by the beginning of that trimester to clear you academically for return to resume your studies at the beginning of T2;

      ii. Failure to meet the academic requirements will be a failure of terms and will result in immediate referral to an Executive Board for suitability.

Please note that any college level courses you pursue or complete during your Setback cannot be used to exempt you from coursework at the Academy and will not be accepted.

Prior to joining the Class of 2027, you must take and pass a Physical Fitness Assessment (PFA) as administered by the Commandant of Midshipmen or the Commandant's designated representative. You will receive instructions for the time and place of the PFA from the Commandant's Office.

Upon your return to the Academy I direct that you complete full Honor Remediation in accordance with the November 2024 Honor Manual (Superintendent Instruction 2024-07, *Regimental Honor Program*). Please note that any college level courses you pursue or complete during your Setback cannot be used to exempt you from coursework at the Academy and will not be accepted.

In accordance with Section 4.8.2 of the November 2024 Honor Manual (Superintendent Instruction 2024-07, *Regimental Honor Program*), you may request reconsideration of this decision. You must notify this office within 24 hours of receipt of this written decision of your intent to request reconsideration, and you must submit your request in writing to this office no

later than seven days after receipt of this decision.  Your request should include any alleged procedural violations.

Should you elect to request reconsideration, you will remain at the Academy during the pendency of your request for reconsideration, provided that you abide with all Academy policies, including all Midshipmen Regulations.  If you are enrolled in classes during the pendency of the request, you will continue in those classes.  If you do not elect to request reconsideration of this setback action, you shall proceed immediately with checkout procedures.  Please contact the Commandant to commence those procedures.

By copy of this memorandum, the Commandant and Registrar are directed to implement this decision.

Sincerely,

Anthony J. Ceraolo
Captain, USMS / USCG (Ret.)
Superintendent *(Acting)*

Encl:   Acknowledgement of Decision

cc:     Commandant
        Registrar
        Counsel

UNITED STATES MERCHANT MARINE ACADEMY
KINGS POINT, NEW YORK

From:      MIDN Morgan Mitchell, Class of 2026

To:        Superintendent *(Acting)*

Subj:      Superintendent's Decision re:
             Honor Board Hearings of 10 September 2025

I am in receipt of the Superintendent's Final Decision of 20 October 2025 concerning the Honor Board Hearing that was convened to consider the allegation that I lied regarding my knowledge of alcoholic consumption at the women's soccer team movement on 17 August 2024.

_____     I accept the decision of the Superintendent, and waive my right to request reconsideration.

✓     I will request reconsideration of the Superintendent's Decision and will submit my request in accordance with Section 4.8.2 of the November 2024 Honor Manual (Superintendent Instruction 2024-07, *Regimental Honor Program).*

*Morgan Mitchell*
MIDN Morgan Mitchell

10/21/2025
Date

This acknowledgement must be emailed to Cynthia Flynn in the Office of the Superintendent at flynnc@usmma.edu by close of business of the next business day after receipt of this written Decision.

# EXHIBIT Q




# M.V. LIBERTY

### American Roll-On Roll-Off Carrier LLC
**816 A1A, Suite 101  Ponte Vedra Beach, FL 32082  USA**

From:   Captain Emily Gramer                                    Date: 10 August 2025
        Master MV Liberty
        IMO# 9310109

To: Whom it May Concern

Subj: Character Statement – Morgan Mitchell

I sailed with Deck Cadet Morgan Mitchell onboard the MV Liberty from December 2024 to March 2025.  She quickly became a valued member of the crew and was trusted to complete tasks with little to no supervision.

Cadet Mitchell knew when to ask for help if needed, and more importantly, when to come forward and admit when a mistake was made.  There was a situation where paint had been mixed incorrectly and then applied on deck, and as soon as Cadet Mitchell realized what happened, she reported the mistake to the Chief Mate, even though she knew he would be unhappy.  Making mistakes is difficult – bringing mistakes forward to the Chief Mate is even more difficult, yet she was compelled to make things right.  This attests to her character and the drive to do the right thing, even when it is the hard thing.

