UNITED STATES DISTRICT COURT                    <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MARINA RONZONI and MORGAN MITCHELL,

                                    Plaintiffs,

            -against-                                           **MEMORANDUM & ORDER**
                                                                25-cv-06691 (JMA) (JMW)
UNITED STATES OF AMERICA, UNITED STATES
DEPARTMENT OF TRANSPORTATION, UNITED
STATES MERCHANT MARINE ACADEMY and
CAPTAIN ANTHONY J. CERAOLO,

                                    Defendants.
-----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

        Plaintiffs Marina Ronzoni and Morgan Mitchell bring this suit against Defendants United

States of America, United States Department of Transportation ("DOT"), United States Merchant

Marine Academy ("USMMA" or "Academy"), and Captain Anthony J. Ceraolo, Acting

Superintendent of the Academy.  In October 2025, Plaintiffs each received a one-year setback,

from the class of 2026 to the class of 2027, as a disciplinary sanction from the Academy.  They

claim that the disciplinary process that resulted in their setback violated the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701, et seq., and the Fifth Amendment.  They also claim that

the penalty itself violates the Fifth Amendment.  Plaintiffs seek an injunction ordering their

reinstatement to their original graduating class; a declaration that Defendants violated the APA

and the Fifth Amendment; and APA relief vacating the setback decision.

        Before the Court are the parties' cross-motions for summary judgment.  Also before the

Court is Plaintiffs' motion for a preliminary injunction. For the reasons set forth below,

Defendants' motion for summary judgment is GRANTED.  Plaintiffs' motion for summary

judgment is DENIED and Plaintiffs' motion for a preliminary injunction is DENIED AS MOOT.

# I.    BACKGROUND

## A.  **USMMA Regulatory Framework and Honor Code**

The USMMA is a service academy in Kings Point, New York.  It is maintained by DOT to "provide instruction to individuals to prepare them for service in the merchant marine of the United States."  46 U.S.C. § 51301(a).  The Academy is led by a Superintendent, who is appointed by the Secretary of Transportation and is delegated the authority to "issue all regulations necessary for the accomplishment of the Academy's mission."  46 C.F.R. § 310.67.  Students at the Academy are known as Midshipmen.

All Midshipmen take an Honor Oath, by which they commit to comply with the Academy's Honor Code: "A Midshipman will not lie, cheat, or steal."  (AR 569–72, 611–14).  The Superintendent sets forth regulations governing Midshipman compliance with the Honor Code in the form of an Honor Manual.  (See AR 569–610 ("2022 Honor Manual"); AR 611–55 ("2024 Honor Manual")).[1]  The Honor Manual also governs the disciplinary procedure for violations of the Honor Code.  (Id.)  Alleged violations of the Honor Code are investigated and adjudicated by an Honor Staff, also called an Honor Board, which is comprised of Midshipmen and advised by a Commissioned Officer or faculty member.  (AR 621.)

Honor Manual Rule 4.3 governs the procedure for investigating alleged violations of the Honor Code.  As relevant to this action, Rule 4.3.3 states that an investigation must include:

a. Notification to the accused, and acknowledgement of a potential honor violation.
b. An interview of the accused Midshipman. This interview will be conducted after the accused Midshipman has had adequate time to obtain an advisor and return the signed documentation acknowledging the accusation of an honor violation, but no more than five business days after receiving the Rights of the Accused. If the accused desires an advisor but is unable to secure one, they may request the Commandant appoint an advisor.

---

[1] The Honor Manual was updated between Plaintiffs' first hearings in September 2024 and their second hearings in October 2025.  No substantive changes were made to the rules that are relevant to the instant action.  Because this litigation primarily concerns the October 2025 hearings, the Court refers herein to the 2024 Honor Manual, which is the version that was operative at that time.

     c.  An interview of the accuser.

     d.  An interview of any relevant individuals who may have knowledge of the potential honor violation.

     e.  Gathering any and all available supporting evidence, documentation, information, etc. that proves or disproves the allegations made against the accused midshipman.

AR (626.)  The Rule also provides:

> The [Regimental Honor Board Chair of Investigations] will work closely with the appropriate [Company Honor Board Chair] and appointed investigating members. They shall ensure that the accused is aware of their rights per Section 4.5, as well as ensure the investigating team gathers all pertinent evidence to build an objective, impartial case.

(Id.)

Honor Manual Rule 4.5 sets forth the rights of a Midshipman accused of violating the Honor Code.  As relevant, Rule 4.5.12 grants accused Midshipmen the right "[t]o have all proceedings and information concerning a pending or completed investigation of an honor violation kept private to the maximum extent possible," and Rule 4.5.14 grants accused Midshipmen the right "[t]o be provided copies of all evidence . . . at least 5 business days prior to an Honor Hearing[.]"  (AR 628.)

Honor Manual Rule 4.6 sets out the procedure for Honor Hearings where alleged violations of the Honor Code are adjudicated. (AR 629.)  Honor Hearings are composed of five voting members of the Academy's Honor Board, as well as several non-voting participants: an Honor Staff Advisor, a presiding officer, the Regimental Honor Staff, and a faculty advisor to the accused midshipman.  (AR 629–30.)  As relevant to this action, Rule 4.6.4 states that:

> At the time the evidence is presented to the voting members during the hearing, the accused will be given an opportunity to object to anything contained therein.  The rules of evidence for judicial proceedings do not apply to Honor Board proceedings.  The presiding officer will consult with the Honor Staff Advisor and rule on objections to evidence.  Additionally, the presiding officer will allow the accused to present any new evidence to be considered at the hearing.

(AR 631.)  A majority vote of the five voting members is required to find an accused Midshipman either in violation or not in violation of the Honor Code.  (Id.)  The voting members must make their determination according to a "majority of evidence" standard.  (AR 641.)

Honor Manual Rule 4.7 sets out the procedure and framework for determining the appropriate penalty once a Midshipman is found to be in violation of the Honor Code.  (AR 631–33.)  The Regimental Honor Board Chair recommends a penalty and refers the case for a decision to the Academy's Commandant, who in turn must refer the case to the Superintendent for a final decision if the Commandant recommends deferred graduation, setback, or disenrollment.  (AR 631–32.)  The possible sanctions for Honor Code violations are disenrollment, setback, deferred graduation, and honor probation and remediation.  (AR 632–33.)  As relevant, Rule 4.7.2.b states:

> A sanction of setback refers to a temporary separation from the Academy, where rejoining the Academy with the next year's class is conditional and dependent on the individual completing contractual terms . . . It is reserved for violations that are unacceptable within the Regiment, but where the possibility of suitability for future service exists with a more in-depth period of remediation and reflection.

(AR 632.)

Honor Manual Rule 4.8 governs the process for a Midshipman to seek reconsideration of their penalty by either the Commandant or Superintendent, whichever of the two made the final decision.  (AR 633–35.)  The only grounds for reconsideration are:

1) There is new evidence of a substantive nature not previously available at the time of the hearing, which would have materially affected the decision.
2) There were procedural errors in the case or in the interpretation of the Honor Code serious enough to deny the Midshipman a fair investigation and/or hearing.
3) The severity of the sanction is disproportionate to the violation(s) committed in accordance with the Honor Code.

(AR 634.)

### B. **Relevant Facts**

#### 1. **Honor Board Investigation**

On August 17, 2024, the USMMA King's Point Futbol Club held a Team Movement ("TM") at Point Lookout Beach, which was attended by members of the USMMA men's and women's soccer teams. (See, e.g., AR 25, 96., 249, 283–85.) Plaintiffs are members of the women's soccer team and were present at the beach. (See, e.g., AR 25–32, 283–99.) Ronzoni was "Midshipman-in-Charge" of the TM. (See AR 522 (admitting that she was "MIC"); AR 76 (establishing that "MIC" is "Midshipman-in-Charge").) At least some of the students present, including some who were underage, consumed alcohol at the TM. (See, e.g., AR 1, 312.)