I saw Cadet Mitchell's confidence build and her leadership skills continued to develop the longer she was onboard.  She took the initiative and asked the third mate on the stern if she could conduct the undocking operation on the aft mooring station and was able to calmly conduct a safe operation.  She always showed up with a good attitude each day, and I expect to see these qualities carried forward as she progresses through her remaining time at Kings Point.

I strongly encourage her to continue working to build her skills, do the hard things, and continue putting in the effort to become a good deck officer.  Deck Cadet Mitchell will make a fine deck officer on any vessel she chooses to go to and I look forward to sailing with her again in the future, when she is a Third Officer.  I can be reached at the below address for any further follow up questions regarding Cadet Mitchell's character.

Respectfully Submitted,

*Emily Gramer*

Captain Emily Gramer

Master – MV Liberty

USMMA Class of 2018

Emily.gramer.2018@gmail.com



U.S. Department
of Transportation

**Maritime
Administration**

U.S. Merchant
Marine Academy

Date:        24 October 2025

From:        CAPT Preston C. De Jean, USMS
             Associate Professor, USMMA

To:          CAPT Anthony Ceraolo, USMS
             Acting Superintendent, USMMA


**SUBJECT:    Character Reference for Midshipman Morgan Mitchell**

Midshipman Mitchell is a student in my BUSN300 Fundamentals of Business Law.  During the course of instruction, Midshipman Mitchell has shown a keen interest in the law and has performed remarkably well, with an "A" average as we enter into final exam week.  I've always known Midshipman Mitchell to be prompt, attentive, organized, respectful, and truly interested in the lecture of the day.

As with all students, I query them about their aspirations and career goals.  Midshipmen Mitchell has communicated to me and shown her eagerness to complete her studies at USMMA, successfully pass the USCG license exam, begin her career as a Merchant Mariner, and one day attend law school.

If you have any questions, please contact me at 516-726-5299 or via email at dejeanp@usmma.edu

                        Respectfully submitted,



                        Preston C. De Jean
                        CAPT, USMS
                        Associate Professor, Maritime Business
                        United States Merchant Marine Academy
                        Kings Point, NY

# U. S. Merchant Marine Academy

U.S. Department of Transportation
**Maritime Administration**

Kings Point, NY 11024-1699
**Department of Marine Transportation**

October 24, 2025

From:  Captain Sean P. Tortora, MS, USMS, Master-Mariner
      President Faculty Forum & Professor of Marine Transportation, USMMA

To:      CAPT Tony Ceraolo, USMS
        Superintendent (Acting), USMMA

Subj:   M/N MORGAN MITCHELL 1/C

1.  M/N Mitchell asked me to provide a character reference letter for her Honor Board appeal of Referral for Setback. Prior to continuing, in accordance with the Family Educational Rights and Privacy Act (FERPA), M/N Mitchell has both volunteered her academic record; and/or granted me permission to disclose any grade data information mentioned herein.

2.  M/N Mitchell is currently my student in my NAUT460 Bridge Management Resource (BRM) course. This course is the U.S. Merchant Marine Academy's capstone course for all deck officer license candidates; and is a requirement for license, graduation, and commission. BRM is conducted on the Academy's full mission bridge simulator. The course consists of running the students through twelve different high-stress real-world shipping situation exercises requiring maximum situational awareness and leadership under extreme conditions. All taking place in a high concentration of vessel traffic with risk of collision. As the course notes, being the capstone course, the students must lean on the successful completion of all their deck officer and leadership related courses as well as their full year at sea. As of this writing, M/N Mitchell has completed all twelve of the scenarios and I expect M/N Mitchell to finish in the top of the class for this term. Additionally, M/N Mitchell was a student in my NAUT 101Introduction to Nautical Science class lecture and lab (AY2023/Term 1). NAUT101, as is NAUT460 BRM, is both a STCW and USCG required course of instruction. M/N Mitchell received an (A-) in this course.