The next day, Plaintiffs were both interviewed by Midshipmen investigating alcohol use at the TM. (AR 3, 249.) During those interviews, Plaintiffs denied knowledge of any drinking at the beach. (AR 1 (reporting that Mitchell denied supplying alcohol at the TM and denied "knowledge of the Futbol Club drinking at the beach"), 247 (same for Ronzoni).) However, one of the investigating midshipmen, Thorsten Muehlbauer, was soon told by another midshipman, Keegan Solmos, that other parties had reported to Solmos that Mitchell and Ronzoni were in fact aware of drinking at the beach. (AR 1 (noting reports that Mitchell "was aware of the group drinking on the TM"), 247 (same for Ronzoni), 116–17 (explaining that Muehlbauer heard these reports secondhand from Solmos).) Muehlbauer offered each Plaintiff the opportunity to self-report for lying during the initial interviews. (AR 1, 247.) Plaintiffs both declined, insisting they had been truthful. (AR 1, 247.) On August 24, 2024, members of the Honor Board questioned the women's soccer team about the TM at the beach, although the administrative record does not contain any information about what was said at that meeting. (See, e.g., AR 274–75, 404.)

Although he had no firsthand knowledge of the reports made to Solmos, (AR 116–17), on August 25, 2024, Muehlbauer filed a Report of Possible Honor Violation (also known as an "HB-

1") accusing each Plaintiff of possibly lying during their initial interviews. (AR 1, 247–48). He noted in the HB-1s that he personally "believe[d Plaintiffs] to be innocent." (AR 1, 247–48.) The HB-1 forms initiated an Honor Board investigation into Plaintiffs for lying about supplying alcohol and for lying about their awareness of alcohol at the TM. Solmos led the investigation team in his role as Regimental Honor Board Chair of Investigations. (AR 3, 249). Plaintiffs were notified that they were accused of lying, (AR 72, 279), informed of their rights under the Honor Manual, (AR 74, 281), and permitted to select a faculty member to advise them throughout the Honor Board proceedings, (AR 75, 282).

Between August 29 and September 27, 2024, the investigation team interviewed other students who were present at the TM. Although scheduling emails suggest that the investigating team pursued interviews with at least ten witnesses, (see AR 270), the investigation reports prepared by Solmos refer to only six witness interviews and the administrative record contains his notes from only those six interviews, (AR 3–20, 249–66). The notes reflect that all six witnesses said that both Mitchell and Ronzoni were interacting with the soccer teams the whole time they were at the beach and that Mitchell and Ronzoni "were fully aware of the situation at the beach." (AR 3–20.) Two witnesses reported that Mitchell and Ronzoni were both drinking at the beach. (AR 9, 17.) One reported that he saw Mitchell drinking at the beach, and that Mitchell said, "they have white claws that the plebe soccer girls can drink." (AR 12.) Another reported that Ronzoni took the cellphones away from the "plebes" (first-year USMMA students), telling them: "you can't have your phones because you are drinking." (AR 15.)

The investigating team also interviewed Mitchell and Ronzoni, who maintained that their statements to Muehlbauer had been truthful. Mitchell told the investigating team that she and Ronzoni "did not bring any alcohol to drink or to pass out" and that she barely interacted with the soccer teams at the beach. (AR 3, 5–6.) Ronzoni said that she was not drinking, that she and

Mitchell brought no alcohol to the beach, that she "saw no alcoholic drinks and was not aware of the situation on the beach," and that she had no interactions with the soccer teams except for playing volleyball with the men's team.  (AR 249, 253–54.)

Solmos's investigation report, his notes from the six witness interviews, and his notes from interviews with Mitchell, Ronzoni, and Muehlbauer made up the "evidence packets" presented at Plaintiffs' Honor Board hearings.  (See AR 3–20, 249–266.)  Per the Honor Manual, these evidence packets were sent to Plaintiffs in advance of their hearings.  (AR 271; see also AR 50.)  All names were redacted from the packets.  (AR 271; see also AR 50.)  Upon reviewing her evidence packet, on October 8, 2024, Ronzoni emailed Midshipman Zachary Alvarado, in his role as Regimental Honor Board Vice Chairman ("RHBVC") and Midshipman Daniel Heck, in his role as Regimental Honor Board Chairman ("RHBC").  Ronzoni wrote:

> I do not believe that this is all of the evidence that was collected from the investigation process . . . . I know my entire team was interviewed on August 24th as I was present for this.  However, there are no notes [in the packet] . . . The amount of interviews held do not equate to the amount of interviews that are present in my evidence packet.

(AR 274.)  Alvarado replied:

> In regards to the August 24th situation, no evidence was gathered that will be used in the hearing.  The purpose of that was to see if there were grounds for a legitimate HB-1 submission.  Anyone who had evidence to share stemming from that meeting was interviewed and their interviews are included in the case packet.

> All official interviews are included in the packet as well as all gathered evidence.  Any other information received that is not in an official interview or submitted for your review will not be used against you in the hearing or shared in any way with the voting members . . . . Everything you have is what is given to the board.

(AR 275.)  In a subsequent email on the same chain, RHBC Heck added:

> Everything that the Vice Chair said is correct.  It is also worth noting that, for your hearing, you are allowed to bring in any additional evidence of your own for submission to the voting members for consideration during deliberations.

(AR 277.)

### 2.  October 2024 Honor Hearings, Penalties, and Reconsideration

On October 16, 2024, the Honor Board held hearings to adjudicate the claims against each Plaintiff.  (AR 33, 300.)

At her hearing, Mitchell presented opening and closing statements in which she reiterated that she "had absolutely zero interaction with any members of the Men or Women's team," that she had no knowledge of any alcohol provided at the beach, that she saw no open containers at the beach, and that she "did not lie throughout any of the interviews or questioning surrounding this case."  (AR 25–26.)  Mitchell also submitted two character references, (AR 27–28), and witness statements prepared by four Midshipmen who attended the TM, two who were interviewed by Solmos and two who were not.  (AR 29–32.)  The hearing staff also reviewed the evidence packet prepared by Solmos.  (See AR 40–46.)  No witnesses testified live at this hearing.  (AR 33.) Mitchell's four witness statements all stated that Mitchell did not provide alcohol at the beach, although none mentioned whether Mitchell was aware of drinking at the beach.  (AR 29–32.)  The five voting members at Mitchell's hearing unanimously found her to be in violation of the Honor Code for lying.  (AR 35 ("I believe MIDN Mitchell was well aware in regard to drinking on the beach."); AR 39 ("Mitchell claims she had zero knowledge of Alcohol consumption at the beach, multiple people state she knew[.]"); see also AR 36–38))

At her hearing, Ronzoni presented opening and closing statements, in which she insisted that any alcohol at the TM had been provided without her knowledge, that she saw no open containers or signs of intoxication at the beach, and that she had been truthful during her interview and the honor proceedings.  (AR 283–85.)  She strongly objected to the allegation that she had taken away the plebes' cellphones because of drinking at the beach, insisting that she took their phones away to "encourage the women to interact with each other rather than just sitting on their phones."  (AR 283.)  She stated:

> Although I cannot remember my exact words, I know it was something along the lines of "I'm sorry I have to take your phones away, if you need them at any point feel free to grab them" . . . At no point did I ever state 'I'm taking this because you are drinking."

(AR 283.)  Ronzoni also submitted six character references, (AR 291–92, 295–99), and eight witness statements prepared by midshipmen who attended the TM, which included statements from Mitchell, three witnesses who were included in the evidence packet, and four who were not, (AR 286–90, 293–94.)  The hearing staff also reviewed the evidence packet prepared by Solmos. (See AR 307–13.)  No witnesses testified live at this hearing.  (AR 300.)  Five of the witnesses stated that they did not see Ronzoni drinking or distributing alcohol at the beach and emphasized that their interactions with her at the TM were "brief" and "limited."  (AR 286–90.)  Two of the witnesses, including one of the witnesses who told Solmos that Ronzoni was drinking at the beach, wrote statements affirming that Ronzoni took the plebes' phones for the purpose of encouraging them to socialize.  (AR 293–94.)   None of Ronzoni's witness statements mentioned whether she was aware of drinking at the beach.  (AR 286–90, 293–94.)  The five voting members at Ronzoni's hearing unanimously found her to be in violation of the Honor Code for lying.  (AR 302 ("Ronzoni claims to have zero knowledge of any 'open containers' at the beach.  However, the initial HB-1 claims she had no knowledge of any drinking."); AR 306 ("Ronzoni purposly [sic] danced around the issue and purposly [sic] attempted to blind herself to the fact that there was drinking by ommitting [sic] the facts."); see also AR 303–05.)