3.  Regarding M/N Mitchell as a student midshipman, she is the model in respect to interest, enthusiasm, dedication, and performance. M/N Mitchell would routinely be one of the first students to arrive for class as well as being one of the last to depart. She fully participated asking pointed and pertinent questions and always seeking to learn as much as possible. M/N Mitchell is a pleasure to have in class and her presence with such exuberance for learning and succeeding provided a positive example for her fellow students.

4.  M/N Mitchell disclosed the Honor Board's recommendation for a disciplinary setback as well as her request to appeal this recommendation directly to you. As a professor, I would normally only be able to speak to a student's character and conduct in the classroom. However, I am in a unique position as M/N Mitchell's lead BRM instructor to speak to her character and conduct as a cadet midshipman in charge of a navigational watch. I have observed and assessed M/N Mitchell as the

1

watch officer under situations of duress and high stress, and she has demonstrated the necessary traits for a young U.S. Merchant Marine officer onboard ship. As a large and diverse-crewed ship's Master/Commanding Officer, I can attest to the fact, I would value an officer of M/N Mitchell's demonstrated ability. I am confident any shortfalls and challenges can certainly be overcome in a person of M/N Mitchell's steadfastness and commitment.

5. As a USMMA senior maritime educator, faculty president, and ship's Master, I would ask for all consideration to allow for M/N Mitchell to walk with her class at commencement; albeit with any disciplinary remediation notwithstanding. During such remediation time period prior to commencement, M/N Mitchell must demonstrate that same enthusiasm and wholeheartedness in which she has done so as a student in my class and during her tenure at USMMA. If M/N Mitchell is as serious as she has stated to me and her other professors, she should welcome such an arrangement.

6. Thank you for your time and consideration.

Sincerely,

I am,

S. P. Tortora
CAPT USMS

October 24, 2025

To Whom It May Concern:

I have known MIDN Morgan Mitchell for the past academic year and I welcome the opportunity to write on her behalf.

As the Regimental Activities Officer, MIDN Mitchell has been committed to creating a community for our midshipmen that fosters both personal and professional growth. She has been an example for others as she successfully juggles that demands of the academics, athletics and the officer position this semester.

MIDN Mitchell is a caring and disciplined leader that many midshipmen try to emulate. One example of her leadership has been her efforts in the working with the individual Morale Officers and Club Leadership. Currently, the academy has over 50 register midshipmen clubs/organizations and active morale officer team that has been responsible for providing over 100 on/off campus events to date this year.

It should be noted that her efforts are intentional in order to create opportunities for midshipman to connect, engage and growth. MIDN Mitchell is an important part of The Office of Student Activities as it serves be a resource for event planning, leadership development, and club participation.

MIDN Mitchell has had her share of learning experience and it is clear she has grown from it. She a bright future ahead of her and I truly believe that the academy community is lucky to have such a leader on our campus.

If you would like to discuss MIDN Mitchell qualities further, please contact me at 516.726.5629.

Sincerely,

Thomas J. O'Boyle
Director of Midshipmen Engagement & Activities
United States Merchant Marine Academy



To the Superintendent,

I am writing in support of the appeal submitted by Midshipman Morgan Mitchell, a student in my economics class and my mentee for the past three years. It has been my privilege to teach Midshipman Morgan Mitchell during the second trimester of the 2024–2025 academic year and to mentor her since her arrival at the Academy.

Throughout this time, Midshipman Mitchell has consistently demonstrated intelligence, diligence, and respectfulness, along with a positive and professional demeanor. She approaches her studies with seriousness of purpose and a strong desire for continuous improvement, both academically and personally.