The two cases proceeded in lockstep.  On October 25, 2024, RHBVC Alvarado wrote a letter about each Plaintiff to Commandant Mikel Stroud, in which he summarized the evidence presented at the hearings and expressed his "full agreement with the voting members' decision" to find Plaintiffs in violation of the Honor Code for lying about their "knowledge of the consumption of alcohol" at the beach.  (AR 40–41, 307–08.)  He recommended a penalty of disenrollment, writing that Mitchell demonstrated a "complete disregard for personal ownership and good

9

character," (AR 40–41), and that Ronzoni "faile[d] to take accountability for her actions in spite of overwhelming evidence," (AR 307–08.)  RHBC Heck also wrote to Commandant Stroud and similarly summarized the hearings and concurred with the voting members' rulings.  (AR 42–43, 309–10.)  He recommended a penalty of setback with honor remediation, writing that each Plaintiff "shows no accountability, nor any remorse for her actions, and continues to attempt to deceive." (Id.)  On October 28, Captain Patrick Keane, the Honor Board faculty advisor, wrote to Superintendent Joanna Nunan, again summarizing the evidence presented at the hearings and concurring with the voting members' conclusions.  (AR 44–45, 311–12.)  Keane agreed with the RHBVC and RHBC "that honor probation and remediation are not sufficient," and recommended that Plaintiffs be setback to the class of 2027.  (AR 45, 312.)  On November 1, Commandant Stroud wrote to Superintendent Nunan, attaching the honor hearing results and recommendations, expressing his agreement with the recommended penalty of setback, and writing that "it is impossible to work remediation for a [Midshipman] that has not come to terms with the truth of what they have done[.]"  (AR 46, 313.)

On November 18, 2024, Superintendent Nunan wrote a letter to each Plaintiff, explaining that she had reviewed each case and affirmed the Honor Board's finding that they were guilty of lying about their "participation in an unauthorized alcohol event[.]"  (AR 47–48, 314–15.) However, rather than impose the penalty of disenrollment or setback recommended by the honor staff, Superintendent Nunan imposed the more lenient penalty of honor remediation on both Plaintiffs.  (AR 47, 314.)

On November 19, 2024, both Plaintiffs submitted requests for reconsideration of Superintendent Nunan's decision.  (AR 49, 316–32.)  In her application, Ronzoni alleged a variety of procedural violations during her Honor Board investigation and hearing.  She argued, inter alia, that the investigating team withheld evidence from the packet used at her hearing.  (AR 321.)

Ronzoni argued that the investigating team conducted more interviews and took more notes than what was included in the evidence packet and improperly excluded exculpatory statements from the packet.  (Id.)  Ronzoni also pointed out that names were redacted from the evidence packet, writing that "without knowledge of [a declarant's] identity, it is impossible to refute their statements." (AR 325.)  Ronzoni also attached supportive statements written by her faculty advisor, her soccer team captain, and Muehlbauer, who again stated his belief in Ronzoni's innocence.  (AR 329–32.)  Mitchell's application for reconsideration was not included in the administrative record.

On December 12, 2024, Superintendent Nunan granted both requests for reconsideration, finding that the requests "met the requirement of Section 4.9(b)(ii) as you raised concerns about procedural errors."  (AR 50–51, 333–34.)[2]  Nunan scheduled new hearings to take place after Plaintiffs returned from their "Sea Year."  (Id.)  In granting reconsideration, Nunan found significant procedural errors in that the investigation reports provided to Plaintiffs had been improperly redacted and that one voting member at the hearing should have recused himself.  (Id.) Nunan also wrote:

> Further, if there are witness statements that were not provided to you, they should have been provided. However, the Investigation Officer is not obligated to interview every potential witness, and you have a right under the Honor Process to call witnesses in your defense at the hearing.

(Id.)

### 3.  September 2025 Honor Hearings, Penalty, and Reconsideration

In September 2025, a new Honor Board convened to re-adjudicate the claims against Plaintiffs.  (AR 81, 371.)  The Company Honor Board Chair of Investigations, Jason Rupli,

---

[2] The rule numbering in the Honor Manual changed between the 2022-06 version that was in use during Plaintiffs' first hearing, (AR 569–610), and the 2024-07 version that was in use during Plaintiffs' second hearing, (AR 611–655). Nunan's letter quotes the text of "Section 4.9(b)(ii)," which is the equivalent of Rule 4.8.1(c) in the 2024-07 manual quoted supra, Part I.A.

prepared new Reports of Investigation based on Solmos's September 2024 investigative notes. (See AR 54–71, 337– 354.)  Rupli's reports and Solmos's notes constituted the evidence packets presented at Plaintiffs' second hearings.  (See AR 54–71, 337–54.)

In early August 2025, Midshipman Charles Cahalan, in his role as RHBVC, provided Mitchell with a copy of the evidence packet for her case.  (AR 137–38.)  An email exchange ensued, to which Plaintiffs give great weight in the instant action.  Mitchell replied to Cahalan with an inquiry: "Is there going to be a new investigation or is the previous packet the only thing available? Am I afforded the right to submit new letters and witness statements?"  (AR 137.) Cahalan responded: "There will not be a new investigation conducted, but you may submit new letters and witness statements."  (AR 136.)  A few weeks later, Mitchell received an email from Midshipman Christopher Debus, in his role as RHBC, regarding the scheduling of her new hearing. (AR 146.)  Debus wrote:

> Furthermore, it is my understanding you may have additional witness statements/evidence you would like to present at your hearing. If this is the case, there are two options available:
>
> 1.  If you have substantive evidence that you wish to present in your defense, the honor staff will reopen the investigation as per the honor manual and investigate all new evidence, whether evidence submitted by you or new evidence uncovered by the investigations officer to include previous statements made since 27 August 2024 which relates to this case.
>
> 2.  As per the Superintendent's Reconsideration Decision of last year, we will proceed with a retrial, using the unredacted case packet which you have in your possession (with no new evidence).

(Id.)  Mitchell asked for clarification, explaining that she had understood Cahalan's earlier email to mean that there would be no re-investigation under any circumstances.  (See AR 135.)  Debus replied:

> Cahalan was correct that no investigation was being conducted at the time and your hearing . . . was based off the unredacted case packet from last year. Additionally, as per MIDN Cahalan's email, you MAY submit new letters and witness statements, however as stated in my previous emails, would prompt the case to be

reopened for investigation of new evidence. If there is any additional confusion regarding your two options, I advise you speak with CAPT Keane.

(AR 134 (emphasis in original).)  Two days later, Mitchell responded: "In reference to the two choices . . . I am confirming Option 2 (Superintendent's Reconsideration Decision) so that we may move forward with the hearing."  (See AR 108–09).

Mitchell's second hearing took place on September 10, 2025.  She presented an opening statement averring that she was truthful in her initial interview, had minimal interactions with others present at the TM and that, had she been aware of any drinking at the TM, "[she] would have put an immediate stop to it."  (AR 76.)  She also re-submitted the same four witness statements from her first hearing.  (AR 77–80.)  At the outset of her hearing, Mitchell again asked for clarification about her right to present new evidence as follows:

> **Mr. Cahalan**: You also have the right to introduce any new evidence . . . Do you understand?
>
> **Midshipman Mitchell**: I have the right to submit new evidence?
>
> **Mr. Cahalan**: That was provided from the Department of Transportation lawyer that this was going to be a direct retrial with all the same evidence.
>
> **Captain Keane**: Do you have new evidence you need to present? That's (indiscernible) standard.
>
> **[Mitchell's faculty advisor]**: There was — not the opportunity to provide. It was either option A or option B. So if option B was chosen, which was a retrial, there was a direct statement that no new evidence could be presented. It was only going to be —
>
> **Keane**: But the other option allowed evidence to be introduced?
>
> **Speaker**: Yes, sir. That was the option (indiscernible).
>
> [. . .]
>
> **Keane**: Okay. So then an option for new evidence at this time and place is not available.  It's a real simple question and it's a real simple answer.  And it's for you: Do you have evidence that's substantial and significant that you would want to present at this hearing?
>
> **Mitchell**: Yes, but I don't have an opening.