As an independent thinker, Midshipman Mitchell exhibits exceptional analytical skills and regularly contributes thoughtful, well-reasoned insights during class discussions. Beyond her academic performance, she has been an asset to the course through her assistance with administrative tasks and her readiness to support fellow midshipmen. Her conduct reflects integrity, leadership, and a genuine commitment to the success of those around her.

Moreover, Midshipman Mitchell has shown admirable perseverance in addressing challenges and devotes significant time and effort to self-improvement. Her dedication to excellence in all aspects of her development—academic, professional, and personal—has been evident in every interaction I have had with her.

I hold Midshipman Mitchell in the highest regard and fully support her appeal, confident that she will continue to uphold the values and standards expected of our Academy students. Please feel free to contact me if you require any additional information.

Thank you for your time and consideration.


Sincerely,

Hsinrong Wei, Ph.D.
Associate Professor
Marine Transportation Department
United States Merchant Marine Academy

09/20/2024

**Character Statement**

**On Behalf of: MIDN Morgan Mitchell 2/C**

**From: MIDN LCDR Shaylin Juhola 1/C**

I am writing this character statement on behalf of Midshipman Mitchell. Midshipman Mitchell is a fellow teammate on the Varsity Women's Soccer Team and throughout my time at Kings Point I have had the privilege of seeing her grow both as an athlete and a person.

Throughout my time on and off the field with Midshipman Mitchell, she has consistently shown integrity, dedication, and a strong work ethic. Midshipman Mitchell works extremely hard in everything that she does from academics, regimental duties, and athletics. Midshipman Mitchell is the type of person who steps up during difficult moments and is one of the first to offer support when someone is struggling. I have personally seen her encourage teammates including myself when a play doesn't necessarily go the way it was intended. Midshipman Mitchell can be seen as a Squad Leader who encourages her Team Leaders as well as her Plebes to continue to strive for the best of there ability in athletics and academics.

I believe that this incident is not reflective of who Midshipman Mitchell truly is. Her actions on many occasions have shown that she values honestly, respect, and service. I have every confidence that she will grow from this and will continue to uphold the valves that all Midshipmen at the United States Merchant Marine Academy are sworn to.

Very Respectfully,

**MIDN LCDR Shaylin Juhola 1/C**

**USMMA Class of 2025**

Date: October 02, 2024

From: MIDN Jinae Teria 1/C

To: Honor Board Council

Subj: Character Witness Statement – MIDN Morgan Mitchell 2/C

To Whom It May Concern,

My name is Jinae Teria, and I serve as the Regimental Cultural Diversity Officer for first rotation. I have had the privilege of knowing MIDN Morgan Mitchell since her first trimester as a plebe at this esteemed institution.

Throughout our friendship, I have consistently been impressed by Morgan's character, work ethic, and commitment to excellence. Her achievements in both athletics and academics are commendable, but what truly stands out to me is her resilience and heartfelt dedication to her peers.

During her time as a plebe, Morgan demonstrated an impressive ability to balance the academic, athletic, and regimental pillars of our academy. Our shared passion for soccer allowed us to connect on a deeper level, and I often found myself in a mentoring role for her. Even when she had to "red-shirt" her first season, Morgan showcased her unwavering support at practices, games, and events, always maintaining a positive attitude and a smile.

As a third-class midshipman, our friendship flourished. Morgan became a trusted source of advice and support during challenging times. She consistently went out of her way to lend a helping hand, listen to my concerns, and be a shoulder to cry on. Her kindness and empathy truly set her apart.

Morgan's support extended beyond our friendship; she actively mentored plebes on the soccer team and within her company. She led with compassion and dedication, fostering an environment where others felt valued and supported. Throughout our friendship, I have observed Morgan prioritize her goals while maintaining a strong moral compass. She has always stayed out of trouble and remained focused on her commitments, demonstrating a commendable level of discipline and dedication.

Very Respectfully,

MIDN Jinae Teria 1/C