**Keane**: Okay.

**Mitchell**: Because I was of the impression that I can bring new evidence to this case.

**Keane**: Well, you have the option per the Department of Transportation lawyer to have a case where you are able to present new evidence as opposed to the original decision, which was one whereby you be — the only difference between your last hearing and this hearing will be that the names would not be redacted.  So if you have new evidence that is significant and that the board should consider, okay, if that's the case, then tell me that right now and we'll go ahead and suspend the hearing and we'll set it up today.

**Mitchell**: No, we can proceed.

**Keane**: I'm giving you the opportunity to present new evidence. Not character statements, but evidence that's relevant to this.

**Mitchell**: No, sir, we can just proceed with the trial today.

**Keane**: Okay. You had the opportunity. I'm just making sure that you're aware that the opportunity was to add new evidence.

**Mitchell**: Yes, sir.

(AR 150–153.)  The honor board proceeded to call four witnesses, all of whom had statements in the evidence packets.  Mitchell cross-examined each witness.  None of the witnesses could recall a specific instance of Mitchell drinking or witnessing drinking, but all four generally testified that alcohol consumption at the TM was so glaringly obvious that it was implausible that Mitchell could have been unaware.  (See, e.g., AR 170 ("There were red Solo cups everywhere, and it was pretty obvious that there was drinking."); AR 176 ("[T]here was really no way to not be sure of the situation."); AR 179 ("[W]hat was happening was pretty evident from . . . people, like, having drinks in the open and stuff like that.").)  Mitchell did not call any live witnesses on her own behalf.  The five voting members at Mitchell's second hearing—all different from those at her first hearing—unanimously found her to be in violation of the Honor Code for lying.  (AR 83–87.)

Ronzoni's second hearing took place on September 25, 2025. She presented opening and closing statements, in which she stated:

14

> It is easy to assume I was 'aware' of the situation in hindsight, since the details are now widely known . . . . However, at the time of the team movement over a year ago, no interviews ever specified what was being consumed or how it was concealed by those drinking . . . Without this knowledge, there was no reasonable way I could have known.

(AR 359.)  She acknowledged that she saw red solo cups at the beach and that some Midshipmen, including Mitchell, were drinking in her car on the way to the beach, but she maintained that once at the beach, she "never witnessed alcohol being bought, supplied, or consumed" and that she "had no reason to be suspicious, as [she] never saw the cups being filled with alcohol nor witnessed anyone acting drunk."  (AR 359–60, 528.)  She also re-submitted the same eight witness statements from her first hearing.  (AR 362–70.)  The Honor Board proceeded to call four witnesses, all of whom had statements in the evidence packets.  Ronzoni cross-examined each witness.  One of the witnesses explained that Ronzoni must have been aware that people were drinking at the beach because it was "obvious" and because she took away the plebes' phones.  (AR 482.)  Another testified that she and Ronzoni had previously discussed alcohol at the TM.  (AR 493 ("I asked [Ronzoni] if it was okay if I got the plebes alcohol and her response was as long as I don't know."))

At the outset of the hearing, Ronzoni was informed of her "right to introduce any new evidence which will help clarify or further [her] defense."  (AR 449.)  When asked if she understood that right, Ronzoni replied, "I do."  (AR 449–50.)  In the middle of the hearing, a board member again clarified: "You understand that this is your opportunity to call all the witnesses that you want, correct?" (AR 491.)  Ronzoni replied, "Yes."  (Id.)  Indeed, Ronzoni did call a live witness—one of the students who had submitted a statement on her behalf and who was not one of Solmos's interviewees—to testify in her defense.  That witness testified that she attended the TM and did not remember Ronzoni mentioning drinking when she collected the plebes' phones, (AR 512), and that nobody whom that student was grouped with at the TM "was intoxicated to the point where it would've been obvious that they were having drinks," (AR 517).

15

The five voting members at Ronzoni's second hearing—all different from those at her first hearing—unanimously found her to be in violation of the Honor Code for lying.  (AR 373–77.)

The penalty phase proceeded pursuant to the same procedure as the first set of hearings, with different individuals in each role.  Again, the RHBVC, RHBC, and Honor Board Advisor each wrote a letter summarizing the honor hearings and recommending a penalty.  RHBVC Cahalan and RHBC Debus both recommended that Plaintiffs be setback.  (AR 88–89, 90–91, 378, 379–80.)  Keane, the Honor Board Advisor for Mitchell's second hearing, recommended that she be disenrolled.  (AR 92–94.)  James Schutta, the Honor Board Advisor for Ronzoni's second hearing, recommended that she be setback.  (AR 381–82.)  Acting Commandant Andrew McCarthy forwarded the hearing and results and recommendations to Acting Superintendent Anthony Ceraolo and concurred that Plaintiffs should be setback.  (AR 95, 383.)

On October 20, 2025, Acting Superintendent Ceraolo wrote a letter to each Plaintiff directing that they be setback to the class of 2027.  (AR 92–94, 384–86.)  In explaining his decision, Ceraolo wrote that he had fully reviewed the Honor Board files, the recorded hearing, the Honor Board's recommendations, and each Plaintiff's entire Academy record.  (Id.)

On October 29, 2025, Plaintiffs both applied for reconsideration to Acting Superintendent Ceraolo.  (AR 99–242, 387–563.)  On December 1, 2025, Acting Superintendent Ceraolo denied both requests for reconsideration.  (AR 243–46, 564–67.)

In her application, Mitchell argued that her right to present new evidence at the hearing had been improperly restricted, referring to the "two options" presented to her in the email from RHBC Debus and the perceived inconsistency with RHBVC Cahalan's statement in his email that she could call witnesses at the hearing.  (AR 106.)  Mitchell acknowledged that that she chose to proceed with a re-hearing on the original evidence packet, (see AR 108), but argued that she "had no idea exactly what the consequences of a reopened investigation would be" and so "had no

16

choice and was forced to agree to not present new evidence at the Honor Board." (AR 111.) She also argued, inter alia: (1) that the investigating team had improperly excluded exculpatory statements from the evidence packet in violation of Rule 4.3.3 and 4.5.14; (2) that the case packet contained only Solmos's summaries of the witness statements, not direct quotes; (3) that her right to confidentiality was breached; and (4) that the penalty of setback was "clearly disproportionate to the offense," noting that Superintendent Nuan had imposed a significantly lighter penalty after the first hearings. (AR 100–01.) She attached numerous exhibits, the most relevant of which include: (1) a new letter from Midshipman Muehlbauer restating that, in hindsight, he "would not have opened the HB-1 [because he] continue[d] to believe MIDN Ronzoni and MIDN Mitchell to be innocent," (AR 116); (2) a letter from Midshipman Michael Doshan, who was interviewed by Solmos and did not say anything incriminating about Mitchell or Ronzoni, and whose statement was not included in the evidence packets, (AR 125);[3] and (3) a letter from Midshipman Victoria Crofford accusing investigating officer Solmos of bias, (AR 143–44 ("In short, the evidence was selectively framed to fit a predetermined outcome."))

Ronzoni presented very similar arguments in her reconsideration application. (AR 388–97.) She argued that her right to present new evidence at the hearing had been improperly restricted when she was faced with a "Hobson's Choice" when "the Honor Board took the position that I

---

[3] Doshan's undated letter is just one paragraph. It reads:

To Whom it May Concern,

On the day of August 17th, 2024 I attended the KP Futbol Beach TM. In the following month, I was interviewed by M/N Solmos for an Honor Board pertaining to two soccer players, M/N Ronzoni and M:N Mitchell, on the women's team. During this interview, I did not say anything incriminating about either one of the players, as I never witnessed them drinking. It came to my attention that my statement was never given to the players as part of their packets, from the Honor Board.

Michael Doshan.

(AR 125.)

could not present any new evidence <u>unless</u> I agreed to the reopening of the investigation."  (AR 388, 396 (emphasis in original).)  She raised the same procedural arguments that Mitchell raised regarding Rules 4.3.3 and 4.5.4; the impropriety of relying on Solmos's notes rather than direct statements, and her right to confidentiality.  (AR 396.)  Like Mitchell, Ronzoni argued that the penalty of setback was "clearly disproportionate to the violation," noting Superintendent Nunan's more lenient penalty decision and the fact that "Midshipmen who readily admitted to drinking and . . . to lying about what occurred at the beach received far less punishment than me." (AR 397.) Ronzoni attached exhibits including, <u>inter alia</u>, the same three letters from Midshipmen Muehlbauer, Doshan, and Crofford that Mitchell had included in her reconsideration application. (AR 408, 440–41, 435–36.)

On December 1, 2025, Acting Superintendent Ceraolo wrote similar letters to each Plaintiff, upholding his decision to set them back to the class of 2027.  (AR 243–45, 564–67.)  In both letters, Ceraolo explained that he "read, and reread" the Plaintiffs' applications and accompanying exhibits, as well as every document from the hearing files, and listened again to the recorded hearings.  (AR 244, 565.)  He concluded that "the totality of the evidence still informs the finding that [Plaintiffs] violated the Honor Code by a preponderance of the evidence" and that "there was no procedural error . . . serious enough to deny [Plaintiffs] a fair investigation or hearing[.]"  (AR 243–44, 565–66.)  He found that each Plaintiff was presented with multiple opportunities to suspend her hearing and to present new evidence and that each chose instead to proceed with the rehearing on the original evidence packet.  (AR 244–45, 565.)  He found that there was no improper limitation on Plaintiffs' ability to present new evidence or witnesses, and that they were explicitly given the opportunity to discover and present all potentially exculpatory evidence.  (<u>See</u> AR 244–45; 565–66.)  Regarding the alleged breach of confidentiality, he wrote that it was difficult to know who may have spread information about their cases, as there were

numerous midshipmen at the TM and involved in the Honor Board proceedings, but that any breach of confidentiality would not have changed the outcome or penalty.  (AR 245, 567.)  R

Regarding Ronzoni's allegations that Solmos's investigation notes were not direct quotes, Ceraolo wrote found that the notes "were verified as truthful" when each interviewee signed the notes.  (AR 566.)  Finally, he rejected the idea that the penalty of setback is disproportionate to the violation.  (AR 245, 567 ("The fact that Superintendent Nunan chose to offer you an alternative to the recommendations made by both Honor Boards in no way influenced my determination that the Honor Board's recommendation for setback was the appropriate outcome in this case.").)  He described several other instances of USMMA students being setback as a penalty for lying.  (Id.)[4]

## C.  **Procedural History**

On December 3, 2025, Plaintiffs filed a Complaint that asserts claims alleging violations of the APA and the Fifth Amendment.  (Compl.)  Plaintiffs alleged that Defendants violated USMMA rules and regulations—specifically, Honor Manual Rules 4.3.3, 4.5.12, 4.5.14, and 4.6.4—and that the punishment they received was arbitrary and capricious.  (Compl. ¶¶ 1, 24–25, 33, 43, 49–50, 53, 59–60, 62–67, 72.)  On December 5, 2025, Plaintiffs sought a temporary restraining order and a preliminary injunction that would stay the setback decision, allowing them

---

[4] Plaintiffs filed three affidavits in support of their motion for summary judgment: one each from Mitchell, Ronzoni, and Captain Charles McDermott, who served as both Plaintiffs' faculty advisor during their first hearings.  (ECF Nos. 20-3, 20-4, 20-6.)  The Mitchell and Ronzoni affidavits set forth no additional facts, just argumentation.  (ECF Nos. 20-3, 20-4.)  McDermott's affidavit presents some facts that indicate bias against Plaintiffs during the first honor board hearings, particularly from Captain Keane.  (See, e.g., ECF No. 20-6 ¶ 14– 22 (stating that, on the day of Plaintiffs' first hearings, Keane had reprimanded the Honor Board for acquitting a different midshipman, and that as a result "there was a lot of tension in the air" during Mitchell's hearing and that, although "[Keane] did not speak" during Ronzoni's hearing, McDermott "felt that, by his mere presence in the room, [Keane] was intimidating the Board members to be harsh").)  These affidavits are not part of the administrative record, and Plaintiffs made no motion to supplement or amend the record with the facts therein.  See Sell v. United States, No. 19-cv-3105, 2020 WL 3791847, at *5 (E.D.N.Y. July 7, 2020) ("Under the so-called 'record rule,' '[g]enerally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision.'" (quoting National Audubon Soc. v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997)).  However, even if the facts in McDermott's affidavit were part of the record, they would have no impact on the Court's analysis.  Any intimidation of the voting members at Plaintiffs' first hearing was cured by the second hearing, which involved all new voting members and is the relevant agency decision in this litigation.

to remain on campus and attend classes.  (ECF No. 4.)  On December 8, 2025, the Court held a status conference, at which the parties stipulated to Plaintiffs' requested TRO.  (ECF No. 9.)  Upon consent of the parties, the Court later extended the TRO through January 25, 2026.  (ECF Minute Order dated Jan. 6, 2026.)  On January 20, 2026, U.S. Senator Roger Wicker submitted an amicus brief in support of Plaintiffs, which the Court considered in its evaluation of the instant motions. (ECF No. 24.)

## II.    STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

However, where "'a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'"  Brezler v. Mills, 220 F. Supp. 3d 303, 321 (E.D.N.Y. 2016) (quoting Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The usual Rule 56 summary judgment standard "does not apply to a review of agency actions."  Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 399 (D.D.C. 2014).  Rather, the district court must determine "whether the agency acted arbitrarily, capriciously or in some other way that violates 5 U.S.C. § 706."  Ass'n of Proprietary Colleges v. Duncan, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015).  Summary judgment is "generally appropriate" in such cases, as compliance with the APA is a legal issue "amenable to summary disposition."  Brezler, 220 F. Supp. at 321; see also Estes v. U.S. Dep't of the Treasury, 219 F. Supp. 3d 17, 27 (D.D.C. 2016) (addressing APA and constitutional claims).

"Generally, a court reviewing an agency decision is confined to the administrative record compiled by the agency when it made the decision."  Nat'l Audubon Soc'y v. Hoffman, 132 F.3d

7, 14 (2d Cir. 1997) (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743–44 (1985)). Thus, the district court's role in APA cases is not to find facts, but solely to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." <u>Roberts v. United States</u>, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), <u>aff'd</u>, 741 F.3d 152 (D.C. Cir. 2014).

### III.    DISCUSSION

#### A. <u>APA</u>

Under the APA, a reviewing court must "hold unlawful and set aside" any agency action found to be, <u>inter alia</u>, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). "[A]n agency action is arbitrary and capricious where 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" <u>Doe v. United States Merch. Marine Acad.</u>, 307 F. Supp. 3d 121, 144 (E.D.N.Y. 2018) (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)). An agency action may also be arbitrary and capricious if the agency "fail[ed] to follow [its] own procedures and regulations." <u>N.B. v. United States</u>, 552 F. Supp. 3d 387, 398 (E.D.N.Y. 2021) (concluding that the USMMA's disciplinary adjudication of a sexual assault allegation did not violate the APA because there was sufficient evidence in the administrative record to support the agency's determination); <u>see also</u> <u>Lightsey v. King</u>, 567 F. Supp. 645, 649–50 (E.D.N.Y. 1983) (finding that the USMMA violated the APA by refusing to reinstate the plaintiff's exam grade after plaintiff was found not in violation of cheating by the Honor Board).

A reviewing court may not "itself weigh the evidence or substitute its judgment for that of the agency." Islander E. Pipeline Co., LLC v. McCarthy, 525 F.3d 141, 150 (2d Cir. 2008).  As long as "there is sufficient evidence in the record to provide rational support for the choice made by the agency, [the court] must uphold its decision." Constitution Pipeline Co. v. N.Y.S. Dep't of Envtl. Conservation, 868 F.3d 87, 102 (2d Cir. 2017) (cleaned up).  Moreover, as other courts in this district have noted, disciplinary decisions at service academies like the USMMA are ill-suited to judicial review due to the particular emphasis these schools put on honorable conduct. See, e.g., N. B., 552 F. Supp. 3d at 390 ("Few decisions properly rest so exclusively within the discretion of the appropriate government officials than the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine." (quoting Wasson v. Trowbridge, 382 F.2d 807, 812 (2d Cir. 1967)); Doe, 307 F. Supp. 3d at 147.

Additionally, the APA has a prejudicial error rule for judicial review of agency action. See 5 U.S.C. § 706.  "Under the prejudicial error rule, a court will not disturb an agency's decision if it determines that the outcome of the agency action would be the same absent agency error." Magellan Tech., Inc. v. United States Food & Drug Admin., 70 F.4th 622, 629 (2d Cir. 2023) (citing Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 659–60, (2007)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Id. (quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009)).

Plaintiffs argue that Defendants violated the APA by failing to follow various agency regulations set forth as rules in the Academy's Honor Manual.  (ECF No. 20-1 ("Pl. MSJ") at 16–19.)  The Court concludes that Defendants did not violate the Honor Manual.  The Court also concludes that, even if the alleged violations did occur, Plaintiffs suffered no prejudice as a result.

### 1. Rule 4.3.3 and Rule 4.5.14

Plaintiffs claim that Defendants violated Honor Manual Rule 4.3.3, which requires the Honor Board's investigating team to gather "any and all available supporting evidence . . . that proves or disproves the allegations against the accused midshipman," and Rule 4.5.14, which gives accused midshipmen the right "to be provided copies of all evidence . . . at least 5 days prior to an honor hearing." (Id. at 9–11.) Plaintiffs argue that Solmos's investigating team violated this rule by intentionally failing to memorialize interviews with witnesses who provided exculpatory information or, alternatively, by memorializing exculpatory interviews but failing to turn them over to Plaintiffs as part of the evidence packet. (Id. at 11.) As evidence, they point to the fact that the evidence packet did not include notes from interviews with Midshipman Doshan or Mitchell's brother (also a USMMA student who was present at the TM), nor notes reflecting investigators' meeting with the full women's soccer team on August 24, 2024. (Id. at 5, 11 (citing AR 104, 125, 391, 408).)

Plaintiffs fail to establish that the evidence packet excluded any evidence that "disprove[d] the allegations" against them. (AR 626.) The evidence packet did not include any notes from Solmos's interview of Doshan.[5] (AR 125, 408; see also AR 207 (email scheduling witness interviews with Doshan alongside witnesses whose statements were included in the packet).) However, the record does not show that any statements from Solmos's interview of Doshan would have exculpated Plaintiffs. Doshan's letter merely indicates that he "did not say anything incriminating about either [Mitchell or Ronzoni]," to Solmos "as [he] never witnessed them drinking." (AR 125, 408.) This is a largely neutral statement that does not prove or disprove the allegations because it establishes nothing regarding Plaintiffs' awareness of other people drinking

---

[5] There is no evidence in the administrative record (or the broader record before this Court) indicating that Solmos actually drafted any notes or summaries from his interviews with Doshan or Mitchell's brother. Accordingly, any claim premised on the Honor Board's failure to turn over those documents necessarily fails. Plaintiffs' alternative argument is that Rule 4.3.3 was violated because Solmos failed to memorialize those interviews.

at the beach, which is what the Honor Board found them guilty of lying about.  (See AR 35–39, 83–87, 302–06, 373–77.)  Regarding Mitchell's brother, nothing in the administrative record suggests that his interview contained relevant, let alone exculpatory, evidence.  (See AR 104 (mentioning that Mitchell's brother was questioned by Solmos without providing any information about what he said in that interview)).  Plaintiffs' reconsideration applications, which are each hundreds of pages long, contain no information about what, if anything, Mitchell's brother said to Solmos or what he observed at the beach.  (See AR 100–242, 388–563.)  As for the women's soccer team meeting, the record reflects that the meeting in question took place before Muehlbauer filed the HB-1 forms accusing Plaintiffs of lying, which establishes that this meeting was not part of the Honor Board's investigation.  Indeed, when Ronzoni inquired as to why the evidence packet did not contain notes from when "[her] entire team was interviewed on August 24[, 2024,]" she was told: "[t]he purpose of that [meeting] was to see if there were grounds for a legitimate HB-1 submission.  Anyone who had evidence to share stemming from that meeting was interviewed and their interviews are included in the case packet."  (AR 274–75.)  Muehlbauer filed the HB-1 forms that initiated the Honor Board investigations into Plaintiffs on August 25, 2024, the day after this meeting.  (AR 1, (Mitchell HB-1 dated August 25, 2024), AR 247 (Ronzoni HB-1 dated August 25, 2024)).  In any event, there is no evidence in the record indicating that any statements made during the August 24 meeting were helpful to Plaintiffs.

Even if the evidence packets were incomplete, Plaintiffs fail to demonstrate how this was prejudicial error.  See Magellan Tech, 70 F.4th at 629.  Plaintiffs argue that the incomplete evidence packets prejudiced their ability to discover witnesses with relevant information "that would have undeniably helped them" at the hearings.  (Pl. MSJ at 2.)  Nothing in the record supports this claim.  On the contrary, the record shows that Plaintiffs knew which witnesses were allegedly excluded from the evidence packets and could easily have called them as witnesses.

(See, e.g., AR 270 (Solmos emailing potential witnesses, including Doshan, regarding interview scheduling and CC'ing Ronzoni and Mitchell); AR 274 (Ronzoni, before her first hearing: "I know my entire team was interviewed on August 24th as I was present for this"); AR 321 (Ronzoni, in her first reconsideration application: "I had knowledge of the additional M/N being interviewed and plebes, yet it was not provided").)

Not only could Plaintiffs have called these witnesses at the first hearings, but Plaintiffs then had a <u>full year</u> to further investigate witnesses before their September 2025 re-hearings, at which they were each offered multiple chances to present new evidence and witnesses. (AR 150–53, 449–50, 491.)[6]  In addition to knowing which statements were allegedly excluded from the packets, Plaintiffs knew which students attended the TM, as they were both present at the beach. Plaintiffs were also present during the August 24 meeting when the entire women's soccer team was questioned. (AR 274 (Ronzoni: "I know my entire team was interviewed on August 24th as I was present for this.").)  They had knowledge of every possible eyewitness and could have called any additional witnesses, including Doshan or Mitchell's brother, at their second hearings. Plaintiffs even included a statement from Doshan in their reconsideration applications, which were filed days after their second hearings.  Accordingly, Plaintiff cannot establish that the investigator's failure to memorialize interview notes prejudiced their ability to discover exculpatory evidence.

Plaintiffs are also unable to show prejudice because the record does not indicate that any additional witnesses would have affected the outcome of their hearings.  As discussed above, Plaintiffs do not identify any exculpatory testimony that Mitchell's brother would have provided.

---

[6] Plaintiffs' argument that they were not afforded sufficient opportunity to present new witnesses at their second hearings is discussed in the next section.

The record also does not indicate that members of the women's soccer team made any exculpatory statements on August 24.

The record contains some information about Doshan's statements to Solmos, but those statements would not have altered the outcome of the hearing. At the October 2024 hearings, Mitchell presented statements from four witnesses, (AR 29–32), and Ronzoni presented statements from eight witnesses, (AR 286–90, 293–94). Although these witnesses generally stated that they did not see Plaintiffs drinking or distributing alcohol at the beach, most of these witnesses emphasized that their interactions with Plaintiffs at the TM were minimal and none meaningfully contested that Mitchell and Ronzoni were aware of drinking at the beach. (AR 29–32, 286–90, 293–94.)[7] Doshan's statement that he "never witnessed them drinking," (AR 125, 408), likewise would not have undermined the testimony of six eyewitnesses who "confidently" said that Mitchell and Ronzoni were "fully aware of the situation at the beach." (AR 9–20; 255–266.) Additionally, the mere fact that Doshan did not make any incriminating statements to Solmos concerning the Plaintiffs would also have had limited, if any, probative value. Accordingly, Plaintiffs cannot establish that either Rule 4.3.3 or Rule 4.5.14 was violated, nor that they suffered any prejudice because of the Honor Board's investigation techniques.

### 2. Rule 4.6.4

Plaintiffs claim that Defendants violated Honor Manual Rule 4.6.4, which provides that the presiding officer at an honor hearing "will allow the accused to present any new evidence[.]" (AR 631.) Plaintiffs argue that Defendants violated this rule by advising Plaintiffs that the Honor Board would re-open the investigations against them if they chose to present new evidence at the September 2025 hearings. (Pl. MSJ at 2–3, 7–8, 11 (arguing that Plaintiffs "had no idea exactly

---

[7] Only one witness statement mentioned either Plaintiff's "awareness" of alcohol use at the beach. The witness wrote: "[Mitchell and I] had a few brief encounters throughout the afternoon and, to my knowledge, she was not aware of myself buying alcohol for plebes[.]" (AR 29) This statement does very little to exculpate Mitchell, particularly in light of the many eyewitness who testified that both Plaintiffs were aware of drinking at the beach.

what the consequences of a reopened investigation would be" and so were "forced to agree to not present new evidence).)

This alleged violation is illusory. No Rule in the Honor Manual, including Rule 4.6.4, gives Plaintiffs the right to present new evidence at a re-hearing without re-investigation or precludes an investigation into evidence the accused seeks to introduce. Plaintiffs' September 2025 re-hearings were ordered by Superintendent Nunan because of two specific procedural problems with their October 2024 hearings: the case packets were improperly redacted and one of the voting members should have recused himself. (AR 50–51, 333–34.) Accordingly, the two options presented to Mitchell—who in turn conveyed them to Ronzoni, (AR 392)—made sense. Plaintiffs could either: (1) develop and present new evidence that was not considered at the first hearings and allow the Honor Board to do the same; or (2) proceed with a re-hearing on an unredacted version of the original case packet and before new voting members, thus curing the procedural defects that Nunan had observed. (AR 146, 150–53.) After receiving numerous explanations of their choices and with the advice of their faculty advisors, Plaintiffs chose to proceed with "Option 2." (AR 106–09, 392–93, AR 150–53, 449–50.) Furthermore, they were each presented with multiple opportunities at their second hearings to pause the proceedings and present new witnesses, which they repeatedly declined to do. (AR 150–53, 449–50, 491.) This was not a "Hobson's Choice," (Pl. MSJ at 2), nor was it a violation of the APA.

### 3. Rule 4.5.12

Plaintiffs also claim that Defendants violated Honor Manual Rule 4.5.12, which provides accused Midshipmen with the right "[t]o have all proceedings and information concerning a pending or completed investigation of an honor violation kept private to the maximum extent possible." (AR 628.) Plaintiffs point to a statement submitted in support of Mitchell's reconsideration application by a Midshipman who reported: "Some friends stated that . . . Rupli,

the investigating officer of the case, has been talking about it and said quote 'they are fucked.' Although I did not explicitly hear [Midshipman] Rupli say that statement, many of his close friends confirmed that he was talking about the case[.]" (AR 141.)  Plaintiffs do not describe any specific prejudice that arose as a result of this alleged breach of confidentiality.

Acting Superintendent Ceraolo considered this same alleged breach of confidentiality and found that it did not prejudice Plaintiffs in the conviction or penalty phase of the honor hearings. In his letters denying Plaintiffs' reconsideration applications, he explained that there were many other ways that information about Plaintiffs' hearings could have spread, including that "approximately 30 people [] were actually on the Team Movement, many of whom were charged with various Honor Violations and other misconduct" and that Mitchell and Ronzoni themselves contacted an unknown number of midshipmen while preparing for the hearings.  (AR 245, 567.) Ceraolo wrote: "if in fact there was a breach, I believe that the totality of the evidence and the facts would have resulted in the same outcome and my decision."  (AR 245, 567.)  The Court finds Ceraolo's prejudice analysis to be compelling and, based on a review of the administrative record, agrees that the alleged breach of confidentiality did not affect the outcome in either Plaintiff's case.

### 4.  Evidentiary Basis for Ronzoni's Violation

Plaintiffs briefly argue that the evidence presented at Ronzoni's second hearing was insufficient to support the Honor Board's finding that she violated the Honor Code.  (Pl. MSJ at 9.)  They claim that Ronzoni's conviction rested on the presence of red solo cups at the beach and the fact that she collected the plebes' cellphones, which was insufficient because some witnesses at the re-hearing testified to drinking alcohol out of other types of containers and acknowledged other possible motivations for the cellphone collection.  (Id. (citing AR 445–542).)

Plaintiffs correctly point out that an agency determination must be set aside by a reviewing court if the agency failed to consider the relevant facts or to articulate a satisfactory explanation

for its decision.  (Pl. MSJ at 18 (citing Guertin v. United States, 743 F.3d 382 (2d Cir. 2014))); see also Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  However, a reviewing Court may not "substitute its judgment for that of the agency."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

Here, there is more than "sufficient evidence in the record to provide rational support for the choice made by the agency."  Constitution Pipeline Co, 868 F.3d at 102.  Superintendent Ceraolo's letter directing that Ronzoni be setback demonstrates that he considered every piece of evidence and argument presented by the Honor Board and by Ronzoni in affirming Ronzoni's violation and imposing setback.  (See AR 384–86.)  Ceraolo also wrote a lengthy letter to Ronzoni rejecting her reconsideration application and explaining his conclusion that "the totality of the evidence still informs the finding that [she] violated the Honor code by a preponderance of the evidence." (AR 564–67.)  As the letter describes, Ceraolo "read, and re-read" every statement, exhibit, and argument Ronzoni presented in her reconsideration application.  (Id.)  Ceraolo also "fully weighed" Muehlbauer's statement that he did not believe Ronzoni lied to him against contradictory eyewitness testimony, including from a witness who testified that Ronzoni told her that it was okay to buy plebes alcohol before the TM.  (AR 566.)  Additionally, another witness testified that, based on her own interactions with Ronzoni at the beach, there was no way Ronzoni could have been unaware of drinking at the TM.  (AR 480.)  Plaintiffs' arguments regarding the red solo cups and Ronzoni's disputed motivation for collecting cellphones do not overcome the significant evidence of their dishonesty and do not undermine the Honor Board's rational decision to find Ronzoni in violation of the Honor Code.  Ceraolo's letters provide a satisfactory explanation of that decision, which was supported by substantial evidence.

## B. **Fifth Amendment**

In addition to their APA claims, Plaintiffs claim that their hearings violated their procedural and substantive due process rights guaranteed under the Fifth Amendment.  As explained below, Plaintiff has not identified any material facts that are in dispute, and the record shows that no Fifth Amendment violations occurred here.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' constitutional due process claims.

### 1. **Procedural Due Process**

"In the context of a Merchant Marine Academy disciplinary hearing, 'due process only requires for the dismissal of a Cadet . . . that he be given a fair hearing.'" N.B., 552 F. Supp. 3d at 400 (quoting Wasson, 382 F.2d 807, 812 (2d Cir. 1967)).  For the hearing to be fair, the accused must be "apprised of the specific charges against him" and "given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence." Doolen v. Wormuth, 5 F.4th 125, 135 (2d Cir. 2021).  In the context of service academy disciplinary proceedings, Second Circuit precedent establishes that, so long as "a service academy affords the cadet a hearing, apprises the cadet of the charges, and gives the cadet an adequate opportunity to present a defense, the proceeding 'would be proper and immune from constitutional infirmity.'" Sell v. United States, No. 19-cv-3105, 2020 WL 3791847, at *7 (E.D.N.Y. July 7, 2020) (quoting Andrews v. Knowlton, 509 F.2d 898, 904–05 (2d Cir. 1975); see also Doe, 307 F. Supp. 3d at 150, 154 (concluding that limitations on the right to cross-examine witnesses do not necessarily constitute a due process violation in the context of USMMA disciplinary proceedings).

Here, Plaintiffs' procedural due process claims are unavailing, as they received notice of the charges against them and a fair hearing.  See Doolen, 5 F.4th at 13; N.B, 552 F. Supp. at 400–01.

### a.    Notice

Plaintiffs were both notified in advance of their hearings that they stood accused of violating the Honor Code's prohibition against lying.  (AR 21, 72, 279, 355).  Plaintiffs claim that "the exact nature of the charges against [them] was not clearly delineated" because it was unclear whether they were accused of lying about "merely being in the presence of alcohol; providing alcohol; or consuming alcohol on the beach."  (Pl. MSJ at 6.)  This alleged confusion is not credible.  The HB-1 forms and evidence packets make clear that Plaintiffs were accused of lying to Muehlbauer during their initial interviews, where they "denied supplying alcohol" and claimed to have "no knowledge of the Futbol Club Drinking at the beach."  (AR 1, 54–71, 247, 337–54.)  Plaintiffs were found to be guilty of lying by a unanimous vote in both rounds of hearings.  (AR 35–38, 83–87, 302–06, 373–77.)  In their verdict notes, many voting members mentioned that Plaintiffs had clearly lied about their knowledge of drinking at the beach.  (See, e.g., AR 39 ("Mitchell claims she had zero knowledge of Alcohol consumption at the beach, multiple people state she knew[.]"); AR 376 ("I do not think, due to the evidence and statements provided, that MIDN Ronzoni would have been completely unaware of alcohol, while the level of said knowledge is uncertain.").)  Plaintiffs knew that they were accused of lying regarding their awareness of drinking at the beach, as evidenced by both: (1) the record from the first hearing, reconsideration applications, and reconsideration decision; and (2) the fact that, at their second hearings, both Plaintiffs made opening statements to both Honor Boards maintaining that they had no awareness of drinking at the beach.  (See AR 25–26, 76, 283–85, 359.)  Their argument that they may also have been accused of other lies is unavailing, as even one lie violates the Honor Code.  (AR 614 ("A Midshipman will not lie, cheat, or steal.").)

### b.    *Fair Hearing*

Plaintiffs' hearings also satisfied procedural due process.  They were given many opportunities to present witness statements and other evidence in their defense.  See <u>N.B</u>, 552 F. Supp. at 400–01.  In support of their claim that the hearings were unfair, Plaintiffs mainly restate their arguments that the Academy violated its own regulations, namely Rules 4.3.3, 4.5.12, 4.5.14, and 4.6.4, during the hearings.  (See Pl. MSJ at 19–21.)  The Court rejects these arguments for the same reasons articulated in Part II.A, <u>supra</u>.  Moreover, even assuming <u>arguendo</u> that some alleged violations of these rules occurred, for many of the same reasons set out <u>supra</u>, none of these alleged violations deprived Plaintiffs of a fair hearing and rose to the level of a constitutional due process violation.

Plaintiffs' other procedural due process arguments also fail.  Plaintiffs argue that Solmos's interview notes were hearsay and that it was improper for the Honor Board to treat his notes as witness "statements." (Pl. MSJ at 3, 8–9, 12.)[8]  As an initial matter, the Honor Manual makes clear that "[t]he rules of evidence for judicial proceedings do not apply to Honor Board proceedings." (AR 631.)  Moreover, each of the witnesses signed Solmos's interview notes to verify their accuracy. (AR 54–71, 337–54; <u>see also, e.g.</u>, AR 484 (live witness testified, at Ronzoni's second hearing, that Solmos read his interview notes back to her before she signed off on them).)  Plaintiffs were notified of these witness statements in advance of their hearings and had time to solicit additional clarifying statements from them.  In fact, both Plaintiffs submitted multiple statements in their defense written by Solmos's witnesses. (<u>Compare</u> AR 9–20, 251–66 (Solmos's notes from interviews with, <u>inter alia</u>, Midshipmen Tallini, Winters, and Crooks), <u>with</u> AR 30 (Winters

---

[8] Based on a review of the administrative record, which includes transcripts from both Plaintiffs' second hearings, Plaintiffs did not object to the admission of these investigative notes at their honor hearings.  (See AR 148–218, 445–533).  They did raise this argument in their second reconsideration applications. (AR 111, 396.)  In his denial letters, Ceraolo explained that, at disciplinary hearings, "relevant evidence, including hearsay, may be considered." (AR 244, 565).

statement for Mitchell); AR 32 (Crooks statement for Mitchell); AR 288 (Crooks statement for Ronzoni); and AR 293 (Tallini statement for Ronzoni).)  Plaintiffs also cross-examined four of Solmos's six witnesses at their second hearings.  (See AR 160, 171, 182, 197, 461, 472–73, 482, 497.)  Plaintiffs complain that they had no opportunity to cross-examine two of the witnesses interviewed by Solmos: Giovanni Tallini and Derek Vanasse, who had graduated and so were not available to testify live at the second hearings.  (Pl. MSJ at 7.)  But Ronzoni did obtain and submit a written statement from Tallini, further confirming that Plaintiffs had the opportunity to solicit additional testimony from these absent witnesses.  (AR 362); see also Doe, 307 F. Supp. 3d at 155 (finding that the USMMA satisfied procedural due process despite limitations on cross-examination because the accused "was given the opportunity to undermine [the witness's] credibility in a number of different ways").

Accordingly, the Court finds that Plaintiffs have not established a procedural due process violation.

### 2.  Substantive Due Process

The doctrine of substantive due process prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  But "the scope of substantive due process is very limited."  Doe, 307 F. Supp. 3d at 156 (citing Washington v. Glucksberg, 521 U.S. 702, 720 (1997)).  To prevail, Plaintiffs must demonstrate that Defendants' conduct "was arbitrary or irrational or motivated by bad faith." Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989). Indeed, "the government action [must be] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." See Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005).

Plaintiffs come nowhere near to clearing this very high bar.  Plaintiffs claim that Acting Superintendent Ceraolo's decision to set them from the class of 2026 to the class of 2027 as a

penalty for their violation was "arbitrary and/or irrational" and "motivated by bad faith" because the penalty was "disproportionate" to their violation. (Pl. MSJ at 22).[9]  In support of this claim, they point to the fact that Superintendent Nunan imposed a more lenient penalty of honor remediation after the first honor hearing, "making it clear that Plaintiffs were penalized for exercising their right to have a second Honor Board." (Pl. MSJ at 10, 12–13, 22.)  To the contrary, the record makes clear that Nunan was the only person out of <u>eleven</u> individuals with a designated role in the penalty-setting process to recommend a penalty less than setback after either hearing. (<u>See</u> AR 40–47, 88–95, 307–14, 378–83.)  Plaintiffs observe that voting members of the Honor Board recommended more lenient penalties. (Pl. MSJ at 22 (citing AR 83–87, 373–77).)  This is true, but it is also irrelevant; voting members have no role in assigning penalties for Honor Code violations. (AR 631–33.)  Ceraolo's letters upholding his setback decision respectfully disagree with Nunan's penalty decision; explain to Plaintiffs that midshipmen who admitted to drinking were penalized differently because they were disciplined through the conduct system, rather than the honor system; and provide examples of other USMMA students who received a setback penalty for lying. (AR 245, 567.)  His reasoned decision cannot be said to "shock the contemporary conscience." <u>Pena</u>, 432 F.3d at 112.

## C. **Discovery**

Plaintiffs maintain that Defendants' motion for summary judgment should be denied because Plaintiffs are entitled to unspecified discovery.  This argument fails on multiple grounds.

First, Plaintiffs have not submitted the requisite affidavit or declaration pursuant to Federal Rule of Civil Procedure 56(d), which states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

---

[9] Plaintiffs did not plead disproportionate punishment as an APA claim, (<u>see</u> Compl.), nor do they argue that their punishment itself violated the APA in their summary judgment brief, (<u>see</u> Pl. MSJ at 15–16).

1) defer considering the motion or deny it;

2) allow time to obtain affidavits or declarations or to take discovery; or

3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Plaintiffs' failure to submit such an affidavit or declaration is, on its own, a sufficient reason to deny their requests for discovery.

Plaintiffs request discovery, but do not identify anywhere in their papers what discovery they would seek. They have thus failed to satisfy the basic requirements of the Federal Rules of Civil Procedure, which provide that a court "may" allow discovery when the nonmoving party on a motion for summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d); see also 1077 Madison St., LLC v. Daniels, 954 F.3d 460, 464 (2d Cir. 2020) (affirming a district court's refusal to allow discovery by the nonmoving party on a summary judgment motion who had "failed to file an affidavit or declaration explaining the need for additional discovery.")

Second, the arguments in Plaintiffs' briefs concerning their requested discovery also fail on other grounds. Plaintiffs do not identify what discovery they seek concerning their APA and Due Process claims or explain why any such discovery is necessary. Moreover, there is a heightened standard for obtaining discovery on APA claims—a standard that Plaintiffs clearly have not satisfied here. See Overton Park, 401 U.S. at 420.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiffs' motion for summary judgment is DENIED and Plaintiffs' motion for a preliminary injunction is DENIED AS MOOT.

**SO ORDERED.**

Dated:    January 25, 2026
          Central Islip, New York

                                    _____
                                    /s/ JMA
                                    JOAN M. AZRACK
                                    UNITED STATES DISTRICT JUDGE